## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| AMAZON.COM SERVICES LLC, | **)** | |
| | **)** | |
| | **)** | |
| *Petitioner*, | **)** | **Case No. _____** |
| | **)** | |
| v. | **)** | |
| | **)** | |
| NATIONAL LABOR RELATIONS | **)** | NLRB Case No. 29-CA-280153, 29- |
| BOARD, | **)** | CA-286577, 29-CA-287614, 29-CA- |
| | **)** | 290880, 29-CA-292392, and 29-CA- |
| | **)** | 295663 |
| *Respondent*. | **)** | |

---

## PETITION FOR REVIEW

---

Petitioner Amazon.com Services LLC ("Amazon"), petitions the Court to review and set aside the Decision and Order of the National Labor Relations Board ("Board") regarding the alleged unfair labor practices charged against Amazon in Case Nos. 29-CA-280153, 29-CA-286577, 29-CA-287614, 29-CA-290880, 29-CA-292392, and 29-CA-295663, dated November 13, 2024 (the "Order"). A copy of the Order is attached as <u>Exhibit 1</u>. The Order is a final order within the meaning of Section 10(f) of National Labor Relations Act, 29 U.S.C. § 160(f), and Amazon is a party aggrieved by the Order. The Order against Amazon is not supported by substantial evidence, and the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.

Amazon respectfully prays that this Court review and set aside the Board's Order, and that Amazon receive any further relief to which it may be entitled.

Respectfully submitted,

HUNTON ANDREWS KURTH LLP

s/ Amber M. Rogers
Amber M. Rogers
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Phone: (214) 979-3000
Fax: (214) 880-0011
arogers@huntonak.com

Elbert Lin
Kurt Larkin
Kevin Elliker
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Phone: (804) 788-8200
Fax: (804) 788-8218
elin@huntonak.com
klarkin@huntonak.com
kelliker@huntonak.com

*Counsel for Petitioner*
*Amazon.com Services LLC*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing will be served by mail and email upon the following:

Jennifer Abruzzo, General Counsel
Peter S. Ohr, Deputy General Counsel
General Counsel's Office of
    Appellate Litigation
National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C. 20570
Jennifer.abruzzo@nlrb.gov
Peter.ohr@nlrb.gov

Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570-0001
appellatecourt@nlrb.gov
courtenforcement@nlrb.gov

Seth Goldstein
Jeanne Mirer
Retu Singla
Julien Mirer & Singla, PLLC
A Working Peoples' Law Firm
1 Whitehall St., 16th floor
New York, NY 10004
sgoldstein@workingpeopleslaw.com
jmirer@workingpeopleslaw.com
rsingla@workingpeopleslaw.com

Teresa Poor
National Labor Relations Board
One Metrotech Center, 20th Floor
Suite 2000
Brooklyn, NY 11201-3948
Teresa.Poor@nlrb.gov

Seth Goldstein
Law Office of Seth Goldstein
217 Hadleigh Drive
Cherry Hill, NJ 08003
sgoldstein@workingpeopleslaw.com

and only mail upon the following:

Dana Joann Miller
23 Prospect Avenue
Staten Island, NY 10301

Connor Spence
Amazon Labor Union
67 Radford Street
Staten Island, NY 10314

s/ Amber M. Rogers
Amber M. Rogers

3

# EXHIBIT 1

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Amazon.com Services LLC** *and* **Dana Joann Miller** **and Amazon Labor Union.** Cases 29–CA–280153, 29–CA–286577, 29–CA–287614, 29–CA–290880, 29–CA–292392, and 29–CA–295663

November 13, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS KAPLAN, PROUTY, AND WILCOX

This case presents several issues arising from employer opposition to a union organizing campaign, including the important question of whether an employer violates Section 8(a)(1) of the National Labor Relations Act (the Act or NLRA) by compelling its employees, on pain of discipline or discharge, to attend a meeting during which it expresses its views concerning unionization.[1]

In April 2021,[2] a group of employees founded the Amazon Labor Union and began organizing at two of the Respondent's locations in Staten Island, New York. During the campaign, the Respondent held a series of mandatory meetings urging the employees to reject union representation. Such meetings are commonly referred to as captive-audience meetings, a term we also use here. Most of the unfair labor practices alleged in this case grow out of statements made by the Respondent's agents at those meetings. The others concern the alleged discriminatory enforcement of the Respondent's Solicitation Policy and an alleged threat to employee Dana Miller.

The judge found that the Respondent violated Section 8(a)(1) of the Act by threatening employees that it would withhold benefits during the mandatory meetings.[3] The judge also found that the Respondent violated Section 8(a)(1) by discriminatorily enforcing its solicitation policy.[4] However, applying the Board's decision in *Babcock & Wilcox Co.*, 77 NLRB 577 (1948), the judge found that requiring employees to attend the meetings or face discipline or discharge was lawful.[5]

On exception, the General Counsel argues that the Board should overturn *Babcock & Wilcox* and find that an employer violates Section 8(a)(1) by mandating employee attendance at a meeting where it expresses its views concerning unionization. As explained in greater detail below, we find that the largely unexplained holding of *Babcock & Wilcox* is not compelled by the text or the legislative history of the Act; rather, it is flawed as a matter of statutory policy. We therefore overrule *Babcock & Wilcox* and hold that an employer interferes with employees' decision whether to exercise their Section 7 rights within the meaning of Section 8(a)(1) of the Act when it compels

---

[1] On January 30, 2023, Administrative Law Judge Benjamin W. Green issued the attached decision. The General Counsel filed exceptions and a supporting brief, the Respondent filed an answering brief, and the General Counsel filed a reply brief. In addition, the Respondent filed cross-exceptions and a supporting brief, the General Counsel filed an answering brief, and the Respondent filed a reply brief.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings, and conclusions only to the extent consistent with this Decision and Order.

We have amended the judge's conclusions of law and remedy consistent with our findings herein. We shall modify the judge's recommended Order and substitute a new notice to conform to our findings and to the Board's standard remedial language.

The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

No party has excepted to the judge's dismissal of the allegation that the Respondent violated Sec. 8(a)(1) by its agent Rebecca Smith's statements during an April 10, 2022 meeting.

Member Prouty would grant the General Counsel's request for a notice-reading remedy for the reasons stated in his concurrence in *CP Anchorage Hotel 2 d/b/a Hilton Anchorage*, 371 NLRB No. 151 (2022), enfd. 98 F.4th 314 (D.C. Cir. 2024).

[2] All dates refer to 2021 unless otherwise indicated.

[3] For the reasons stated by the judge, we agree that the Respondent violated Sec. 8(a)(1) of the Act by threatening employees, through the statements of Workforce Staffing Manager Eric Warrior on March 15, 2022, and Respondent agent Katie Lev on April 18, 2022, that it would withhold improvements in wages and benefits during bargaining and/or the preelection period. The judge erroneously indicated that these meetings occurred in 2021, and we have corrected this error consistent with the record evidence.

[4] As discussed further below, we agree with the judge that the Respondent violated Sec. 8(a)(1) by discriminatorily enforcing its Solicitation Policy against Miller, but we rely on a different rationale than the judge.

[5] Applying *Tri-Cast, Inc.*, 274 NLRB 377 (1985), the judge dismissed allegations that the Respondent threatened employees with a loss of existing benefits by misrepresenting employee rights under Sec. 9(a). In *Siren Retail d/b/a Starbucks*, 373 NLRB No. 135 (2024), the Board overruled *Tri-Cast*, but it did so prospectively only. As the General Counsel conceded that the statements at issue here were lawful under *Tri-Cast*, we affirm the judge's dismissal of those allegations.

The judge also dismissed allegations that the Respondent violated Sec. 8(a)(1) by threatening Miller, promising employees improvements to the Career Choice Program, and soliciting and impliedly promising to remedy employees' grievances. For the reasons set forth below and contrary to our dissenting colleague, we reverse the judge's dismissal of the allegations regarding the threat and the solicitation of grievances. In addition, having duly considered the matter, we find it appropriate to sever and retain the allegations regarding promised improvements to the Career Choice Program for further consideration. As explained in his dissent, Member Kaplan agrees with the judge's dismissal of this complaint allegation.

employees to attend a captive-audience meeting on pain of discipline or discharge.

## I. FACTUAL BACKGROUND

The Respondent operates fulfillment and storage centers including, as relevant here, in Staten Island, New York. As noted above, in April 2021, a group of employees founded the Union and began a campaign to organize the Respondent's JFK8 fulfillment center. Thereafter, the Union also began organizing the Respondent's nearby LDJ5 storage center. The Union conducted its campaign from a tent at a bus stop across the street from the JFK8 facility. During the campaign, some employees posted messages on the Respondent's Voice of Associates, or "VOA," digital message boards.

The Respondent responded to the Union's organizing effort with its own campaign to dissuade employees from signing union-authorization cards and selecting union representation. The Respondent's campaign included a series of meetings that the Respondent stipulated it required employees to attend.[6] As discussed further below, between November 2021 and April 2022, the Respondent conducted these mandatory meetings at both the JFK8 and LDJ5 facilities.[7]

## II. DISCRIMINATORY APPLICATION OF SOLICITATION POLICY AND ALLEGED THREAT TO EMPLOYEE DANA MILLER

### FACTS

As noted above, both the Respondent's JFK8 and LDJ5 facilities have a number of VOA digital message boards. Employees can post messages for viewing by, and possible responses from, management and other employees on the boards. The Respondent's Solicitation Policy applies to electronic communication, such as the VOA boards. It prohibits, in relevant part, "soliciting for financial contributions, memberships, subscriptions, and signatures on petitions . . . ." The accompanying FAQs list as "some examples of solicitation that are prohibited, unless legally protected": "Solicitation for . . . signatures on petitions[;] Distribution of literature or materials of any kind . . . ."

On July 8, employees Dana Miller and Connor Spence delivered a petition to General Manager Felipe Santos and Senior Human Resources Manager Jenna Edwards that sought to have the company declare Juneteenth a paid holiday. Santos told them that he did not know of any company plans to do so and that he could not do anything further to help them.

On July 9, Miller posted the following message on the VOA board:

> 6/21/21: ALU [Amazon Labor Union] AA's [Amazon Associates] spoke to G.M. for holiday pay on Juneteenth. Dismissed. ALU put together a petition and is gathering signatures, over 50+ now! 7/8/21: Presented again, Felipe [Santos] confirmed that he wouldn't use any energy/effort to make positive changes for workers! So you're invited to come sign the petition for well-deserved holiday pay at the ALU [Amazon Labor Union] tent, speak up for yourself and help make history.

The Respondent's managers reacted to the post, as demonstrated by the following exchange later that day between Senior HR Manager Edwards and Assistant General Manager Marc Zachary on the Respondent's "Chime" electronic messaging platform:

> Edwards: I'm shocked Stephanie is suggesting to remove a VOA comment but I'm aligned 100%
>
> Zachary: Yea awesome
>
> Edwards: It is not asking any type of question and instead antagonizing and trying to rally a group of people. We should not stand for that
>
> Zachary—agreed, it's definitely not appropriate for VOA and probably violates the solicitation policy[.]

Three days later, on July 12, a human resources representative pulled Miller from her position and told her to report to a meeting with Human Resources Business Partner Mike Tanelli in GM Santos' office. According to the

---

[6]  The Respondent's stipulation was solely for the purposes of this case.

[7]  On October 25, the Union filed a petition to represent a unit of the Respondent's employees at the JFK8 facility. The Union later withdrew that petition and filed another on December 22. On February 4, 2022, the Union filed a petition to represent a unit of the Respondent's employees at the LDJ5 facility. The Union ultimately won the election at JFK8 and lost the election at LDJ5.

Amazon filed objections to the election at JFK8. See Case 29–RC–288020. The Regional Director overruled those objections, and the Union was certified as employees' representative on January 11, 2023. On August 29, 2024, the Board denied Amazon's Request for Review and its Motion to Reopen the Record. See *Amazon.com Services LLC*, 373 NLRB No. 93 (2024). No objections have been filed regarding the LDJ5 election.

Amazon has in the meantime refused to bargain with the Union at JFK8, and a test-of-certification case involving that facility is pending before the Board. See Case 29–CA–310869. On September 5, 2024, Amazon filed a complaint for declaratory and injunctive relief with the United States District Court for the Western District of Texas raising constitutional challenges related to the pending test-of-certification case. On September 30, 2024, in an unpublished order, the United States Court of Appeals for the Fifth Circuit granted Amazon's motion for an administrative stay of the test-of-certification case. See *Amazon.com Services LLC v. NLRB*, No. 24-50761 (5th Cir. Sept. 30, 2024). The test-of-certification case currently is stayed pursuant to the Fifth Circuit's order.

recording of the meeting made by Miller, the ensuing exchange occurred:

> Tanelli: Just on one of the comments made on the VOA board regarding the ALU and . . . going to the tent to sign up for holiday pay, things like that . . . . So Amazon solicitation policy clearly is defined that you can have every right to do that on nonworking time, in break areas. The VOA board is actually not a mechanism you can use that on.
>
> Miller: But why not?
>
> Tanelli: That's a mechanism for you to talk directly to management, right? . . . Anything related, like, to the ALU, and the tent, things like that like for going and signing up, unfortunately, that's something that we cannot have on the board . . . . It's against the policy, but . . . you're not in trouble or anything like that, right? I just did want to follow up with you, let you know that the comment will be removed.

Miller said she would repost her message, whereupon Tanelli responded:

> Tanelli: Okay, well, I'm telling you now, like, this is not a conversation for you to be reprimanded. Right? This is [for] me to educate you on the solicitation policy. You cannot put that on the board, unfortunately. And there will be additional followup if a comment like that goes back up again.

Miller reposted the message later that day, but it was taken down. She tried again at the end of her shift but was denied access to the system. By the next morning, she had regained access and posted her message again, but it was again taken down. Miller was never disciplined for any of her postings.

As Edwards' Chime post suggests, the Respondent has never removed any posts other than Miller's Juneteenth post from the VOA board. Miller testified that during the campaign she saw "hundreds of" vote yes and vote no posts on the VOA board and that none of them were taken down. In response to a General Counsel subpoena, the

Respondent turned over a list of all VOA postings between May 1 and July 15, which totaled 388. During this period, Miller posted 35 times, and none of the posts were removed other than the ones seeking signatures on the Juneteenth petition. There is no evidence that any other employee had attempted to use the VOA board to solicit signatures. However, there was a posting in March 2022 telling employees that there were "VOTE NO" t-shirts available in the break room and inviting them to come by and get one. The Respondent did not remove this post despite the Respondent's Solicitation Policy prohibiting "[d]istribution of . . . materials of any kind."[8]

## ANALYSIS

### A. Discriminatory Enforcement of Solicitation Policy

The judge found that the Respondent discriminatorily enforced its Solicitation Policy in removing Miller's post and thereby violated Section 8(a)(1). The judge found that because the Respondent "prohibit[ed] posts regarding the signing of documents at the Union tent . . . while allowing solicitations of a similar character to remain," the Respondent discriminatorily enforced its policy along Section 7 lines under *Register Guard*, 351 NLRB 1110, 1118 (2007), enfd. in relevant part and remanded sub nom. *Guard Publishing v. NLRB*, 571 F.3d 53 (D.C. Cir. 2009).

The Respondent excepts to the judge's finding that it discriminatorily enforced its Solicitation Policy. The Respondent's chief argument on exception rests on the fact that it allowed voluminous numbers of posts that constituted union or other Section 7 activity: prounion and antiunion posts, posts about safety conditions, even other posts arguing that Juneteenth should be made a paid holiday. Our dissenting colleague advances a similar argument.

We adopt the judge's finding of a violation for the reasons that follow. Under existing Board law, as reflected in *Register Guard*, 351 NLRB at 1118, to be unlawful, discrimination must be "along Section 7 lines." That is, unlawful discrimination within the meaning of Section 8(a)(1) consists of "disparate treatment of activities or communications of a similar character because of their union or other Section 7-protected status." Id.[9] It is well

---

[8] Miller testified that she had also seen a post in March 2022 advertising Union pins, buttons, lanyards and shirts available for pickup at the Union tent. However, there is no documentary evidence regarding such a posting.

[9] Although the judge quoted the correct legal standard under *Register Guard,* supra, he misstated the test when applying it. He found a violation because "the context could reasonably cause an employee to believe that the Respondent was discriminatorily enforcing its solicitation policy[.]" In finding a violation, we do not rely on this aspect of the judge's decision.

The General Counsel requests that we overrule *Register Guard*'s discrimination standard in this case. Having found that the Respondent's removal of Miller's posting is unlawful even under *Register Guard*, we decline to revisit that standard at this time. However, we would be willing to reconsider it in a future appropriate case.

We also decline the General Counsel's request to overrule *AT&T Mobility, LLC,* 370 NLRB No. 121 (2021), at this time. Under *AT&T Mobility,* the remedy for unlawfully applying a facially neutral rule to restrict Sec. 7 activity is an order to cease and desist. Chairman McFerran dissented in *AT&T Mobility* and adheres to the views stated there. She nevertheless applies it for institutional reasons for the purpose of

established that discrimination on the basis of the Section 7-protected content of a speaker's message is not a legally permissible ground of action. See, e.g., *Gallup American Coal Co.*, 32 NLRB 823, 829 & fn. 4 (1941) (employer violated Section 8(a)(1) through its "interference" with Section 7 activity by its "singling out of only the union signs" painted on boulders on its premises "for obliteration" while "the other signs thereon were permitted to remain"), enfd. 131 F.2d 665 (10th Cir. 1942).

Here, contrary to our dissenting colleague, we find that the Respondent's singling out of Miller's Juneteenth post for removal while permitting the "VOTE NO" post constitutes such impermissible discrimination under its Solicitation Policy. See *Communications Workers v. NLRB*, 6 F.4th 15, 23 (D.C. Cir. 2021) (finding discriminatory enforcement where respondent "singled out [employee's] email for condemnation because of its union-related content"). The Respondent took down Miller's post inviting employees to come to the Union tent to sign the Union's petition to make Juneteenth a paid holiday while leaving up a post that invited employees to come to the breakroom to get a VOTE NO t-shirt, although both actions clearly violated the policy. This is discrimination along Section 7 lines in its most obvious form. See *Register Guard*, 351 NLRB at 1118. By only invoking the Solicitation Policy to restrict prounion conduct while allowing the antiunion conduct to remain, the Respondent treated the posts in a disparate manner based on the content of the posts. Such disparate treatment of Miller's post based on its protected message encouraging her coworkers to join together to urge the Respondent to make Juneteenth a paid holiday "interfere[d] with" Section 7 rights. Id. at 1123.[10]

As it argues on exception, the Respondent did indeed allow Section 7-related posts that did not fall within the ambit of its Solicitation Policy to stay up: the pro- and antiunion posts, the safety-related post, and the other Juneteenth posts that it references. But as to Section 7-related posts that fell within the scope of the policy, one was permitted (the post about the distribution of VOTE NO t-shirts) while another was not (the post endeavoring to get other employees to combine their efforts with those of 50 of their coworkers by signing a petition in support of a paid holiday).[11] Here, the Respondent impermissibly took it upon itself to pick and choose which Section 7 activity it would permit and which it would not.

Therefore, we affirm the judge's finding that the Respondent violated Section 8(a)(1) by selectively and disparately enforcing its Solicitation Policy.

### B.  Threat to Miller

The judge found that HR Business Partner Tanelli's statement that "there will be additional followup if a comment like that goes up again" was not an unlawful threat. He noted that Tanelli had specifically told Miller that she was not in trouble and that the purpose of the meeting was to educate her about the Solicitation Policy. As to the "additional followup" if she reposted the message, the judge reasoned that "'additional followup' does not necessarily imply anything more than another educational meeting." He then noted that Tanelli's statement did not dissuade Miller from reposting her message and that she was not disciplined for doing so and stated that the lack of disciplinary followup "tend[s] to confirm that there had been no threat of discipline in the first place." Therefore, he declined to find a threat and dismissed the allegation.

On exception, the General Counsel argues that the judge failed to consider that Tanelli's statement "was made in the context of the Respondent's aggressive anti-union response" to the campaign, and that Tanelli engaged in another 8(a)(1) violation during this meeting—i.e., the disparate enforcement of the Respondent's Solicitation Policy in removing Miller's post. She also relies on the Board's subsequent decision in *Lush Cosmetics, LLC*, 372 NLRB No. 54 (2023), where the Board found an unlawful

---

[10] The dissent makes much of the fact that the solicitation policy affirmatively assured employees that they had a right to solicit during nonworking time. We do not find that argument relevant as this case concerns discriminatory enforcement rather than the facial validity of the rule.

[11] The dissent's and the Respondent's arguments regarding the Respondent's tolerance of the "VOTE NO" t-shirt post are grounded on assertions that the post was not of a "similar character" to Miller's post because it did not seek signatures on a petition. However, "Distribution of literature or materials of any kind" was clearly defined in the FAQs to the Solicitation Policy as an example of activity that was prohibited under the policy. Thus, issues of solicitation versus distribution are a distinction without a difference here. Indeed, the Respondent and the dissent would draw such fine distinctions here between protected actions so

as to make it difficult for such actions to ever be found to be "of a similar character," and hence essentially impossible to find discrimination. We do not construe the Act or the *Register Guard* standard so narrowly, recognizing that employees must be given breathing room to fully exercise their Sec. 7 rights.

In addition, the Respondent and the dissent assert that even if the "VOTE NO" t-shirt post *was* of a similar character, it was an "isolated instance of digression" from its Solicitation Policy, relying on *Wal-Mart Stores*, 350 NLRB 879, 881 (2007). We disagree. In *Wal-Mart*, the Board discounted a single incident that occurred 7 years prior to its decision. By contrast, here, the Respondent permitted the "VOTE NO" posting mere months after it removed Miller's posting regarding the Juneteenth petition. Further, when Miller attempted to repost her message, the Respondent repeatedly removed it. And as noted above, there is testimonial evidence that the Respondent also permitted a posting regarding buttons and lanyards that was contrary to the plain terms of its Solicitation Policy. Therefore, we reject the Respondent's and the dissent's argument regarding an "isolated instance of digression."

---

determining the remedy in this case. Members Prouty and Wilcox did not participate in *AT&T Mobility* and express no view as to whether it was correctly decided. They apply it here as extant Board precedent for institutional reasons.

threat on facts similar to those presented here and rejected many of the factors relied upon by the judge. We find merit in the General Counsel's arguments, and we reverse the judge and find that Tanelli made an unlawful threat to Miller.

Whether a statement alleged to violate Section 8(a)(1) is unlawful turns on whether, under the totality of the circumstances, it has a reasonable tendency to coerce employees in the exercise of their Section 7 rights. Id., slip op. at 3; see also, e.g., *KSM Industries,* 336 NLRB 133, 133 (2001) (citing cases). The employer's motive is immaterial.

Contrary to the dissent, we find that Tanelli's message about "additional followup" would have reasonably been understood by Miller to mean that further postings about the employees' terms and conditions of employment would result in discipline or other future reprisals. The judge concluded, and the dissent agrees, that "'additional follow up' does not necessarily imply anything further than another educational meeting." However, that implicit standard is contrary to established law, which, as explained, requires only that a statement have a reasonable tendency to coerce, not that a coercive interpretation of the statement is the only possible reasonable interpretation. Here, Miller had directly been told that her Juneteenth petition posting violated the company's Solicitation Policy. Thus, she could easily have understood the reference to "additional followup" as meaning future discipline and not merely further, superfluous "education."

Additionally, the employees here, including Miller herself, had posted a great number of prior messages criticizing the Respondent's employment policies and arguing for unionization in the previous weeks and months, and not one post had ever been removed. Thus, the removal of Miller's post was a highly unusual action, as Edwards' Chime message indicated, and a reasonable employee certainly could have perceived it as signaling a change in the Respondent's willingness to tolerate such posts. To be called in and told that her post would be removed and that there would be "additional follow up" if she posted her message again would have a reasonable tendency to make an employee in her place fearful of future discipline.

Finally, as we noted above, the Board's decision in *Lush Cosmetics*, supra, which issued 3 weeks after the judge's decision, rejected much of the reasoning used by the judge here, and strongly supports finding a violation.[12] First, in *Lush,* the Board discounted the fact that the employee was told that they were not being disciplined. *Lush,* supra, slip op. at 3. Second, citing well-established precedent, the Board explained that whether or not the employee changed their behavior in response to the statement is not dispositive, nor is the employee's subjective interpretation of the statement. Id. Third, the absence of later discipline was deemed irrelevant by the Board. In short, and contrary to our dissenting colleague's contention, *Lush* contradicts numerous bases of the judge's rationale for finding Tanelli's statement to be lawful.

For all these reasons, we find that the judge erred in analyzing Tanelli's statement that "there will be additional follow up if a comment like that goes up again." We therefore reverse his dismissal of the allegation, and find that the Respondent, through Tanelli, unlawfully threatened Dana Miller in violation of Section 8(a)(1).

## III. SOLICITATION OF AND IMPLIED PROMISE TO REMEDY GRIEVANCES

### FACTS

On November 10, Respondent agent Michael Williams held a mandatory meeting with about 50 employees at JFK8. In this meeting, Williams talked at length about the Respondent's "open door" policy and how much the Respondent valued the "direct relationship" it had with its employees. He told them that "we rely on your feedback . . . to improve the workplace," and that "[w]e can't make improvements if we don't know what you're thinking, if we don't know your concerns."

Williams also urged the employees to take their concerns further up the chain of command if they were not getting a satisfactory resolution of their problem, stating as follows:

> Your conduct in posting unsubstantiated allegations . . . is not acceptable . . . In the future, we ask you to refrain from making unsubstantiated allegations . . . on the [company intranet site]. *If you elect to continue such inappropriate conduct, the Company may consider your actions to amount to misconduct.*

Id., slip op. at 2 (emphasis added). The employee posted two subsequent messages critical of the company. He was not disciplined for any of his posts. The *Lush* Board rejected the respondent's contention that its message "was merely of a coaching nature," and found an unlawful threat. Id., slip op. at 2–3.

---

[12] The facts of *Lush* are as follows. In *Lush,* an employee posted a message about the employer's wage policies on a company intranet site similar to the VOA board. The message, citing the company's touting of its support for an organization that defended immigrants' rights, stated that: "Y'all should find a[n] org that supports Canadian immigrants that work in warehouses . . . . Before you stand on your soap box, pay your workers a livable wage. STARTING with your immigrant workers in your own company." Id., slip op. at 1. The employer deemed the message a violation of its "zero-tolerance [policy] for defamatory and/or personal attacks," and an HR representative sent the employee a letter stating that he had implied without support that the respondent was mistreating its manufacturing employees, and continuing:

That Open door policy we talk about all the time. It gives you direct access not just to your [Area Manager], but also to your [District Manager], right? Even if you have an issue and someone in HR is not resolving your issue, don't settle for that. Take it to the next level. Go see a [Vice President]. If that VP is not resolving your issue, go see the [Human Resources Manager], and so on and so forth.

Later in the presentation, Williams said:

[I]f you put something on the VOA board because your [Area Manager] or your [Operations Manager] has not responded, before you put it up there, the first thing I would do is say, "Hey, I need to see the [General Manager] or I need to see Senior [Operations] . . . . Yeah, you can put it on the VOA board, but some people don't like using the VOA board . . . . So escalate. That's the truth. Escalate. There's nothing wrong with that. You have a voice, we want you to use that voice.

At a November 11 meeting, Respondent agent Mike Rebell, like Williams, urged employees to take their complaints and concerns up the chain of command:

[I]f you are going to your [Area Manager] or maybe on the floor HR, if they are not able to answer your questions and get it resolved, escalate that up, go to the next level. Maybe it's the [Operations] Manager, maybe it's an HR Manager. But currently you have that direct working relationship all the way up to the GM and honestly even above and outside of the building if you choose to do that.

        . . . .

[I]f you feel that you are not getting the response that you want or feel that you deserve, you can also escalate that if you are not getting that response you can go request a meeting with . . . depending on what it is, . . . maybe it's . . . the safety manager . . . [or] maybe it's requesting a meeting with the AGM, Assistant General Manager or maybe an [Operations] Manager. But if you are not getting that response you want currently you have that direct working relationship . . . all the way to the [General Manager], get the answer, continue to escalate that so you can get the answer.

At the same meeting, Respondent agent Ron Edison mentioned employees' ability to take their concerns to

Operations Managers and "up from there" if employees felt there was a barrier with their direct process manager but

emphasized "that should be your direct line of contact, is directly with your direct process path manager." He focused primarily on various existing means of management-employee communication such as "Connections," "Gemba walks," "birthday roundtables," and the VOA board, and he urged employees to use these mechanisms for "working directly together" with management.[13]

The judge found that none of the statements at issue contained an unlawful solicitation of grievances. He found Williams did not actually solicit employee grievances at the meeting and therefore was not in a position to offer any specific solutions. Rather, he found, Williams merely urged employees to direct their complaints to management at various levels pursuant to an open-door policy and in forums that were already available. His assessment of Rebell and Edison's presentations, which he considered together, was similar. Specifically, he found that their presentations largely explained existing forums for employees to express and resolve complaints and that they did not solicit particular grievances or offer to resolve them.

On exception, the General Counsel points to Williams' statements that the Respondent could not make improvements if it did not know what employees are thinking and that it is the managers' job to listen to employee concerns and improve working conditions as evidence that the Respondent solicited grievances and impliedly promised to remedy them. She also disputes the judge's reasoning that Williams, Rebell, and Edison were merely urging employees to direct their complaints to management in forums that were already available, arguing that employees were being sent a message that "the grievances they raised now were going to be remedied, and if they were not immediately remedied by raising them with their direct supervisors or on the VOA board, then they would be remedied if the employees escalated them to higher management, all in order to discourage employees from joining the Union." Unlike our dissenting colleague, we agree with the General Counsel that, contrary to the judge's finding, the Respondent unlawfully solicited and impliedly promised to remedy employee grievances.

### ANALYSIS

The principles regarding solicitation of grievances are well established. The solicitation of grievances during an

---

[13] Connections is a program that greets employees when they log into their computer. It asks them a few brief workplace questions, and employees may raise concerns in response to these questions. Gemba walks involve managers walking the floor of the facility and asking employees what they like and do not like about the company. Birthday roundtables are monthly meetings held for employees whose birthdays fall within the month. At the meetings, employees can talk with and raise concerns with the general manager or assistant general manager of the facility.

organizing campaign, if accompanied by a promise, express or implied, to remedy those grievances, violates Section 8(a)(1). *Mek Arden, LLC d/b/a Arden Post Acute Rehab*, 365 NLRB 1065, 1066 (2017) (citing *Maple Grove Health Care Center*, 330 NLRB 775, 775 (2000), enfd. 755 Fed.Appx. 12 (D.C. Cir. 2018)). It is the promise to remedy the grievance rather than the solicitation that constitutes the violation. Id. However, solicitation of grievances in the midst of a union campaign creates a rebuttable presumption of an implied promise to remedy the grievances. Id. The employer may rebut this presumption by, for instance, establishing that it had a past practice of soliciting grievances "in a like manner" prior to the campaign, or by clearly establishing that the statements at issue were not promises. Id. (citing *Mandalay Bay Resort & Casino*, 355 NLRB 529, 529 (2010)).

Here, we reverse the judge and find a violation.[14] Williams did indeed solicit grievances when he stated: "We can't make improvements if we don't know what you're thinking, if we don't know your concerns." Plainly, there is no way to interpret this other than Williams asking employees to express their grievances—or stated another way, their "concerns"—to management. That statement, in itself, gives rise to an inference that the Respondent was promising to remedy those grievances. See *Arden Post Acute Rehab*, 365 NLRB at 1066 (citing *Maple Grove Health Care Center*, 330 NLRB at 775) (solicitation in a preelection setting creates rebuttable presumption of promise to remedy). In a similar vein, Williams told the employees, "You have a voice, we want you to use that voice." Moreover, Williams' language went further, strongly suggesting that the Respondent intended to make "improvements" based on employees' concerns.

And there was much more. The employees were told over and over to seek out managers with their concerns. Williams stated: "[I]f you have an issue and someone in HR is not resolving your issue, . . . go see a vice president. If that VP is not resolving your issue, go see the [HR Manager], and so on and so forth." And Rebell stated: "If you feel that you are not getting the response that you want or feel that you deserve, . . . you can go request a meeting with . . . the safety manager [or] maybe it's requesting a meeting with the AGM, Assistant General manager or maybe an [Operations] Manager." The Respondent made numerous such solicitations of grievances, again giving rise to a presumption of an implied promise to remedy

them. See *Arden Post Acute Rehab*, supra at 1066; *Maple Grove Health Care*, supra at 775.

The basis for presuming an implied promise to remedy is clear here. Williams told the employees that if the manager they talked to "is not resolving your issue, don't settle for that. Take it to the next level." Similarly, Rebell told them that "if you are going to your [Area Manager] or maybe on the floor HR, if they are not able to . . . get it resolved, escalate that, go to the next level . . . [take it] all the way up to the GM and honestly, even above and outside of the building if you choose to do that." The message was clear: by taking their complaints or requests – that is, their "grievances"—from one person to another, up the managerial chain ("escalate . . . . escalate"), they will get the resolution they are seeking.

The Respondent argues that "[a]ny inference that the mere solicitation of grievances creates an implied promise to remedy those grievances evaporates when an employer has a practice of soliciting grievances in place prior to an organizational campaign." It is not unlawful, it argues, for an employer with a past practice of soliciting employee grievances to continue such a policy during an organizing campaign, nor is it unlawful to encourage employees to use preexisting avenues to voice their concerns, provide suggestions, or solicit grievances. Our dissenting colleague likewise argues that an employer can "tout its existing Open Door policy *as part of its campaign*." (emphasis in original). In applying these principles, the Respondent and the dissent largely echo the judge. The essence of their argument is that the pertinent presentations simply reminded employees of preexisting avenues for raising their concerns, including its open-door policy and "encouraging direct manager communication."

We reject the Respondent's argument that any practice of soliciting grievances in place prior to a union campaign is sufficient to rebut the inference of an implied promise to remedy grievances. The Board has held that an employer cannot rely on its past practice if it "'significantly alters its past manner and methods of solicitation during the union campaign.'" *Mandalay Bay Resort & Casino*, 355 NLRB at 530 (quoting *House of Raeford Farms*, 308 NLRB 568, 569 (1992), enfd. mem. 7 F.3d 223 (4th Cir. 1993), cert. denied 511 U.S. 1030 (1994)).[15]

Here, there was no past practice of large meetings held by unknown agents of the Respondent telling employees that "[w]e can't make improvements if we don't know . . . your concerns," going on at length about the "open door

---

[14] In finding a violation, we rely on the remarks of Williams and Rebell. We find it unnecessary to pass on the remarks of Edison, as any finding of a violation would be cumulative and would not affect the remedy.

[15] In addition, the Board has relied upon employer references to unionization efforts during grievance solicitation meetings, which were present here, to show a deviation from a past practice of grievance solicitation. *Manor Care Health Services—Easton*, 356 NLRB 202, 221 (2010).

policy," and urging employees to ratchet things up until they (implicitly) got what they wanted. The fact that the Respondent referenced existing management-employee communication methods such as "Connections," "Gemba walks," "birthday roundtables," and the VOA board in the course of these comments signifies little. Contrary to its contention that it was simply following past practice by encouraging employees to use preexisting procedures, the Respondent was emphatically urging employees to scale the entire chain of command as they saw fit[16] until they got what they wanted. This is not soliciting grievances "in a like manner" as prior to the campaign.[17] Nor did the Respondent "clearly establish[]" that the statements in dispute were not promises. *Arden Post Acute Rehab*, 365 NLRB at 1066 (citing *Mandalay Bay*, 355 NLRB at 529).

Finally, in arguing that the Respondent's communications at the November meetings were protected by Section 8(c), our dissenting colleague views the Open Door policy in a vacuum. But our task in examining an allegation of unlawful solicitation of grievances is not to look solely at the policy, but instead to consider the overall context, including the coercive manner in which it was presented to employees. Here, as explained, the Respondent's remarks at the November meetings conveyed a sea change in its approach. Employees were now repeatedly urged to "escalate" their concerns as high in the chain of command as they needed to go to get the result they desired. Thus, the Respondent's remarks were not in fact consistent with its past practice.[18]

As the Respondent failed to demonstrate that its solicitation of grievances was in accord with its past practice or to establish that its statements were not promises, it failed to rebut the presumption arising from its solicitation of grievances in the midst of the union campaign. See *Arden Post Acute Rehab*, 365 NLRB at 1066; *Maple Grove Health Care Center*, 330 NLRB at 775. Accordingly, we reverse the judge and find that the Respondent violated

Section 8(a)(1) by soliciting and impliedly promising to remedy grievances.

IV. CAPTIVE-AUDIENCE MEETINGS

In *Babcock & Wilcox Co.,* 77 NLRB 577 (1948), the Board held, without explanation, that the "language" and "legislative history" of Section 8(c) of the Act preclude the Board from holding that an employer violates Section 8(a)(1) when it requires employees to attend a captive-audience meeting. The Respondent stipulated that the employees here were required to attend many captive-audience meetings, during which the Respondent's agents made statements opposing union representation generally and the Union specifically. At one point in the campaign, the Respondent held meetings at its JFK8 facility every 45 minutes from 9 a.m. to p.m. and 7 p.m. to 4 a.m. 6 days a week. Managers personally notified employees that they were scheduled to attend, escorted them to the meetings, and scanned their ID badges to digitally record attendance. Pursuant to *Babcock & Wilcox*, the judge dismissed the General Counsel's allegations that these meetings were unlawful. The General Counsel argues that we should overrule *Babcock & Wilcox* and hold that captive-audience meetings and other similar mandatory employer-employee encounters violate Section 8(a)(1). The Respondent disagrees, contending that such meetings do not violate Section 8(a)(1) and are affirmatively protected under free speech principles, including those embodied in Section 8(c).

Consistent with "the authority to develop and apply fundamental national labor policy" that Congress has conferred upon us, *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 500 (1978), and informed by our "[c]umulative experience" doing so, *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266 (1975) (quotations omitted), as well as a careful examination of the language and legislative history of Section 8(c), we have decided to overrule *Babcock & Wilcox*. For the reasons explained below, we conclude that captive-audience meetings violate Section 8(a)(1) because

---

[16] Indeed, Williams seemed to encourage employees to skip the VOA Board, instead calling on them to "escalate," including by requesting a meeting with the Assistant General Manager or the Operations Manager, while Rebell encouraged employees to go "all the way up to the General Manager and . . . even above and outside the building if you choose to do that."

[17] Building on the fact that employees "had the ability" to communicate with senior management under the Open Door policy, the dissent attempts to make the case that the November meetings marked no change from the Respondent's past practice regarding employee communication with higher-ups. That is distinctly not the case; there is a huge difference between telling employees that it is permissible for them to reach out to senior management and urging them over and over to escalate their concerns until they got what they wanted.

[18] There is also no merit to the dissent's contention that the combined effect of our decision here and in *Siren Retail d/b/a Starbucks*, 373

NLRB No. 135 (2024), will effectively silence employers' expression of their views on open-door policies in contravention of Sec. 8(c) and the First Amendment. In *Siren Retail*, we held that an employer violates Sec. 8(a)(1) by stating "that it will end its existing open-door policy if employees organize" because such a statement constitutes a threat of the loss of a benefit. Id., slip op. at 12 fn. 23. Here, contrary to our dissenting colleague's contention, we do not "find that it is also unlawful for employers to remind employees of long-standing open-door policies." Rather, as explained, we find that this Respondent violated Sec. 8(a)(1) because it went well beyond merely "reminding" employees of its existing policy—it repeatedly encouraged employees to escalate their concerns until they received the resolution they wanted—which constitutes an unlawful solicitation of grievances. Thus, our decision today does not require employers "to sit silently on the sidelines."

they have a reasonable tendency to interfere with and co-erce employees in the exercise of their Section 7 right to freely decide whether or not to unionize, including the right to decide whether, when, and how they will listen to and consider their employer's views concerning that choice. Section 8(c) permits an employer to hold and ex-press its views on unionization to employees, but only if no "threat of reprisal or force or promise of benefit" is made. Thus, Section 8(c) does not license employers to *compel* employees, on pain of discipline or discharge, to attend meetings where they are forced to listen to the em-ployer's views, for such compulsion amounts to a "threat of reprisal" and is "without the protection of the First Amendment." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).

Below, we first describe the legal background of the captive-audience meeting issue. We then provide the Board's first comprehensive analysis of that issue. That analysis leads to two conclusions. The first is that captive-audience meetings interfere with and coerce employees in the exercise of their Section 7 rights, in violation of Sec-tion 8(a)(1). The second is that free-speech principles, in-cluding those embodied in Section 8(c) and the First Amendment, do not insulate employers from liability for such violations. We do not, however, broadly prohibit employers from holding workplace meetings with their employees to express their lawful views on unionization in a noncoercive manner. Thus, we specify straightfor-ward steps that employers may take to avoid violating Sec-tion 8(a)(1) when they wish to hold such a meeting, in-cluding by informing employees, in advance, of the sub-ject matter and the voluntary nature of the meeting.[19]

## A. Background

In the years immediately following the 1935 enactment of the Act, the Board took the position that it required em-ployers to maintain strict neutrality concerning unioniza-tion. See, e.g., *Nebel Knitting Co.*, 6 NLRB 284, 293–294 (1938), enfd. 103 F.2d 594 (4th Cir. 1939); *Virginia Ferry Corp.*, 8 NLRB 730, 736 (1938), enfd. 101 F.2d 103 (4th Cir. 1939). However, within a few years, the Supreme Court clarified that employers and unions are free to ex-press their views on unionization, while also making clear that they may not interfere with, restrain, or coerce em-ployees in the course of expressing those views.

In *NLRB v. Virginia Electric & Power Co.*, 314 U.S. 469 (1941), the Court reviewed a Board decision finding unfair labor practices based in part on the employer's speeches and written materials presented to employees. Id. at 476–477. In light of the employer's First

Amendment challenge, the Court remanded the case for the Board to explain whether its findings were based on the substance of the employer's statements alone or rather on the employer's entire course of conduct. Id. at 477–480. The Court distinguished between the expression of views, which was permitted, and coercive conduct "evi-denced in part by speech," which was not permitted, ob-serving:

> Neither the Act nor the Board's order here enjoins the employer from expressing its view on labor policies or problems, nor is a penalty imposed upon it because of any utterances which it has made. The sanctions of the Act are imposed not in punishment of the employer but for the protection of the employees. The employer in this case is as free now as ever to take any side it may choose on this controversial issue. But certainly con-duct, though evidenced in part by speech, may amount in connection with other circumstances to coercion within the meaning of the Act. If the total activities of an employer restrain or coerce [its] employees in their free choice, then those employees are entitled to the pro-tection of the Act. And in determining whether a course of conduct amounts to restraint or coercion, pressure ex-erted vocally by the employer may no more be disre-garded than pressure exerted in other ways.

Id. at 477; see also *NLRB v. American Tube Bending Co.*, 134 F.2d 993, 994–995 (2d Cir. 1943) (applying *Virginia Electric & Power* and holding that the substance of an employer's let-ter and speech to employees "that a union would be against the employees' interests as well as the employer's" was not unlawful).

A few years later, in *Thomas v. Collins*, 323 U.S. 516 (1945), the Supreme Court held that the application of a Texas statute that required union organizers to register with the state and to obtain an "organizer's card" before soliciting union members violated the First Amendment. Under the Texas statute, a union organizer who had failed to register was enjoined from soliciting members and then was held in criminal contempt after he addressed a meet-ing of employees in connection with an upcoming union representation election. Id. at 520–524. The Court ob-served that the Act protects "workers' right to organize freely for collective bargaining" and further observed that included within this broader right is the "right fully and freely to discuss and be informed" concerning their organ-izational choice. Id. at 533–534. The Court also noted the distinction between protected "persuasion" and prohibited "coercion," observing:

---

[19] We decline at this time the General Counsel's request that we ad-dress circumstances other than those presented in this case (mandatory

meetings with assembled employees), such as unscheduled one-on-one encounters between an agent of the employer and an employee.

[D]ecision here has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. *National Labor Relations Board v. Virginia Electric Power Co.*, 314 U.S. 469 [(1941)]. Decisions of other courts have done likewise. When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. Cf. *National Labor Relations Board v. Virginia Electric & Power Co.*, supra. But short of that limit the employer's freedom cannot be impaired. The Constitution protects no less the employees' converse right.

Id. at 537–538 (footnotes omitted).

With this guidance from the Supreme Court in mind, in *Clark Bros. Co.*, 70 NLRB 802 (1946), the Board considered the legality under the Act of an employer's antiunion campaign speeches "made on the [employer's] premises during working hours." Id. at 804. The Board first held that making such a speech on work premises during working hours was unlawfully coercive because the employer "paid its employees for listening" and had "exclusive access to [them] in a matter relating to their organizational activities." Id. But the Board also separately held that "the conduct of the respondent in compelling its employees to listen to a speech on self-organization . . . independently constitutes interference, restraint, and coercion within the meaning of the Act." Id. As to this second holding, the Board reasoned that the Act guarantees employees the right to freely receive aid, advice, and information from others concerning their organizational rights and that that "freedom is meaningless . . . unless the employees are also free to determine whether or not to receive such aid, advice, and information." Id. at 805. The Board concluded that the employer's use of "its superior economic power"—its mandate that the employees attend a meeting where it would express its antiunion views—thus "independently violated Section 8(1) of the Act." Id. In response to the dissent of Member Reilly—who took the view, "as a matter of policy as well as established judicial precedent," that the employer had not committed a violation, id. at 813—the Board noted that the case involved "coercive acts," and "not mere expressions of opinions," such that its decision was consistent with the Supreme Court's guidance. Id. at 806.[20]

The Second Circuit enforced the Board's order. *NLRB v. Clark Bros. Co.*, 163 F.2d 373 (2d Cir. 1947). The court reasoned that the particular facts of the case did "not call for laying down so broad a rule" as the Board had, but it noted that an employer should only be able to hold a captive-audience meeting "provided a similar opportunity to address [employees] were accorded representatives of the union." Id. at 376. Given that the employer had not provided such an equivalent opportunity, and had mounted an aggressive antiunion campaign that culminated in the captive-audience meeting soon before voting in a representation election was to begin, the court concluded that "the Board was justified in finding that the respondent's conduct was coercive and an interference with the employees' right to self-organization[.]" Id.

In 1947, Congress passed the Labor Management Relations Act, commonly referred to as the Taft-Hartley Act. It amended the National Labor Relations Act in many respects, including by making explicit that Section 7—which guarantees employees the right to self-organize, form, join, or assist unions, bargain collectively, and engage in other concerted activities—also protects employees' "right to refrain from any or all of such activities." As Senator Taft explained, this right to refrain "was always implicit" in the Act. 93 Cong. Rec. 7001 (June 12, 1947), reprinted in 2 NLRB, Legislative History of the Labor Management Relations Act, 1947 (hereinafter "2 LMRA Hist.") at 1623; see also *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 67 (2008) (explaining that the Taft-Hartley Act "emphasized" the right to refrain). In all other respects, Section 7 and Section 8(a)(1) of the Act remained unchanged. See H.R. Rep. No. 80-510 (hereinafter "Conference Report"), at 38-40 (1947), reprinted in 1 NLRB, Legislative History of the Labor Management Relations Act, 1947 (hereinafter "1 LMRA Hist.") at 542-544. Thus, the amendments did not narrow statutory protections for employees in any way.

With relatively little debate, Congress also included, among the Taft-Hartley Act's provisions, Section 8(c), which equally "protects speech by both unions and employers." *Brown*, 554 U.S. at 67. Section 8(c) provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c). This provision largely codifies the Supreme Court's decisions in *Virginia Electric & Power* and *Thomas*, as, in the Court's words, it "implements the First Amendment." *Gissel*, 395 U.S. at 617. As repeatedly reflected in the Taft-Hartley Act's legislative history and

---

[20] Member Reilly later served as a senior staff member of the Senate Committee that considered the Taft-Hartley Amendments and was one of two authors of the Senate Committee report accompanying that

legislation. See Gerard D. Reilly, *The Legislative History of the Taft-Hartley Act*, 29 GEO. WASH. L. REV. 285 (1960).

subsequently confirmed by the Supreme Court, Section 8(c) also "prevent[s] the Board from attributing antiunion motive to an employer on the basis of [its] past statements"—as relevant, for instance, to an allegation of an employer's unlawful retaliation against employees in violation of Section 8(a)(3) of the Act. *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 62 fn. 5 (1966) (citing Conference Report at 45, reprinted in 1 LMRA Hist. at 549); see also, e.g., H.R. Rep. No. 80-245 (hereinafter "House Report"), at 33 (1947), reprinted in 1 LMRA Hist. at 324; 93 Cong. Rec. 7002 (June 12, 1947) (statement of Senator Taft), reprinted in 2 LMRA Hist. at 1624. Senator Taft explained that, consistent with the text of Section 8(c), "the privilege of this subsection is limited to expression of 'views, arguments, or opinion,'" such that "[i]t has no application to statements which are acts in themselves or contain directions or instructions." 93 Cong. Rec. 7002 (June 12, 1947), reprinted in 2 LMRA Hist. at 1624.

The legislative history of the Taft-Hartley Act reflects little consideration of the issue of captive-audience meetings. Such meetings are not mentioned, for instance, in the House Report or the Conference Report. However, the report of the Senate Committee on Labor and Public Welfare characterized the Board's first holding in *Clark Bros.*—that, independent of the mandatory nature of the meeting, it is an unfair labor practice for an employer to make a speech concerning unionization "in the plant on working time"—as "too restrictive" and therefore recommended overruling that holding. S. Rep. No. 80-105 (hereinafter "Senate Report"), at 23–24 (1947), reprinted in 1 LMRA Hist. at 429–430. The Senate Report's single reference to *Clark Bros.* is the only one in the Taft-Hartley Act's voluminous legislative history.

In 1948, in *Babcock & Wilcox*, the Board again considered the scenario in which an employer had "compel[led] its employees" to attend a meeting during which it expressed its antiunion views. 77 NLRB at 578. Overruling *Clark Bros.* in its entirety, the Board found that the captive-audience meeting was not unlawful on the ground that "the language of Section 8(c) of the amended Act, and its legislative history, make it clear that the doctrine of the *Clark Bros.* case no longer exists as a basis for finding unfair labor practices in circumstances such as this record discloses." Id. The Board offered no further analysis beyond this statement. Rather, it treated the meaning of Section 8(c) as self-evident. It did not explain how the language of Section 8(c) or its legislative history permits employers not only to express their views on unionization, but also to compel employees, on pain of discipline or discharge, to attend meetings where those views are expressed.

Three years later, in *Bonwit Teller, Inc.*, 96 NLRB 608 (1951), the Board found that an employer violated Section 8(a)(1) and committed objectionable conduct sufficient to set aside an election when it held a captive-audience meeting but failed to grant the union's request to hold an equivalent meeting on the employer's premises under similar conditions. Id. at 611. The Board found that the employer's conduct—actively campaigning against the union, including by holding a captive-audience meeting while rejecting the union's request for its own captive-audience meeting—constituted discriminatory enforcement of a no-solicitation rule. Id. at 611–612. The Board further found that "an even more fundamental consideration" for deeming the employer's conduct unlawful was that "the right of employees, guaranteed by Section 7 of the Act, freely to select or reject representation by a labor organization necessarily encompasses the right to hear both sides of the story under circumstances which reasonably approximate equality." Id. at 612. Accordingly, in the Board's view, "an employer who chooses to use [its] premises to assemble [its] employees and speak against a union may not deny that union's reasonable request for the same opportunity to present its case, where the circumstances are such that only by granting such request will the employees have a reasonable opportunity to hear both sides." Id. The Board rejected the dissent's view that its findings were barred by Section 8(c), as it noted that an employer is "free to exercise fully its right of free speech" as protected by that provision. Id. at 615. The Second Circuit affirmed the Board's order in relevant part, on the ground that the employer had discriminatorily applied its no-solicitation rule. *Bonwit Teller, Inc. v. NLRB*, 197 F.2d 640, 645–646 (2d Cir. 1952).

Just 2 years later, the Board again changed the applicable legal framework in a pair of cases issued the same day, *Livingston Shirt Corp.*, 107 NLRB 400 (1953), and *Peerless Plywood Co.*, 107 NLRB 427 (1953). In *Livingston Shirt*, the Board overruled *Bonwit Teller*, concluding that an employer did not commit an unfair labor practice when, after holding its own captive-audience meetings, it barred the union seeking to represent its employees from holding similar meetings on its premises. 107 NLRB at 404-409. The Board reasoned that Section 8(c)'s protection of free speech does not have "real meaning" if it "gives rise to an obligation on the part of the employer to accord an equal opportunity for the union to reply" to an employer's captive-audience meeting with an equivalent meeting of its own. Id. at 405–406. The *Livingston Shirt* Board admitted, however, that in the companion case, *Peerless Plywood*, it was "deviating from the strict logic" of its decision. Id. at 408. In *Peerless Plywood*, the Board concluded, in the context of a representation case in which the

Board assesses allegations of objectionable campaign conduct, that "employers and unions alike will be prohibited from making election speeches on company time to massed assemblies of employees within 24 hours before the scheduled time for conducting an election." 107 NLRB at 429. The Board reasoned that "the combined circumstances of (1) the use of company time for preelection speeches and (2) the delivery of such speeches on the eve of the election tend to destroy freedom of choice and establish an atmosphere in which a free election cannot be held." Id. at 429–430.

In the years since, the Board has permitted employers to strictly control employees during captive-audience meetings conducted more than 24 hours in advance of an election. To be sure, in some cases, the Board has found that an employer violated the Act when it imposed discipline on employees who made statements or asked questions during a captive-audience meeting.[21] More recently, however, the Board has found that while an employer cannot discharge an employee for making statements or asking questions at a captive-audience meeting, it may still lawfully take other disciplinary measures short of discharge to "refus[e] to allow others to express their opposing, pro-union viewpoints during the meeting." *Electrolux Home Products*, 368 NLRB No. 34, slip op. at 4 & fns. 13–14 (2019); see also *Eagle-Picher Industries*, 331 NLRB 169, 169 (2000). The Board has also found that employers can effectively preempt employee statements or questions by excluding certain employees—like known union supporters—from meetings that are mandatory for other employees.[22]

### B. Analysis

Congress conferred on the Board "the authority to develop and apply fundamental national labor policy," *Beth Israel Hospital*, 437 U.S. at 500, including the authority to change its view on issues presented under the Act. See *J. Weingarten, Inc.*, 420 U.S. at 265–266; see also *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786–787 (1990).[23] Today we do what the *Babcock & Wilcox* Board

failed to do in 1948: carefully examine the issues presented by captive-audience meetings and provide a reasoned explanation for a change in the Board's view. We explain both how such meetings infringe on employees' freedom to exercise their rights under Section 7 of the Act and why, contrary to *Babcock & Wilcox*, Section 8(c) does not insulate employers from unfair labor practice liability in this context. While the Board's approach to captive-audience meetings has been fixed for decades, it has never been fully or persuasively explained. Captive-audience meetings are now a common feature of campaigns.[24] Given the importance of the issue, we believe a reexamination is long overdue. That reexamination leads us to overrule *Babcock & Wilcox* and its progeny, for the reasons that follow.

Under the legal status quo, an employer can compel employees, under the threat of discipline or discharge, to attend meetings where they are required to listen to the employer's views on whether they should unionize or not. As just noted, employers frequently opt to do so. An employer can hold these meetings repeatedly, for whatever length of time it wants, and whenever it wants, with the sole exception, pursuant to *Peerless Plywood*, that it cannot do so within 24 hours of a representation election. An employer can observe employees at these meetings, seeing, among other things, with whom they associate and how they react to what they hear. An employer can silence, or even banish, employees who would express their own views or even just ask questions. It should be clear, then, that a captive-audience meeting is an extraordinary exercise and demonstration of employer power over employees in a context where the Act envisions that employees will be free from such domination. We thus prohibit captive-audience meetings.

Neither Section 8(c) nor the First Amendment precludes the Board from finding captive-audience meetings unlawful. The plain meaning of Section 8(c)'s statutory text is that employers and unions may *noncoercively* express their views concerning unionization and that the substance

---

[21] See, e.g., *F.W. Woolworth Co.*, 251 NLRB 1111, 1111, 1113–1115 (1980), enfd. 655 F.2d 151 (8th Cir. 1981); *Howell Metal Co.*, 243 NLRB 1136, 1137 (1979); *J.P. Stevens & Co.*, 219 NLRB 850, 850 (1975), enfd. 547 F.2d 792 (4th Cir. 1976); *Prescott Industrial Products Co.*, 205 NLRB 51, 51–52 (1973), enf. denied in relevant part 500 F.2d 6 (8th Cir. 1974).

[22] See, e.g., *Mueller Brass Co.*, 220 NLRB 1127, 1127, 1138–1139 (1975), enf. denied on other grounds 544 F.2d 815 (5th Cir. 1977); *Spartus Corp.*, 195 NLRB 134, 134, 141 (1972), enfd. on other grounds 471 F.2d 299 (5th Cir. 1973); *Luxuray of New York*, 185 NLRB 100, 100 & fn. 1 (1970), enfd. in part on other grounds 447 F.2d 112 (2d Cir. 1971).

[23] The Supreme Court has made clear that administrative agencies may change their legal rules consistent with the Administrative Procedure Act, so long as they as they provide a reasoned explanation for doing so. See *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–222

(2016); see also *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–516 (2009); *National Cable & Telecommunications Assn. v. Brand X Internet Services*, 545 U.S. 967, 981–982 (2005).

[24] One study of about 1,000 Board-supervised representation elections showed that 89 percent of employers held captive-audience meetings, and over half of employers held more than five captive-audience meetings in the runup to an election. See Kate Bronfenbrenner, *No Holds Barred: The Intensification of Employer Opposition to Organizing*, Economic Policy Institute Briefing Paper #235 at 10 Tbl. 3 (2009), available at https://www.epi.org/publication/bp235/. The facts of this case similarly illustrate how frequently employers may hold captive-audience meetings during representation campaigns. As mentioned above, at one point in the campaign, the Respondent was holding meetings at its JFK8 facility every 45 minutes, 6 days a week.

of those views cannot be held against them. That unambiguous text does not suggest that, in addition to protecting their speech, Section 8(c) also permits employers to *compel* employees to listen to their speech. Such permission would be out of keeping with the First Amendment, which protects the right to free expression but does not grant the right to a captive audience nor authorize employer coercion in the labor relations setting. The Taft-Hartley Act's legislative history confirms as much. It makes clear, as the Supreme Court has explained, that the purpose of Section 8(c) is to permit employers and unions to noncoercively express their views on unionization and to prohibit those views from being used against them as evidence of an unlawful motive for other challenged actions. The single congressional report that briefly addresses the Board's decision in *Clark Bros.* references only one of the holdings there—that employers may not hold meetings to express their views during "working time"—and not the decision's independent condemnation of the practice of *compelling* employees to attend those meetings. In any case, that report's origins caution against relying on it to support a broad reading of Section 8(c).

### 1. Section 8(a)(1)

Section 7 of the Act provides, in most relevant part, that employees "shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities." 29 U.S.C. § 157. Section 8(a)(1) enforces Section 7 by making it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]." Id. §

158(a)(1). "The broad purpose of [Section] 8(a)(1) is to establish 'the right of employees to organize for mutual aid without employer interference.'" *Exchange Parts*, 375 U.S. at 409 (quoting *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945)). Accordingly, "[t]he basic test for an 8(a)(1) violation . . . is whether—regardless of intent—the employer engaged in conduct that reasonably tends to interfere with the free exercise of employee rights under the Act." *MEI-GSR Holdings, LLC d/b/a Grand Sierra Resort & Casino/HG Staffing, LLC*, 365 NLRB 751, 752 (2017).[25]

The Board's traditional interpretation of the statutory phrase "interfere with" is consistent with its ordinary meaning. See, e.g., *Standard-Coosa-Thatcher Co.*, 85 NLRB 1358, 1360 (1949) ("Inherent in the very nature of the rights protected by Section 7 is the concomitant right of privacy in their enjoyment—'full freedom' from employer intermeddling, intrusion, or even knowledge."). Accordingly, with judicial approval, the Board has long and consistently found that employers violate Section 8(a)(1) when they intrude on the privacy and autonomy of employees by, for instance, surveilling, interrogating, or polling them with regard to their exercise of Section 7 rights.[26] These protections for employees' privacy and autonomy are necessary to make Section 7 rights meaningful, given the power that employers have over employees in the workplace—power that the Act and the Supreme Court explicitly recognize.[27]

Captive-audience meetings intrude on this protected sphere of employee privacy and autonomy and reasonably tend to interfere with employees' exercise of Section 7 rights in at least three distinct ways. First, captive-audience meetings impinge on an employee's "Section 7 right to choose, free from any employer coercion, the degree to

---

[25] See also *American Freightways Co.*, 124 NLRB 146, 147 (1959) ("It is well settled that the test of interference, restraint, and coercion under Section 8(a)(1) of the Act does not turn on the employer's motive or on whether the coercion succeeded or failed. The test is whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act.").

[26] See, e.g., *McCullough Environmental Services*, 306 NLRB 345, 345, 347–348 (1992) (interrogation and impression of surveillance), enfd. in relevant part 5 F.3d 923 (5th Cir. 1993); *Beretta U.S.A. Corp.*, 298 NLRB 232, 232 (1990) (impression of surveillance), enfd. mem. 943 F.2d 49 (4th Cir. 1991); *Belcher Towing Co.*, 265 NLRB 1258, 1258, 1266–1267 (1982) (surveillance), enfd. in relevant part 726 F.2d 705 (11th Cir. 1984) (per curiam); *Price's Pic-Pac Supermarkets, Inc.*, 256 NLRB 742, 742, 745–748 (1981) (interrogation, impression of surveillance, and polling), enfd. 707 F.2d 236 (6th Cir. 1983); *Presbyterian/St. Luke's Medical Center*, 258 NLRB 93, 93, 102 (1981) (interrogation), enfd. 723 F.2d 1468 (10th Cir. 1983); *Rich's Precision Foundry, Inc.*, 250 NLRB 1317, 1317, 1319 (1980) (interrogation and impression of surveillance), enfd. 667 F.2d 613 (7th Cir. 1981); *Interntherm, Inc.*, 235 NLRB 693, 693–694 (1978) (interrogation and surveillance), enfd. in relevant part 596 F.2d 267 (8th Cir. 1979); *P.S.C. Resources, Inc.*, 231

NLRB 233, 233, 236 (1977) (interrogation), enfd. 576 F.2d 380 (1st Cir. 1978); *Head Ski Division, AMF, Inc.*, 222 NLRB 161, 161, 171 (1976) (interrogation and polling), enfd. sub nom. in relevant part *Midwest Regional Joint Bd., Amalgamated Clothing Workers of America, AFL–CIO v. NLRB*, 564 F.2d 434 (D.C. Cir. 1977); *Historic Smithville Inn*, 169 NLRB 78, 78–84 (1968) (interrogation, surveillance, and polling), enfd. 414 F.2d 1358 (3d Cir. 1969); *Miller Redwood Co.*, 164 NLRB 389, 389 (1967) (interrogation and impression of surveillance), enfd. 407 F.2d 1366 (9th Cir. 1969); *Cold Spring Granite Co.*, 101 NLRB 786, 786–787 (1952) (interrogation and surveillance), enfd. 208 F.2d 163 (8th Cir. 1953).

[27] See 29 U.S.C. § 151 (describing the "inequality of bargaining power between employees . . . and employers"); *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 240 (1978) (describing employees as persons "over whom the employer, by virtue of the employment relationship, may exercise intense leverage"); *Gissel*, 395 U.S. at 617 (describing "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear").

which [they] will participate in the debate concerning representation,"[28] which is an aspect of the employee's more fundamental right to be let alone with respect to the exercise of rights under the Act. Second, captive-audience meetings can readily serve as a mechanism for employers to observe and surveil employees as they address the exercise of employees' Section 7 rights. Finally, because the employer has compelled employees to attend captive-audience meetings on pain of discipline or discharge, the employer's message in the meeting urging rejection of or support for the union is reasonably likely to take on a similarly coercive character. Just as employees may reasonably conclude that they have no real choice but to attend the meeting, so may employees reasonably conclude that, in fact, they do not have free choice concerning union representation. The employer's ability to require attendance at the meeting demonstrates the employer's economic power over the employees and reasonably tends to inhibit them from acting freely.

To begin, when employers compel employees to attend captive-audience meetings under threat of discipline or discharge, they force them to participate, at least as listeners, in the debate concerning union representation. The power to compel attendance at captive-audience meetings is not an incident of Section 8(c)'s protection of employers' speech. Instead, exercising the power to compel attendance is quintessentially conduct by which employers "interfere with" employees' exercise of their own Section 7 rights. To be sure, an employer generally has the prerogative to dictate the work tasks and activities that fill its employees' working time, see, e.g., *Peyton Packing Co.*, 49 NLRB 828, 843 (1943) ("Working time is for work."), enfd. 142 F.2d 1009 (5th Cir. 1944), but when an employer compels its employees to attend a captive-audience meeting, it is not exercising that prerogative. Rather, it is meddling in the decision-making sphere that, under the Act, belongs exclusively to employees: namely, whether, when, and how employees choose to exercise their Section 7 rights or to refrain from doing so. It is well established that an employer may not "condition[] an employee's continued employment on the employee's abandonment of [their] Section 7 rights." *Intercon I (Zercom)*, 333 NLRB 223, 223 fn. 4 (2001). To hold otherwise would be to eviscerate the rights granted by the Act. Compelling employees to attend a captive-audience meeting effectively conditions their employment on the abandonment of their Section 7 rights.

As the Supreme Court has explained, Section 7 guarantees "workers' right to organize freely for collective bargaining," and that right "comprehends whatever may be appropriate and lawful to accomplish and maintain their organization," including the "right fully and freely to discuss and be informed concerning this choice." *Thomas*, 323 U.S. at 533–534. A captive-audience meeting overrides employees' right to *freely* be informed about unionization—or not. In the context of a political election, being compelled to attend a party's campaign meeting would rightly be denounced as antithetical to voters' freedom of choice. The same should be true in the context of union representation elections, not least because, as the Supreme Court has recognized, employees are vulnerable in a way that typical independent voters are not, given employees' economic dependence on the employer. See, e.g., *Gissel*, 395 U.S. at 617–618.

The compelled participation that the Act specifically protects against is also irreconcilable with American law's more general focus on protecting the "unwilling listener's interest in avoiding unwanted communication," despite the communicators' wish to express their views. *Hill v. Colorado*, 530 U.S. 703, 716–717 (2000) (upholding state law preventing protesters from approaching entrants to health clinic). That interest "is an aspect of the broader 'right to be let alone'" that Justice Brandeis characterized as "'the most comprehensive of rights and the right most valued by civilized men.'" Id. at 717 (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)). Thus, while the "right to persuade" is an essential right "protected by the First Amendment, as well as by federal statutes," id. at 717–718 (internal citation omitted), like the Act's Section 8(c), it remains the case that "'no one has a right to press even 'good' ideas on an unwilling recipient,'" id. at 718 (quoting *Rowan v. U.S. Post Office Dept.*, 397 U.S. 728, 738 (1970)). Accordingly, where "'the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure,'" the need to protect such unwilling listeners is at its zenith. Id. (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975); *Lehman v. Shaker Heights*, 418 U.S. 298 (1974)). By contrast, when a person is not captive—like the pedestrian who can readily walk away or the television viewer who can easily change the channel—"the burden

[28] *Allegheny Ludlum Corp.*, 333 NLRB 734, 741 (2001) (addressing employer's antiunion campaign video), enfd. 301 F.3d 167 (3d Cir. 2002); accord *First American Enterprises d/b/a Heritage Lakeside*, 369 NLRB No. 54, slip op. at 4–5 (2020) (addressing employer's request that an employee encourage another employee to vote against union representation); *Smithfield Packing Co.*, 344 NLRB 1, 3–5 (2004) (addressing employer handing employee a "Vote No" stamp to mark employer's product), enfd. sub nom. *United Food & Commercial Workers Local 204 v. NLRB*, 447 F.3d 821 (D.C. Cir. 2006); *Dawson Construction Co.*, 320 NLRB 116, 117 (1995) (addressing employer ordering employee to hold "reserve gate" sign indicating employer's view concerning jobsite picket of another employer).

normally falls upon the [person] to 'avoid further bombardment.'" *Erznoznik*, 422 U.S. at 210–211 (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)). In light of Section 7's guarantees, employees in the workplace have a legitimate interest in avoiding unwanted communication concerning the exercise of their Section 7 rights. Captive-audience meetings are particularly powerful tools to force a message onto unwilling listeners. Employees summoned by their employer to such meetings cannot simply walk away to avoid hearing views that they would rather not hear, unless they are prepared to lose their jobs or suffer other discipline. Under the Act and the First Amendment, employers undoubtedly have the right to persuade, but that right must accommodate employees' right to be left alone in the sphere protected by the Act, just as in other settings the right of a speaker does not override the right of an unwilling listener. Employers may express their views on unionization, but they may not compel employees to listen to them.

Captive-audience meetings intrude on employees' private sphere surrounding Section 7 rights in a second way by enabling employers to observe and monitor employees in a series of employer-structured events.[29] To begin, employees directed to attend a captive-audience meeting must choose whether or not to comply with the employer's order. This puts employees to the sort of employer-compelled "observable choice" concerning union support that the Board has prohibited in a variety of settings.[30] Next, captive-audience meetings let employers observe the behavior of employees in an employer-controlled setting that will reasonably tend to reveal their sentiments concerning unionization. Obviously, employees who speak out in opposition to the employer's views—perhaps because they feel pressure to do so[31]—will be noticed by the employer, as will employees who ask questions. In turn, employees who speak might well fear that they have exposed themselves to reprisal because they have frustrated the employer's expression of its own views, to which employees have been compelled to listen. But even employees who do not speak are subject to observation at the meeting—a meeting they must attend. An employer might monitor where employees sit (for instance, whether someone sits and talks with known union supporters or opponents) and other nonverbal behaviors (like raised eyebrows, rolled eyes, or darting glances) in response to the employer's statements. In sum, captive-audience meetings subject employees to the employer's scrutiny, as employees surely understand. Such scrutiny tends to interfere with the exercise of Section 7 rights.[32]

Finally, the Supreme Court's recognition in *Gissel*, 395 U.S. at 617, that a realistic appraisal of an employer's communications about unionization must account for "the economic dependence of the employees on their employers" and "the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear" applies with particular force to statements made during a captive-audience meeting. The directive to attend the meeting, on pain of discipline or discharge, necessarily drives home to employees that the employer controls their participation in the election campaign by means of its economic power over them. The captive-audience context, in turn, clearly communicates to employees that they lack the genuine freedom to choose whether, when, and how to participate in the choice concerning union representation, just as they lacked the freedom to choose whether to attend the meeting. This context, then, implicates the Supreme Court's distinction between free speech and coercive speech in the labor context. As the Court has observed, an employer's expression of views is not protected when to "persuasion other things are added which bring about coercion, or give it that character." *Thomas*,

---

[29] For an example of such observation and monitoring, see *Sysco Grand Rapids, LLC*, 367 NLRB No. 111, slip op. at 14 (2019) (employer "convened mandatory small group meetings every week or every other week" and "[e]mployees' reactions at these meetings"—including "employee demeanor and reactions to supervisors' statements"—"were recorded in a Company database"), enfd. in part mem. 825 Fed.Appx. 348 (6th Cir. 2020).

[30] See, e.g., *Allegheny Ludlum*, 333 NLRB at 740 (employers' request that employees participate in antiunion campaign videotape); *Smithfield Packing*, 344 NLRB at 3–4 (employee handed "Vote No" stamp to mark employer's product); *Dawson Construction*, 320 NLRB at 117 (employee ordered by employer to hold "reserve gate" sign indicating employer's view concerning jobsite picket of another employer); *Scientific Atlanta, Inc.*, 278 NLRB 467, 467 (1986) (employer required employees to disseminate antiunion literature).

[31] As already observed, a captive-audience meeting effectively forces employees to participate in the debate over unionization, under terms dictated by the employer. The pressures created by a captive-audience meeting are not hard to grasp.

First, the employer's expression of views might be provocative, even deliberately so, to supporters of the union, and so they may reactively speak out. The desire to speak may be especially strong because employees have no comparable power to summon their coworkers to a meeting, at work or otherwise. Thus, the occasion created by an employer's captive-audience meeting might be viewed by union supporters as a rare opportunity to rebut the employer's views in the workplace. Meanwhile, a supporter's silence might be seen by coworkers as reflecting a lack of courage or conviction, creating pressure on supporters to speak out. In these respects, it is the employer's decision to compel attendance at the meeting that tends to interfere with employees' ability to choose when, how, and to what degree to exercise their Sec. 7 rights.

[32] As noted, the Board's decisions have long prohibited employers from surveilling employees or giving employees the impression that they are under surveillance, because this intrusive practice inhibits employees from freely exercising their Sec. 7 rights.

323 U.S. at 537. Compelling employees to listen to the employer's views adds coercion to persuasion.[33]

For each of these reasons, captive-audience meetings violate Section 8(a)(1) of the Act. They impermissibly demonstrate to employees that their employer's power over them in the workplace extends to the denial of the exercise of the rights guaranteed by Section 7.

### 2. Free-speech principles

A careful examination of Section 8(c) of the Act—which the *Babcock & Wilcox* Board failed to do—demonstrates that it does not immunize employers who conduct captive-audience meetings. The Supreme Court has repeatedly held that "people are entitled to rely on the law as written," such that "when the meaning of the statute's terms is plain," the analysis "is at an end." *Bostock v. Clayton County*, 590 U.S. 644, 673–674 (2020).[34] Below, we first explain that the analysis here appropriately starts and ends with the text of Section 8(c). Its plain meaning is that employers may noncoercively express their views on unionization, but they may not coerce employees to listen to them. We then explain that even if Section 8(c)'s legislative history is consulted, it confirms that Section 8(c) was not intended to shield employers from liability under Section 8(a)(1) for compelling attendance at a captive-audience meeting. Instead, it was intended to prevent the Board from using the content of an employer's lawful expression of its views as evidence of an unlawful motive in connection with an unfair labor practice, like unlawful retaliation under Section 8(a)(3) that, unlike unlawful interference under Section 8(a)(1), requires proof of motive. Last, we explain that, like Section 8(c), the First Amendment does not shield employers from liability under Section 8(a)(1) for compelling attendance at a captive-audience meeting. As the Supreme Court has explained, "[a]ny assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting," and, "[t]hus, an employer's rights cannot outweigh the equal rights of the employees to associate freely." *Gissel*, 395 U.S. at 617. Prohibiting

captive-audience meetings ensures the proper balance by not interfering with employers' right to express their views on unionization, while protecting employees' right to decide, for themselves, whether, when, and how to engage with those views.

### a. Section 8(c)'s text

Section 8(c), as noted, provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c). Section 8(c)'s unambiguous meaning is that employers may noncoercively *express* their views on unionization, but they may not *compel* employees to listen to them. On its face, Section 8(c) does not address captive-audience meetings. That fact is telling. When an employer compels its employees to attend a meeting, it is not "expressing" or "disseminating" any "views, argument, or opinion" in the "ordinary, contemporary, common meaning" of those words. *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (internal quotation marks omitted).[35] As the Supreme Court's cases in the free speech context illustrate, expressing or disseminating a view is distinct from compelling someone to listen to it. Prohibiting compulsion does not impermissibly interfere with expression or dissemination. Had Congress intended not only to protect employers' freedom to express their views, but also to immunize them from unfair labor practice liability for compelling employees to listen to their views, it surely would have said so specifically.

An employer's act of compelling employees to attend a captive-audience meeting is thus not Section 8(c)-protected expressive speech. This distinction between coercive conduct prohibited by Section 8(a)(1) and speech protected by Section 8(c) has been explicitly or implicitly drawn by the Board in analogous contexts, with judicial

---

[33] In this regard, the subjective reactions of employees to being compelled to attend a captive-audience meeting are irrelevant under the established standard, which considers only whether the challenged conduct reasonably tends to interfere with, restrain, or coerce employees in the exercise of their Sec. 7 rights. See, e.g., *American Freightways Co.*, 124 NLRB at 147.

[34] See also, e.g., *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) ("[W]hen [a] statute's language is plain," the statute "is to [be] enforce[d] . . . according to its terms."); *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (same); *Dodd v. United States*, 545 U.S. 353, 359 (2005) (same); *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (same).

[35] The ordinary meaning of the words used in Sec. 8(c) supports our understanding of what that section protects and what it does not. A

"view" is a "[m]ode of looking at anything; esp., manner of regarding any subject of thought; conception; opinion; judgment; as, to state one's *views* of a debated policy." *View*, Webster's New International Dictionary 2842 (2d ed. 1934). An "argument" is "[a] reason or reasons offered in proof, to induce belief, convince the mind, or persuade to action; reasoning expressed in words; as, an *argument about, concerning*, or *regarding* a proposition, *for* or *in favor of* it, or *against* it." *Argument*, Webster's New International Dictionary 147 (2d ed. 1934). An "opinion" is "[t]hat which is opined; belief stronger than impression, less strong than positive knowledge; settled judgment in regard to any point; a notion or conviction founded on probable evidence; a belief; a view; a judgment; as, based only on *opinion*; imprisoned for one's *opinions*." *Opinion*, Webster's New International Dictionary 1708 (2d ed. 1934).

approval.[36] In *Allegheny Ludlum*, for instance, the employer, as part of its antiunion campaign, prepared a video "as to why employees should vote against representation." 333 NLRB at 735. Under Section 8(c), the Board observed, "employers have the right to present noncoercively their position regarding a union organizing campaign, including through the use of antiunion campaign videotapes[.]" Id. at 738. But the employer crossed the line when it coerced employees, including by individually soliciting them, to appear in the video. Id. at 740–743. This was a straightforward manifestation of the Supreme Court's rule that "[a]ny assessment of the precise scope of employer expression . . . must be made in the context of its labor relations setting," such that "an employer's rights cannot outweigh the equal rights of the employees to associate freely[.]" *Gissel*, 395 U.S. at 617. Accordingly, the Third Circuit, in affirming the Board's decision, found that it "reasonably balance[d] the rights created under sections 8(a)(1) and 8(c)." *Allegheny Ludlum*, 301 F.3d at 179. We strike that same balance in prohibiting captive-audience meetings.

Finding a violation of Section 8(a)(1) based on compelling employees to attend a captive-audience meeting does not require the Board to rely on the employer's expression of views, argument, or opinion as "evidence of" the unfair labor practice.[37] That prohibition, as the Supreme Court has explained, is intended "to prevent the Board from attributing antiunion motive to an employer based on [its] past statements." *Linn*, 383 U.S. at 62 fn. 5 (citing Conference Report at 45, reprinted in 1 LMRA Hist. at 549). Such a motive is required to prove only certain violations, like an employer's retaliation, in violation of Section 8(a)(3), for an employee's exercise of Section 7 rights. The test for interference and coercion under Section 8(a)(1), by contrast, "does not turn on the employer's motive." *American Freightways*, 124 NLRB at 147. Accordingly, in cases such as *Allegheny Ludlum*, the violation of Section 8(a)(1) was based not on the employer's expression of views—whether in a video, literature, or paraphernalia—but rather on its pressuring and coercing

employees to participate in or accept the expression. In the captive-audience context, similarly, the Section 8(a)(1) violation turns not on the substance of the employer's views, but rather on the employer's use of compulsion: the threat, whether explicit or implicit, that employees will suffer discipline, discharge, or some other adverse consequence if they fail to attend the meeting. Employers retain full freedom to express their views on unionization to employees in the workplace, provided that they do not compel employees to listen to them.

Moreover, for the reasons articulated above, an employer's message in a captive-audience meeting cannot meet the explicit requirement of Section 8(c) that, to be protected, an employer's views must "contain[] no threat of reprisal." As explained, by compelling employees to attend a captive-audience meeting and communicating its own message there, the employer creates a reasonable tendency that economically dependent employees will feel inhibited from exercising free choice as to whether, when, and how to participate in the decision concerning union representation. This tendency is eliminated if the employer expresses its views to employees who voluntarily choose to attend such a meeting, because such a meeting does not carry the threat of discipline or discharge for not attending.

*b. Section 8(c)'s legislative history*

Because the language of Section 8(c) is unambiguous, as we have shown, there is no need to consider its legislative history. See *Bostock*, 590 U.S. at 673–674. But even if we were to consider the legislative history, as a whole it confirms that Section 8(c) was *not* intended to shield employers from liability under Section 8(a)(1) for compelling attendance at a captive-audience meeting. Rather, Section 8(c) was intended to prevent the Board from using the content of an employer's lawful expression of views as evidence of an unlawful motive in connection with an unfair labor practice that, unlike unlawful interference under Section 8(a)(1), requires proof of motive. The sole piece of legislative history that even mentions *Clark Bros.*

---

[36] See, e.g., *Allegheny Ludlum Corp.*, 333 NLRB at 739–745 (holding that soliciting individual employees to appear in employer's campaign videos was unlawfully coercive conduct); *Reno Hilton*, 319 NLRB 1154, 1156 (1995) (holding that requiring employees to wear employer's campaign T-shirts was unlawfully coercive conduct); *Fieldcrest Cannon, Inc.*, 318 NLRB 470, 470, 496 (1995) (same), enfd. in relevant part 97 F.3d 65 (4th Cir. 1996); *House of Raeford Farms, Inc.*, 308 NLRB 568, 570 (1992) (holding that requiring employees to refrain from displaying prounion apparel and sign a list to receive employer's campaign T-shirts was unlawfully coercive conduct), enfd. 7 F.3d 223, 1993 WL 362053, at *4 (4th Cir. 1993) (mem.); *Scientific Atlanta, Inc.*, 278 NLRB at 467 (holding that requiring employees to disseminate employer's campaign literature was unlawfully coercive conduct); *Kurz-Kasch, Inc.*, 239 NLRB 1044, 1044 (1978) (holding that requesting that employees wear

employer's campaign buttons was unlawfully coercive conduct); *Florida Steel Corp.*, 224 NLRB 587, 587–589, 594 (1976) (holding that compelling employees to pose for employer's campaign photographs was unlawfully coercive conduct), enfd. mem. 552 F.2d 368 (5th Cir. 1977); *The Paymaster Corp.* 162 NLRB 123, 133–134 (1966) (holding that requiring employee to read antiunion notice aloud at meeting with other employees was unlawfully coercive conduct).

[37] Cf. *IBEW, Local 501 v. NLRB*, 341 U.S 694, 704–705 (1951) (rejecting argument that Sec. 8(c) and First Amendment prevented Board from finding violation of Sec. 8(b)(4)(A) based on peaceful picketing that induced or encouraged unlawful secondary boycott, and observing that the "general terms of [Sec.] 8(c) appropriately give way to the specific provisions of [Sec.] 8(b)(4)").

suggests only an intent to overrule that case in part unrelated to the issue of compelling attendance at captive-audience meetings.

The Conference Report, which "next to the statute itself [] is the most persuasive evidence of congressional intent," *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981), does not mention captive-audience meetings. Instead, it describes what Section 8(c) *was* designed to address: "The practice which the Board has had in the past of using speeches and publications of employers concerning labor organizations and collective-bargaining agreements as evidence, no matter how irrelevant or immaterial, that some later act of the employer had an illegal purpose gave rise to the necessity for this change in the law." Conference Report at 45, reprinted in 1 LMRA Hist. at 549. In other words, Section 8(c) was intended to prevent the Board from ascribing an antiunion motive to an employer in connection with an alleged unfair labor practice that requires proof of motive—such as a retaliatory discharge of employees for union activities, in violation of Section 8(a)(3)—based on the substance of the employer's earlier lawful statement of opposition to unionization. The Supreme Court has thus observed that the "congressional intent" was "to prevent the Board from attributing antiunion motive to an employer on the basis of [its] past statements." *Linn*, 383 U.S. at 62 fn. 5 (citing Conference Report at 45, reprinted in 1 LMRA Hist. at 549).

Moreover, the Conference Report makes clear that Section 8(c) was principally derived from the free speech provision of the House bill rather than from the corresponding provision in the Senate bill. Conference Report at 45, reprinted in 1 LMRA Hist. at 549. The House Report accompanying that House bill, like the Conference Report, makes no mention of captive-audience meetings. Instead, like the Conference Report, it describes the type of Board decisions that Section 8(c) was intended to "correct[]," such as when the Board infers from an employer's past criticism of a union that a foreman's later discharge of a union official for gross misconduct "was for union activity." House Report at 33, reprinted in 1 LMRA Hist. at 324.

Senator Taft, the principal sponsor of the legislation, placed a statement in the Congressional Record, which, with reference to the Section 8(c) that emerged from the Conference, expressed a substantially similar view to that of the Conference and House Reports:

> The conferees had in mind a number of Board decisions in which because of the fact that an employer has at some time committed an unfair labor practice a speech by him, innocuous in itself, has been held not to be privileged . . . . There have also been a number of decisions

by the Board in which discharges of employees, even though there was no evidence in the surrounding circumstances of discrimination, have been deemed unfair labor practices simply because at one time or another the employer has expressed himself as not in favor of unionization of his employees. The object of this section, therefore, is to make it clear that decisions of this sort cannot be made under the conference bill.

93 Cong. Rec. 7002 (June 12, 1947), reprinted in 2 LMRA Hist. at 1624. Senator Taft also confirmed what is plain from the statutory text: "[T]he privilege of this subsection is limited to expression of 'views, arguments, or opinion,'" such that "[i]t has no application to statements which are acts in themselves or contain directions or instructions." Id. An employer's directive to employees requiring them to attend a captive-audience meeting clearly falls into this category of statements to which Section 8(c) does *not* apply.

The Senate Report accompanying the Senate bill is the only piece of legislative history that even mentions *Clark Bros.* It states:

> Another amendment to this section would insure both to employers and labor organizations full freedom to express their views to employees on labor matters, refrain from threats of violence, intimation of economic reprisal, or offers of benefit. The Supreme Court in *Thomas v. Collins* (323 U.S. 516) held, contrary to some earlier decisions of the Labor Board, that the Constitution guarantees freedom of speech on either side in labor controversies and approved the doctrine of the *American Tube Bending* case (134 F. (2d) 993). The Board has placed a limited construction upon these decisions by holding such speeches by employers to be coercive if the employer was found guilty of some other unfair labor practice, even though severable or unrelated (*Monumental Life Insurance*, 69 N. L. R. B. 247) or if the speech was made in the plant on working time (*Clark Brothers*, 70 N. L. R. B. [No.] 60). The committee believes these decisions to be too restrictive and, in this section, provides that if, under all the circumstances, there is neither an expressed or implied threat of reprisal, force, or offer of benefit, the Board shall not predicate any finding of unfair labor practice upon the statement. The Board, of course, will not be precluded from considering such statements as evidence.

Senate Report at 23–24, reprinted in 1 LMRA Hist. at 429–430.

The reference to *Clark Bros.* having been "too restrictive" would seem to be the unspecified "legislative history" that the *Babcock & Wilcox* Board relied on—along with the equally unexamined "language of Section

8(c)"—to conclude that Section 8(c) gives employers a right to hold captive-audience meetings. See *Babcock & Wilcox*, 77 NLRB at 578. The *Babcock & Wilcox* Board ignored that Section 8(c) was principally derived from the House bill, not the Senate's bill discussed in the Senate Report, and ignored the rest of the legislative history, which, as explained, nowhere suggests that Congress intended to address the captive-audience issue.

In any event, the Senate Report itself does not demonstrate a clear intention to immunize employers who hold captive-audience meetings. Although it refers to the Board's decision in *Clark Bros.* as "too restrictive," the Report's description of that decision suggests that the Senate Committee intended simply to ensure that employers were free to express their constitutionally protected views on Section 7 activity in a "speech" "made in the plant on working time." Senate Report at 23, reprinted in 1 LMRA Hist. at 429. *Clark Bros.*, as noted, had broadly held such a speech to be unlawful. 70 NLRB at 804. But that decision had "also" and "independently" held that "the conduct of the [employer] in compelling its employees to listen to a speech on self-organization" was *separately* unlawful. Id. The Senate Report does not address this second, separate holding. For the Board to hold that an employer may not *compel* employees to attend a captive-audience meeting does not prevent the employer from making the type of speech that the Senate Report actually addressed—one that is "in the plant" and "on working time," provided that attendance is voluntary. In the case of the compelled meeting, the unfair labor practice is in no sense "predicate[d]" on any employer "statement" made in the speech, see Senate Report at 24, reprinted in 1 LMRA Hist. at 430, but rather is based entirely on the employer's requirement that employees attend the speech on pain of discipline or discharge. Moreover, there is no suggestion in the sole Supreme Court decision cited by the Senate Report, *Thomas v. Collins*, that the free speech rights of employers and unions entail a right to compel others to listen. In fact, as we have pointed out, *Thomas* strongly suggests the opposite. In light of these considerations, the Senate Report simply cannot bear the weight that *Babcock & Wilcox* apparently placed on it.[38]

### c. First Amendment

The First Amendment likewise does not entitle employers to hold captive-audience meetings. Not only would such a constitutional entitlement conflict with the general rule that the First Amendment gives "'no one . . . a right

to press even 'good' ideas on an unwilling recipient,'" *Hill*, 530 U.S. at 718 (quoting *Rowan*, 397 U.S. at 738), it would also ignore the Supreme Court's admonition that "[a]ny assessment of the precise scope of employer expression . . . must be made in the context of its labor relations setting," such that "an employer's rights cannot outweigh the equal rights of the employees to associate freely." *Gissel*, 395 U.S. at 617. In the "labor relations setting," the First Amendment comfortably accommodates an employer's robust right to express its views on unionization with an employee's right to decline to listen to those views.

### 3. Lawful voluntary meetings

For the reasons explained above, we hold that an employer violates Section 8(a)(1) of the Act if it requires employees to attend a meeting at which the employer expresses its views on unionization. Importantly, requiring employees to attend such meetings is unlawful regardless of whether the employer expresses support for or opposition to unionization. Such captive-audience meetings violate Section 8(a)(1) and prohibiting them does not infringe employer speech protected by Section 8(c) and the First Amendment. The violation turns on the employer's use of its power to compel employees to attend such a meeting. Thus, a voluntary meeting, held in the workplace on work time, does not violate the Act.

To provide clear guidance for employers, we have decided to establish a safe harbor from liability for employers who wish to express their views concerning unionization in a workplace, work-hours meeting with employees. Thus, an employer will not be found to have violated Section 8(a)(1) if, reasonably in advance of the meeting, it informs employees that:

> 1. The employer intends to express its views on unionization at a meeting at which attendance is voluntary;

> 2. Employees will not be subject to discipline, discharge, or other adverse consequences for failing to attend the meeting or for leaving the meeting; and

> 3. The employer will not keep records of which employees attend, fail to attend, or leave the meeting.

An employer may avail itself of this "safe harbor" by giving employees these assurances. Then, of course, the employer must also follow through on these assurances to stay on the right side of the law. When an employer both gives these assurances and follows through on them, it

---

[38] Indeed, it is noteworthy in evaluating the weight due the Senate Report that, as indicated above, one of the two Senate staffers authoring the Report was former Board Member Reilly, the dissenting Board Member in *Clark Bros.* See *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005) (cautioning against "judicial reliance on

legislative materials like committee reports, which . . . may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history").

may lawfully hold voluntary meetings with its employees on company time in order to noncoercively express its views on unionization. We do not hold, however, that the failure to give these assurances will itself result in a violation of Section 8(a)(1).

We add a few additional points of clarification. An employer will be found to have compelled attendance at a meeting concerning the employer's union views if, under all the circumstances, employees could reasonably conclude that attendance at the meeting is required as part of their job duties or could reasonably conclude that their failure to attend or remain at the meeting could subject them to discharge, discipline, or any other adverse consequences. An express order from a supervisor, manager, or other agent of the employer to attend such a meeting is sufficient, but not always necessary, to establish a violation. Moreover, attendance at a meeting that is included on employees' work schedules, as communicated by a supervisor, manager, or other agent of the employer, will be considered to be compelled. Compliance with the steps outlined above will ensure that the holding of the meeting itself is lawful, but it does not, of course, otherwise immunize employer and employee conduct or statements made during that meeting.

### C. Prospective Application

The Board's usual practice is to apply new policies and standards retroactively to all pending cases, including the case in which the new rule is announced, unless doing so would amount to a manifest injustice. *SNE Enterprises, Inc.*, 344 NLRB 673, 673 (2005). To determine whether retroactive application amounts to a manifest injustice, we consider the reliance of the parties on preexisting law, the effect of retroactivity on accomplishment of the purposes of the Act, and any particular injustice arising from retroactive application. Id. Here, on balance and in the circumstances of this particular case, we find that application is warranted on a prospective basis only.

First, we recognize the reliance interest of the parties on preexisting law. In 1948, the *Babcock & Wilcox* Board found that captive-audience meetings are lawful. Accordingly, however thin the reasoning undergirding that conclusion might have been, it has been the law for more than 75 years. We think it is clear that employers have reasonably come to rely on the fact they could lawfully hold captive-audience meetings, however anomalous that may have been under the Section 8(a)(1) standards otherwise governing their conduct. Thus, there are strong employer reliance interests weighing against retroactive application.

Second, and on the other hand, employees have a strong interest in the Board applying the more carefully reasoned approach that we adopt today, which more effectively accomplishes the Act's purposes by prohibiting captive-audience meetings. As noted, captive-audience meetings undermine the Act's core principles of employee autonomy with respect to exercising (or refraining from the exercise of) Section 7 rights. Retroactive application of today's prohibition in all extant cases would thus help accomplish the Act's purposes.

Third, and last, it would be an injustice to apply our new rule in the instant case because the Respondent would likely be judged to have committed an unfair labor practice based on conduct that was clearly lawful at the time it was undertaken.

After carefully considering the particular circumstances of this case, we conclude that, on balance, and weighing each of these three factors, prospective application is the more appropriate course. We think that future application of the rule we announce today will sufficiently promote the policies of the Act by placing employers on notice that captive-audience meetings are no longer permissible while giving appropriate weight in this case and in other pending cases to the reliance employers have reasonably placed on the long-standing holding of *Babcock & Wilcox*.

### D. Response to the Dissent

Our dissenting colleague argues that the Board must continue to permit employers to use captive-audience meetings, which he views as promoting free discussion and debate in the workplace, even though employees are compelled by the employer to attend and may be silenced by the employer while there. He rejects our view that captive-audience meetings violate Section 8(a)(1) by interfering with employees' freedom to decide whether, when, and how to exercise their Section 7 rights or to refrain from doing so. Finally, our colleague contends that prohibiting captive-audience meetings raises serious constitutional questions, implicating the doctrine of constitutional avoidance—even though we permit employers to express their views freely, so long as they do not compel employees to listen to them, a balance consistent with the *Gissel* Court's view of how the First Amendment operates in the workplace. As we will explain, our dissenting colleague's arguments are unpersuasive. They reflect a misunderstanding of our position here, of the Board's jurisprudence under Section 8(a)(1), of Section 8(c) and the Supreme Court's relevant decisions, and of the Act's legislative history, among other key considerations. Our colleague, in short, does not supply the reasoned basis for concluding that captive-audience meetings must be permitted that the Board failed to provide in *Babcock &*

*Wilcox* many years ago.[39]   We cannot agree that the Board's perfunctory decision there demonstrates the "considered judgment" that our colleague claims for it.

We start with the dissent's repeated claim that permitting captive-audience meetings promotes the Act's policy of encouraging free debate in the workplace.  By definition, captive-audience meetings are unfree.  They demonstrate, to employees, the power of the employer to *control* the debate.  Not only are employees forced to assemble and listen to their employer's views, but they may also be prevented from expressing their own views—all on pain of discipline or discharge.  Indeed, our dissenting colleague himself cites a Board decision he joined, which found that "[i]t is lawful for an employer to conduct a captive-audience meeting to persuade employees not to unionize while refusing to allow others to express their opposing, prounion viewpoints during the meeting," including by ordering the assembled employees to "shut up" and having that order followed.  *Electrolux Home Products*, 368 NLRB No. 34, slip op. at 4 & fns. 13–14.  Our holding today, of course, permits employers to express their view at voluntary meetings in the workplace—and such meetings do a much better job fostering the uninhibited and free debate that our dissenting colleague purports to champion.

Our colleague's contention that captive-audience meetings comport with Section 8(a)(1) is similarly untenable.  He insists that if captive-audience meetings are prohibited,

"then there would appear to be no principled basis for not similarly prohibiting *any* mandatory meeting at which an employer states its position on *any* term or condition of employment—such as a new safety rule or work process—or, indeed, any subject that affects employees' intersts as employees."  (Emphasis in dissent; internal quotations omitted.)  But the meetings he refers to—which fall outside the definition of a captive-audience meeting used here—do not implicate the Section 7 concerns we address.  Our colleague does not persuasively explain how, when an employer conducts an everyday workplace meeting and "states its position on [a] term or condition of employment" (whatever this may mean), the Section 7 rights of employees are implicated in any way, much less interfered with.[40]   As explained, our decision today prohibits only mandatory meetings where an employer expresses its views for or against unionization to its employees.

The dissent relatedly argues that because "an employer has the right to determine what work employees will be required to perform during working time . . . [i]t follows that, during working time, an employer may lawfully require employees to attend meetings about unionization as well."  This argument is circular.  It assumes that a captive-audience meeting may be regarded as "working time" consistent with the Act simply because the employer has imposed a requirement on employees to attend.[41]   Certainly, attending a captive-audience meeting is distinct from an employee's ordinary work duties, for which the

---

[39] Our dissenting colleague also argues that our decision not to seek *amicus* briefing is "indefensible."  But he has repeatedly joined Board majorities rejecting the need for such briefing and observing that "[t]he Board has broad discretion with respect to whether to invite briefing prior to adjudicating a major issue" and that "[n]either the Act, the Board's Rules, nor the Administrative Procedure Act requires the Board to invite amicus briefing before reconsidering precedent."  *Hy-Brand Industrial Contractors, Ltd.*, 365 NLRB 1554, 1585 (2017); see, e.g., *Apogee Retail, LLC*, 368 NLRB No. 144, slip op. at 10 fn. 19 (2019); *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 13 fn. 30 (2019); *PCC Structural's, Inc.*, 365 NLRB 1696, 1706, 1707 (2017); *The Boeing Co.*, 365 NLRB 1494, 1514 (2017).  As in these decisions, which our colleague endorsed, we have determined that it is not necessary to invite *amicus* briefing here in order for the Board to decide this case appropriately.

[40] The Board decisions our dissenting colleague cites—which are not based on the Board's traditional view that captive-audience meetings are lawful—demonstrate as much.  In *Daisy's Originals, Inc., of Miami*, the employer had convened a mandatory meeting to announce its position that it had a basis to withdraw recognition from the incumbent union. 187 NLRB 251, 253–255 (1970).  In *Addressograph-Multigraph Corp.*, the employer had convened a mandatory meeting to announce a new work procedure for certain union-represented employees.  228 NLRB 6, 6–9 (1977).  The Board's conclusion in both cases—that the mandatory meetings did not constitute unlawful retaliation against protected activity in violation of Sec. 8(a)(3) of the Act—would be unaffected by our decision today.  That a captive-audience meeting interferes with and is coercive as to employees' Sec. 7 right to decide whether, when, and how to engage with their employer's union views has no bearing on the

legality of a meeting announcing withdrawal of union recognition or changes in work procedures.

[41] Our dissenting colleague is incorrect when he insists that a "captive-audience meeting . . . is . . . a routine application of the longstanding rule that 'working time is for work.'"  Neither the Board, nor the courts, have ever deemed captive-audience meetings to be "work."  Our colleague's view, in turn, illustrates the threat posed by captive-audience meetings to the goals of the Act.  If such meetings are lawful, for the reasons our colleague insists, then there can be no limiting principle on their use.  An employer would be free to require employees to attend captive-audience meetings for the entire workday, over a period as long as the employer wishes, until the employer was satisfied that employees had adopted its view as their own—and this, of course, has been the law until today.  See, e.g., *International Baking Co.*, 342 NLRB 136, 138 (2004) (employer's "managers and supervisors held approximately 80 meetings" with petitioned-for unit of 331 employees and "during each week of the campaign a particular subject or subjects were covered in all the meetings held that week"), enfd. mem. 185 Fed.Appx. 691 (9th Cir. 2006); *Andel Jewelry Corp.*, 326 NLRB 507, 507 (1998) (Member Fox, dissenting) (employer "repeatedly held captive audience meetings with employees," including "daily meetings during working time with employees in each of the Employer's departments"); *Giant Eagle, Inc.*, 06–CA–188991, 2018 WL 1325594, slip op. at 1, 3–4 (NLRB Div. of Judges 2018) (in three-week period before election for a petitioned-for unit of just seven employees, employer held meetings that "generally lasted three hours" in both the morning and the afternoon on five different days); *Rugby Manufacturing Co.*, 18–CA–15802-1, 2002 WL 2029505 (NLRB Div. of Judges 2002) (employer gave "daily anti-union speeches" at its facility).

employee was hired.  Nor may an employer create work duties that infringe on Section 7 rights.  We do not understand our colleague to argue that an employer lawfully could determine that a nonsupervisory employee's work duties included wearing an antiunion button, soliciting other employees to oppose the union, distributing the employer's campaign literature, or reporting on other employees' union activity—and then direct the employee to do so or be fired.  The fundamental purpose of the Act, rather, is to limit the traditional power of employers to command and control their employees by carving out a space for employees to engage in protected concerted activity—even at work, during the workday.  An employer's authority over its employees must be balanced against employees' Section 7 rights.[42]  Our decision today strikes such a balance.

Our dissenting colleague also unpersuasively argues that there is "no meaningful difference" between "the distribution of employer campaign literature," which the Board has held does not violate Section 8(a)(1), and "attendance at a captive-audience speech."  We disagree.  Distribution merely requires employees "to *receive* the [employer's] campaign literature."  (Emphasis added by dissent, quoting *Intermet Stevensville*, 350 NLRB 1349, 1356 (2007).)  Once employees have received the literature—which takes but an instant—they are free to read it or not, as and when they choose, consistent with their Section 7 rights.  A captive-audience meeting is very different.  It is a time-consuming affair, which employees are compelled to attend and where they must listen to their employer's views on unionization.  The more apt analogy with employer distribution of campaign literature is provided by the *voluntary* meetings that our decision today expressly authorizes and protects.

Our dissenting colleague's arguments related to Section 8(c) are no more persuasive.  To begin, his position on the text's meaning is inconsistent.[143]  At one point he argues that Section 8(c) narrowly "focus[es] on the content of the employer['s] or union['s] 'expression' itself rather than on the circumstances surrounding it."  But elsewhere, he says, instead, that a captive-audience meeting "is, by its very nature, 'the dissemination' of the employer's views" that Section 8(c) explicitly protects.  Neither of these interpretations advances his position here.  We *agree* that Section 8(c) protects the content of an employer's speech, but not the circumstances surrounding the speech.  As we have explained, our prohibition of captive-audience meetings is based not on the employer views expressed at the meeting—whether for or against unionization—but on the surrounding circumstances: that employees are compelled to attend the meeting, on pain of discipline or discharge.  We disagree, however, with our colleague's suggestion that an employer's order to attend a meeting is itself a protected "dissemination" of the employer's views under Section 8(c).  As we have explained, such a directive does not communicate a view.  Neither does the directive—which, of course, comes *before* the meeting—disseminate the employer's view to be communicated at the meeting, consistent with the ordinary meaning of "dissemination" as the spreading of a view.[44]  But even if one could view an employer's directive as "dissemination" in the statutory sense, Section 8(c) protects only a "dissemination" that "contains no threat of reprisal."  29 U.S.C. § 158(c).  A directive to attend a captive-audience meeting, on pain of discipline or discharge, obviously contains a "threat of reprisal."

Our dissenting colleague's assessment of Section 8(c)'s legislative history is similarly unconvincing.  He concedes that neither the Conference Report nor the House Report addresses captive-audience meetings.  He emphasizes that the House Report indicates an intent to allow the Board to only prohibit a statement that "by its own express terms" constitutes a threat, House Report at 33, reprinted in 1 LMRA Hist. at 324, but he ignores that that language was *not included* in the enacted text of Section 8(c).  And he draws from the Conference Report that the "purpose [of Section 8(c)] is to protect the right of free speech," Conference Report at 45, reprinted in 1 LMRA Hist. at 549, but points to nothing in the Conference Report suggesting that compelling employees to listen to the employer's views is encompassed within that right, contrary to general free-speech principles.  At bottom, what our dissenting colleague has engaged in is an exercise of "looking over a crowd and picking out [his] friends."  *Exxon Mobil*, 545 U.S. at 568 (internal quotations omitted).  He has found just one "friend"—the Senate Report—but, for the

---

[42] See *Republic Aviation Corp.*, 324 U.S. at 797–798.

[43] Meanwhile, our colleague's claim that compelled attendance at a captive-audience meeting does not implicate the Sec. 7 right to refrain from protected concerted activity is meritless.  Our colleague says that employees are not engaged in protected activity "when they are required to sit in a room while an employer gives a speech opposing unionization,'" but surely he would agree that an employer could not fire employees for sitting and listening to a speaker advocate for the union, instead of getting up and walking away.  Just as mistaken is our colleague's statement that a captive-audience meeting somehow furthers employees'

right to receive antiunion information.  Sec. 7, rather, grants employees the right to choose whether, when, and how to receive information related to unionization: they may not be coerced to receive it.  Recall that Sec. 8(c) provides that: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

[44] *Disseminate*, Webster's New International Dictionary 753 (2d ed. 1934).

reasons we have explained, that Report is not friendly to his position.

Finally, our dissenting colleague contends that a prohibition on captive-audience meetings raises "serious constitutional problems" under the First Amendment and so, under the doctrine of constitutional avoidance, the Board must interpret the Act to permit such meetings. We are not persuaded. As explained, our focus is on the employer's requirement that employees attend the meeting and listen to the employer's views. An employer's implicit or explicit statement to employees that they must attend a captive-audience meeting or face job consequences is plainly a threat of reprisal. Such threats explicitly fall outside the protection of Section 8(c), and Section 8(c), as the Supreme Court has observed, "implements the First Amendment." *Gissel*, 395 U.S. at 617.

We see no serious constitutional problem, then, in prohibiting captive-audience meetings while permitting employers to express their views in voluntary meetings. We do not understand our colleague to argue that employers even arguably have the First Amendment right to threaten employees at a captive-audience meeting or to promise them benefits. He fails to see, however, that an employer's use of coercion to compel attendance at a captive-audience meeting is not immunized because the meeting involves the employer's expression of views.[45] Rather, in the Supreme Court's words, the First Amendment permits the Board to find an unfair labor practice when "to this persuasion other things are added which bring about coercion, or give it that character." *Thomas*, 323 U.S. at 537–538. Of course, the Supreme Court has made clear that the Board has the authority to find unfair labor practices that are based on speech itself, if the speech amounts to a threat of reprisal, as in *Gissel*, or a promise of benefit, as in *Exchange Parts*, 375 U.S. at 408. Finding captive-audience meetings unlawful does not turn on the employer's speech at the meeting, or on the viewpoint expressed there, but rather on the employer's directive to attend the meeting—which may be speech, but which is undeniably coercive as well. An employer's First Amendment rights are

not meaningfully diminished if the employer is forbidden from using its power over employees to compel them to listen to its views, while retaining the ability to express those views to employees willing to listen to them.

Relying principally on the Eleventh Circuit's recent decision in *Honeyfund.com Inc. v. Governor, State of Florida*, 94 F.4th 1272 (11th Cir. 2024), the dissent contends that prohibition of captive-audience meetings raises serious First Amendment questions because it "singles out captive-audience speeches about unionization for prohibition while permitting mandatory meetings on other subjects" and, as such, is an impermissible content-based restriction. We have carefully considered the *Honeyfund.com* decision but conclude that it is distinguishable. Nor does our colleague's assertion that we are impermissibly "singling out" captive-audience speeches from all other employer-mandated subjects have any merit.

In *Honeyfund.com*, the Eleventh Circuit granted a preliminary injunction against enforcement of a newly enacted Florida statute—the Stop W.O.K.E. Act, also known as the Individual Freedom Act—under the First Amendment. The court observed that Florida sought

> to bar employers from holding mandatory meetings for their employees if those meetings endorse viewpoints the state finds offensive. But meetings on those same topics *are* allowed if speakers endorse viewpoints the state agrees with, or at least does not object to. This law, as Florida concedes, draws its distinctions based on viewpoint—the most pernicious of dividing lines under the First Amendment.

94 F.4th at 1275 (emphasis in original). The court went on to hold that "[b]y limiting its restrictions to a list of ideas designated as offensive, the [Stope W.O.K.E.] Act targets speech based on its content" and "by barring only speech that endorses any of those ideas, it penalizes certain viewpoints—the greatest First Amendment sin." Id. at 1277.[46]

Our holding today makes no distinctions based on viewpoint.[47] An employer may not require employees to attend a captive-audience meeting regardless of the view that the

[45] In a similar regard, the fact that a speaker intends to communicate a message protected by the First Amendment does not entitle them to use the threat of violence to force others to listen to them. In the labor relations setting, a coercive threat of discipline or discharge is similarly unprotected.

[46] It was in this context that the Eleventh Circuit rejected Florida's argument that the Stop W.O.K.E. Act was regulating conduct, not speech. The court observed that the "fact that only mandatory meetings *that convey a particular message and viewpoint* are prohibited makes quick work of Florida's conduct-not-speech defense." 94 F.4th at 1278 (emphasis in original). As the court explained:

> If Florida disapproves of the message, the meeting cannot be required. This is a direct penalty on certain viewpoints—because the conduct and the speech are so intertwined, regulating the former means restricting

the latter. In short, the disfavored "conduct" cannot be identified apart from the disfavored speech.

Id. Here, in contrast, our holding does not reflect disapproval of the employer's message, but of the employer's coercion of employees as a means of ensuring that they will listen to the employer's message.

[47] The contrast between the Act and the Florida statute is not limited to this crucial distinction. The Florida statute communicated the State's disapproval of one viewpoint by imposing monetary remedies for violation of the law: backpay, compensatory damages, punitive damages, and attorney's fees awards. 94 F.4th at 1276. None of those remedies is available under the Act if an employer unlawfully holds a captive-audience meeting; rather, the employer simply will be ordered to cease and desist from holding such meetings. The employer will remain free, of course, to conduct voluntary meetings at which it expresses its views.

employer expresses—whether it urges employees to vote against the union, to vote for the union, or simply to refrain from exercising their Section 7 rights altogether. None of these viewpoints is "offensive" to the Act. What is offensive to the Act, rather, is the employer's use of its power to require employees to listen to its views—whatever they are. The Act is intended to protect employee free choice from precisely such coercion.

Contrary to our dissenting colleague's assertion, no serious First Amendment issue is posed here because we prohibit captive-audience meetings (as defined) and not all employer-mandated meetings in the workplace. This distinction is entirely a function of the Act's protection of Section 7 rights—and the *Gissel* Court has made clear that the First Amendment must be understood in the "context of [the] labor relations setting" in which the Board regulates. *Gissel*, 395 U.S. at 617.[48] Where an employer-mandated meeting does not impinge on employees' Section 7 rights, the Board has no basis to regulate it. If our colleague's criticism of our holding were valid, in turn, it would undermine the Board's ability to effectively administer and enforce the Act. The Board necessarily "singles out" employer statements and actions that implicate Section 7, while ignoring others.[49] An employer's threat of reprisal for supporting a union violates the Act; a threat for supporting a political candidate does not. An employer's statement prohibiting employees from talking about wages violates the Act; a statement prohibiting discussion about foreign policy does not. An employer's promise of benefits if employees vote against the union violates the Act; a promise of benefits for attending religious services does not. An employer's requirement that employees wear t-shirts communicating its anti-union message violates the Act; an employer's requirement that employees wear t-shirts communicating a message opposing climate change does not. These distinctions reflect the provisions of the Act, not the Board's impermissible content-based regulation of employer speech. In straining to find serious constitutional issues presented here, our colleague turns the doctrine of constitutional avoidance into its opposite, a doctrine of "constitutional collision." *United States v. Hansen*, 599 U.S. 762, 781 (2023).[50] The Supreme Court, however, has made clear that "[w]hen

legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict." Id.

### AMENDED CONCLUSIONS OF LAW

1. Amazon.com Services LLC (the Respondent) is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Amazon Labor Union (the Union) is a labor organization within the meaning of Section 2(5) of the Act.

3. The Respondent has violated Section 8(a)(1) of the Act by selectively and disparately enforcing its Solicitation Policy by removing messages that Dana Miller posted on its VOA board inviting employees to come to the Union tent to sign a petition in support of making Juneteenth a paid holiday while permitting other Section 7-protected messages to remain.

4. The Respondent has violated Section 8(a)(1) by threatening Dana Miller that she will be subject to discipline if she reposts her Section 7-protected message inviting employees to come to the Union tent to sign a petition in support of making Juneteenth a paid holiday.

5. The Respondent has violated Section 8(a)(1) by soliciting grievances and impliedly promising to remedy them in order to discourage the Union support in the presentations by Michael Williams on November 10, 2021, and by Mike Rebell on November 11, 2021.

6. The Respondent has violated Section 8(a)(1) by threatening employees, through the statements of Eric Warrior on March 15, 2022, and Katie Lev on April 18, 2022, that it would withhold improvements to wages and benefits during bargaining and/or the preelection period.

7. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

### ORDER

The National Labor Relations Board orders that the Respondent, Amazon.com Services LLC, Staten Island, New York, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Selectively and disparately enforcing its Solicitation Policy against employees engaging in protected concerted activity.

---

[48] The context in which this case arises, of course, differs dramatically from the context of *Honeyfund.com*, in which (as the Eleventh Circuit pointed out) Florida was unable to demonstrate any legitimate interest, predicated on some other existing statute or policy, for prohibiting and penalizing the meetings targeted by the Stop W.O.K.E. Act. 94 F.4th at 1280-1282.

[49] For example, as discussed above, the Board's discrimination standard under *Register Guard*, 351 NLRB at 1118, requires the Board to distinguish between statements and actions that implicate Sec. 7 and those that do not.

[50] In any event, even if our prohibition were to trigger strict scrutiny, this should be the rare case where the regulation would withstand such scrutiny because it is "narrowly tailored to serve a compelling interest." See *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015). Ensuring employees' full freedom to decide whether, when, and how to exercise their organizational rights is a compelling interest given our Congressional charge of "protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing." 29 U.S.C. § 151.

(b) Threatening employees with discipline if they engage in protected concerted activities.

(c) Soliciting grievances from employees and impliedly promising to remedy them in order to discourage employees from supporting the Union.

(d) Threatening employees that it will withhold improvements in wages and working conditions if they engage in activities on behalf of the Union and/or if they select the Union as their bargaining representative.

(e) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the purposes of the Act.

(a) Post at its facilities in Staten Island, New York copies of the attached notice marked "Appendix."[51] Copies of the notice, on forms provided by the Regional Director for Region 29, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facilities involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since July 12, 2021.

(b) Within 21 days after service by the Region, file with the Regional Director for Region 29 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that complaint paragraphs 15(a) and 16(a) are severed and retained for further consideration.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C.   November 13, 2024

_____
Lauren McFerran,                              Chairman

_____
David M. Prouty,                              Member

_____
Gwynne A. Wilcox,                             Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

MEMBER KAPLAN, dissenting in part.

The National Labor Relations Act embodies a Congressional policy "'favoring uninhibited, robust, and wide-open debate in labor disputes.'"[1] As the Supreme Court has repeatedly stressed, "'freewheeling use of the written and spoken word . . . . has been expressly fostered by Congress.'"[2] Consistent with this policy, the Union "aggressively" communicated its position that employees should choose union representation during its 2021-2022 organizing campaign at the Respondent's JFK8 fulfillment center and LDJ5 storage center.[3] And the Respondent also vigorously communicated its position that employees should choose to remain unrepresented. No one disputes that the Respondent had the right to communicate its position to the employees. Instead, the General Counsel contends that the Respondent violated the Act because it required employees to attend meetings at which it

<hr>

[51] If the facilities involved in these proceedings are open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facilities involved in these proceedings are closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facilities reopen and a substantial complement of employees has returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that

"This notice is the same notice previously [sent or posted] electronically on [date]."

If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[1] *Chamber of Commerce v. Brown,* 554 U.S. 60, 68 (2008) (quoting *Letter Carriers v. Austin,* 418 U.S. 264, 272–273 (1974)).

[2] Id.

[3] *Amazon.com Services LLC,* 373 NLRB No. 92, slip op. at 8–13 (2024) (Member Kaplan, dissenting).

campaigned against the Union. Substantially agreeing with the General Counsel, the majority holds that an employer violates Section 8(a)(1) of the Act "if it requires employees to attend a meeting at which the employer expresses its views on unionization," though my colleagues decline to apply their newly-fashioned standard retroactively to this case.

But Section 8(c) of the Act plainly states that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit." As the Board correctly recognized more than three-quarters of a century ago in *Babcock & Wilcox Co.*, the text of Section 8(c) and its legislative history make it clear that an employer does not violate the Act by requiring employees to attend a meeting at which it campaigns against unionization.[4] While my colleagues contend that *Babcock* was wrongly decided, none of their arguments withstand scrutiny.

To the contrary, the majority's attempt to ban so-called "captive-audience speeches" harkens back to an earlier era when the Board sought to impose on employers a policy of strict neutrality regarding unionization.[5] This flagrantly unconstitutional overreach was decisively rejected by the Supreme Court as a violation of the First Amendment guarantee of freedom of speech. When the Board sought to evade those rulings by, among other things, banning captive-audience speeches, Congress responded by enacting Section 8(c) for the specific purpose of nullifying those evasions. I believe the Board should learn from that experience. Instead, the majority seems determined to repeat it. But their effort to prohibit captive-audience speeches today is just as indefensible as it was in 1948, when *Babcock* was decided.

---

[4] 77 NLRB 577, 578 (1948).

[5] Although the term "captive-audience speech" is obviously a pejorative label, it is one that has been used in prior Board decisions as well as in the majority's decision in this case. I use it here for the sake of clarity.

[6] *Bethany College,* 369 NLRB No. 98, slip op. at 4 (2020).

[7] The majority defends their failure to allow public briefing all the same, citing *Apogee Retail, LLC*, 368 NLRB No. 144, slip op. at 10 fn. 19 (2019) (overruling four-year old precedent regarding investigative confidentiality rules); *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 13 fn. 30 (2019) (overruling waiver standard that has been rejected by several circuit courts of appeals); *PCC Structurals, Inc.*, 365 NLRB 1696, 1706, 1707 (2017) (overruling 6-year old precedent regarding unit determinations); and *Boeing Co.*, 365 NLRB 1494, 1514 (2017) (overruling 13-year old precedent for determining whether work rules violated the Act), as precedent for overruling *Babcock* without public briefing. My colleagues are mistaken in their view that because amicus briefing was not solicited in those cases it should not have been solicited here. None of those cases involved the confluence of factors present in this

In fact, subsequent First Amendment jurisprudence has made it even clearer that the Board simply does not have the power to prohibit captive-audience speeches. Nor may the rights guaranteed by the Constitution properly be regarded as obstacles to be evaded in the service of some other goal. The Constitution is the ultimate source of authority for the entire Federal Government, including the Board. While the rights set forth in the National Labor Relations Act are undeniably important, "those rights are subordinate to those enshrined in the Constitution where there is a potential conflict between the two."[6] Here, the conflict between the majority's prohibition of captive-audience speeches and the Constitution is manifest and irreconcilable.

Making matters worse, my colleagues take this momentous step without first issuing a notice and invitation to file briefs so that interested amici could present their views. Public briefing and input are particularly warranted here because *Babcock* has been the law for more than 75 years, no court has ever questioned its holding, overruling it is a sea change in the legal landscape governing union election campaigns, and because of the impact of today's decision on the First Amendment guarantee of free speech. Especially under those circumstances, today's decision will be of immense significance to every employer, union, employee, member of the labor-management community, and to many others as well. The individuals and entities who will be affected by today's decision deserved the opportunity to speak to the important issues it raises before it was decided. For all of these reasons, the majority's failure to allow public briefing is indefensible.[7]

My colleagues compound their error by unjustifiably finding that the Respondent independently violated the Act when it mentioned, during some of its captive-audience speeches, its existing Open Door policy.[8] Like the majority's unfounded ban on captive-audience speeches,

---

case: a 75-year-old precedent that had never been questioned by any court whose overruling implicates serious First Amendment concerns.

[8] As discussed further below, I also dissent from the majority's finding that the Respondent violated Sec. 8(a)(1) of the Act by prohibiting a posting by employee Dana Joann Miller that violated its internal digital message board policy or by telling Miller that further violations would lead to "additional follow-up."

I agree with my colleagues that, under extant precedent, the Respondent unlawfully told employees that wages would be "frozen" if the Union became their representative. That violation is properly remedied by the issuance of a cease-and-desist order and the posting of an appropriate remedial notice. But the fact that some employers may make unlawful statements at captive-audience speeches, or even that the Respondent did so in this case, does not and cannot justify prohibiting all such meetings, regardless of what is said in them.

Finally, I concur in dismissing the complaint allegation that the Respondent violated the Act when it told employees that by signing a union authorization card they gave up the right to speak for themselves. For the reasons stated in my dissent in *Siren Retail d/b/a Starbucks*, 373

this finding also impermissibly chokes off the "uninhibited, robust, and wide-open debate in labor disputes" that Congress intended to foster.[9]  And I also dissent from the majority's decision to sever the allegation that the Respondent unlawfully mentioned its existing educational benefits during some of its speeches.  As explained below, I would affirm the judge's dismissal of this allegation.  Whether or not my colleagues would agree with that result, the judge carefully analyzed this issue in his decision and the parties have fully briefed it.  There is no valid justification for the majority to refuse to resolve it now.

### I.  CAPTIVE-AUDIENCE SPEECHES ARE LAWFUL

The complaint alleges, in relevant part, that the Respondent violated Section 8(a)(1) of the Act by holding seven mandatory meetings regarding unionization at its Staten Island JFK8 and LDJ5 facilities.  The meetings were held at the Respondent's facility during employees' working time.  The Respondent stipulated that attendance at the meetings was mandatory and that at those meetings it described its existing benefits, the process of collective bargaining, including the fact that wages and benefits can be increased or decreased as a result of bargaining, and urged employees to reject the Union.  During several meetings, employees challenged some of the Respondent's statements.  There is no indication that the Respondent took any action against any of those employees.

Employers regularly hold mandatory meetings to train employees on a new work process or equipment, human resources issues, safety standards, and the like.[10]  The Respondent also regularly holds such meetings.[11]  Indeed, the Respondent maintains a Learning Department at the facilities at issue in this case as well as a training room.  Some employees working at Staten Island JFK8 and LDJ5 were assigned by the Respondent to be learning ambassadors, charged with training new hires and other employees in the skills required for their jobs.  In short, mandatory meetings on a wide variety of job-related issues are a common and accepted feature of the American workplace.

### A.  Congress and the Courts Have Consistently Rejected Efforts by the Board to Restrict Non-Coercive Speech

The Board initially tried to enforce a policy of strict employer neutrality towards unions.[12]  The Supreme Court decisively rejected this blatant overreach in *NLRB v. Virginia Electric & Power Co.*[13]  Shortly thereafter, the Court reaffirmed in *Thomas v. Collins*

> that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. . . .  When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed.  But, short of that limit, the employer's freedom cannot be impaired.  The Constitution protects no less the employees' converse right.  Of course, espousal of the cause of labor is entitled to no higher constitutional protection than the espousal of any other lawful cause.  It is entitled to the same protection.[14]

Undeterred, the Board thereafter sought to limit employer speech by prohibiting captive-audience speeches in *Clark Brothers Co.*[15] and by finding otherwise lawful employer statements unlawful based on unrelated unfair labor practices in *Monumental Life Ins. Co.*[16]  Congress responded in 1947 by adding Section 8(c) to the Act.  In doing so, it explicitly disapproved of *Clark Brothers* and *Monumental Life Ins. Co.* as "too restrictive" of the intended "full freedom" of both employers and labor organizations "to express their views to employees on labor matters" if they refrain from threats of violence, intimidation, economic reprisal, or offers of benefit.[17]  Responding to this clear Congressional command, the Board shortly thereafter repudiated the *Clark Brothers* ban on captive-audience speeches in *Babcock.*

A few years later, the Board once again targeted captive-audience speeches, this time by holding that they were unlawful unless the union was granted the opportunity to reply.[18]  This doctrine was roundly rejected by reviewing courts as an impermissible attempt to nullify

---

NLRB No. 135 (2024), those statements were lawful.  See also *Henrickson, USA LLC,* 366 NLRB No. 7, slip op. at 3 (2018) (finding that it is lawful for an employer to state that, by signing a union authorization card, "you no longer have a voice, you've signed that away to some third-party"), enf. denied other grounds 932 F3d 465 (6th Cir. 2019).

[9] *Chamber of Commerce v. Brown,* 554 U.S. at 68 (internal quotations omitted).

[10] Flowtrace, Average Time in Meetings and its Impact, https://www.flowtrace.co/collaboration-blog/average-time-in-meetings-its-impact.

[11] Tr. 301.

[12] See, e.g., *Southern Colorado Power Co.,* 13 NLRB 699 (1939) (finding that employer unlawfully "express[ed] opposition to the proposed formation of a labor organization of its office employees"), enfd. 111 F.2d 539 (10th Cir. 1940).

[13] 314 U.S. 469, 477 (1941) (holding that the National Labor Relations Act does not "enjoin[] the employer from expressing its view on labor policies or problems").

[14] 323 U.S. 516, 537–538 (1945) (citations and footnotes omitted).

[15] 70 NLRB 802, 804–805 (1946) (finding captive-audience speech during working time on plant premises unlawful), enfd. other grounds 163 F.2d 373 (2d Cir. 1947)

[16] 67 NLRB 244 (1946) (finding statement that employer was against the union unlawful because employer committed other unfair labor practices).

[17] Senate Report No. 105 on S. 1126, I Leg. History of LMRA 1947 429-430.

[18] *Bonwit Teller, Inc.,* 96 NLRB 608 (1951), enfd. other grounds 197 F.2d 640, 645–646 (2d Cir. 1952), cert. denied 345 U.S. 905 (1953).

Section 8(c).[19]  Rightly so, as subsequent Supreme Court First Amendment decisions have made clear.[20]  A few years after adopting the right-of-reply standard, the Board abandoned it.[21]

Thereafter, the Board abandoned its fruitless efforts to restrict captive-audience speeches and instead repeatedly reaffirmed that they were lawful. Until today.

### B.  Captive-Audience Speeches Do Not Violate the Act

#### 1.  Captive-audience speeches are lawful under Section 8(c)

Consistent with the Congressional policy of encouraging "free debate on issues dividing labor and management,"[22] the Board has long held that the Act permits employers to hold captive-audience speeches.[23]  This is so in part because captive-audience speeches are protected by Section 8(c).  As noted above, Section 8(c) provides that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."  By its terms, Section 8(c) permits the Board to find that "[t]he expressing of any views, argument, or opinion, *or the dissemination thereof*" is an unfair labor practice if, and only if, "*such expression*" contains a threat of reprisal or force or promise of benefit. (Emphasis added).  The text of Section 8(c) makes clear that Congress intended that the inquiry into the lawfulness under the Act of the "expressing of any views, argument, or opinion," or the "dissemination" of those views, focus on the content of the employer or union "expression" itself rather than on the circumstances surrounding it.  Condemning an otherwise lawful speech on the basis that attendance was mandatory contravenes that principle.

This interpretation of Section 8(c) is reinforced by its legislative history.  As noted above, the legislative history of the Taft-Hartley Act plainly shows that Congress intended to repudiate the holding of *Monumental Life Ins. Co.,* under which the Board held "speeches by employers to be coercive if the employer was found guilty of some other unfair labor practice, even though severable or unrelated."[24]  It is further reinforced by the fact that the only reference to *Clark Brothers* anywhere in the legislative history of the Taft-Hartley Act is its repudiation as a decision that was "too restrictive."[25]

As the Supreme Court subsequently recognized in *NLRB v. Gissel Packing Co.,* Section 8(c) means that "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as *the communications* do not contain a 'threat of reprisal or force or promise of benefit.'"[26]  Simply put, a captive-audience speech is an exercise of the freedom to communicate that the Supreme Court endorsed in *Gissel*.  And Section 8(c) of the Act prevents the Board from condemning a captive-audience speech, if the speech itself does not contain a threat of reprisal or force or promise of benefit, simply because employees are required to attend.

#### 2.  Captive-audience speeches do not interfere with Section 7 Rights

Even apart from Section 8(c), captive-audience speeches are lawful because they do not interfere with the exercise of employees' Section 7 rights, properly understood.  Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," as well as "the right to

---

[19] See, e.g., *NLRB v. F. W. Woolworth Co.,* 214 F.2d 78 (6th Cir. 1954).

[20] See, e.g., *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974) (holding that state right of reply law constituted unconstitutionally compelled speech).

[21] *Livingston Shirt Corp.,* 107 NLRB 400 (1953).

[22] *Linn v. Plant Guard Workers,* 383 U.S. 53, 62 (1966).

[23] See, e.g., *Electrolux Home Products, Inc.,* 368 NLRB No. 34, slip op. at 5 (2019) ("It is lawful for an employer to conduct a captive-audience meeting to persuade employees not to unionize while refusing to allow others to express their opposing, prounion viewpoints during the meeting."); see also *NCRNC v. NLRB,* 94 F.4th 67, 74 (D.C. Cir. 2024) (holding that employer's individual distribution of campaign leaflets, observation of employee responses, and associated one-on-one persuasion efforts were protected speech under the Act); *NLRB v. Pratt & Whitney Air Craft Div., United Technologies Corp.,* 789 F.2d 121, 134 (2d Cir. 1986) ("Granting an employer the opportunity to communicate with its employees does more than affirm its right to freedom of speech; it also aids the workers by allowing them to make informed decisions . . . .").

[24] Senate Report No. 80-105 on S. 1126 at 23–24, reprinted in 1 NLRB, Legislative History of the Labor Management Relations Act, 1947 at 429 (hereafter "1 LMRA Hist.").

[25] Id.; see also *NLRB v. Golub Corp.,* 388 F.2d 921, 926 (2d Cir. 1967) ("*Virginia Electric & Power Co*., and the Board's rather halting response to it, see, e.g., *A. J. Shawalter Co*., 64 NLRB 573 (1945); *Clark Bros*, 70 NLRB 802 (1946), enforced on a limited basis in 163 F.2d 373 (2d Cir. 1947), constituted the background for § 8(c) of the Taft-Hartley Act, 61 Stat. 142 (1947).").

[26] 395 U.S. 575, 618 (1969) (emphasis added); accord *Chamber of Commerce v. Brown,* 554 U.S. at 68 ("Sections 8(a) and 8(b) demonstrate that when Congress has sought to put limits on advocacy for or against union organization, it has *expressly set forth the mechanisms for doing so*. . . . [T]he addition of [Sec.] 8(c) *expressly* precludes regulation of speech about unionization so long as *the communications* do not contain a threat of reprisal or force or promise of benefit." (emphasis added; quotation omitted)).

refrain from any or all of such activities."[27] Among other things, Section 7 guarantees employees the right to express their own views concerning unionization. But requiring employees to attend a captive-audience speech does not interfere with those Section 7 rights. To the contrary, the Act protects employees who express their views concerning unionization during a captive-audience speech to the same extent as in any other setting.[28]

The Board has held that an employer interferes with employee Section 7 rights when it compels employees to express opposition to unionization by, for example, including an employee in a campaign video that reasonably indicates that the employee is against the union without the employee's consent,[29] directing an employee to wear a "Vote No" t-shirt,[30] or requiring employees to pose for photographs while holding "Vote No" signs prepared by and given to the employees by the employer.[31] But requiring employees to attend a meeting at which the employer expresses *its* views about unionization cannot reasonably be likened to these unlawful actions. To the contrary, mere attendance at a captive-audience meeting does not suggest that the employees in the audience hold any position on unions, much less compel them to express a position, any more than mere attendance at any meeting indicates that the listener necessarily agrees with the speaker.[32] That is especially true when, as is the case with captive-audience speeches, attendance is mandatory.

Nor is attendance at a captive-audience speech remotely comparable to situations where employers distribute

campaign paraphernalia in a manner that forces employees to make an observable choice whether or not to display it.[33] The Board has repeatedly made clear that the strictures applicable to the distribution of paraphernalia intended to be displayed by an employee do not apply to the distribution of literature that is not intended to be displayed by employees.[34] Employers may distribute literature directly to individual employees, in keeping with the established principle that "employers are entitled to distribute campaign literature during a campaign."[35] Such distributions do not coerce employees in the exercise of their Section 7 rights even if the employee has not consented in advance, as the Board has long held.[36] Nor does an employer representative "violate[] Section 8(a)(1) by injecting himself into a conversation [among employees about the union] in order to express an 8(c) opinion."[37] There is no meaningful difference, for Section 7 purposes, between the distribution of employer campaign literature or the interruption of a prounion conversation to present the employer's side and attendance at a captive-audience speech. All "require" the employee to receive a presentation of the employer's position on unionization and none involve the distribution of anything that employees are expected to display.[38] It cannot be the case that requiring employees to attend a captive-audience speech unlawfully interferes with Section 7 rights when requiring employees to receive campaign literature containing the same message, or to pause their own union-related conversation to hear the employer's side, does not.

---

[27] 29 U.S.C. § 157.

[28] See *Prescott Industrial Products Co.*, 205 NLRB 51 (1973) (finding statements by employees during captive-audience speech expressing support for union protected unless "the misconduct is so violent or of such character as to render the employee unfit for further service"), enf. denied in relevant part 500 F.2d 6 (8th Cir. 1974). Accordingly, I cannot agree with my colleagues that, under existing precedent, employees lawfully may "be prevented from expressing their own views [during a captive-audience speech]—all on pain of discipline or discharge." As noted above, employees were not prevented from expressing their views during the Respondent's captive-audience speech in this case.

[29] *Allegheny Ludlum Co.*, 333 NLRB 734, 744 (2001), enfd. 301 F.3d 167 (3d Cir. 2002).

[30] *Fieldcrest Cannon*, 318 NLRB 470, 496 (1995), enfd. in part 97 F.3d 65, 72, 74 (4th Cir. 1996).

[31] *Florida Steel Corp.*, 224 NLRB 587, 588–589, 594 (1976), enfd. mem. 552 F.2d 368 (5th Cir. 1977).

[32] See *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 557 ("We have sustained First Amendment challenges to allegedly compelled expression in two categories of cases: true 'compelled-speech' cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government; and 'compelled-subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity."); *Cresman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) ("[I]n order to make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action."). Plainly, requiring attendance at a meeting at which a speaker expresses

the speaker's opinion on a topic is not "compelled speech," on the part of attendees, as the courts have defined it.

Likewise, requiring employees to attend a captive-audience speech cannot reasonably be likened to the coercive interrogations about union activity at issue in *Standard-Coosa-Thatcher Co.*, 85 NLRB 1358, 1360 (1949).

[33] Cf. *A.O. Smith Automotive Products Co.*, 315 NLRB 994, 994 (1994).

[34] *Intermet Stevensville*, 350 NLRB 1349, 1355–1356 (2007) (finding that supervisor lawfully handed literature directly to employees at the timeclock); *Jefferson Stores*, 201 NLRB 672, 673, 676–677 (1973) (finding that employer's assistant manager lawfully distributed "vote no" cards directly to employees at the doors of the plant); see also *Alladin Gaming, LLC*, 345 NLRB 585, 586 (2005) (holding that employer lawfully interrupted prounion solicitation to give its perspective on unionization: "employees may listen to the employer representative while he speaks, and, to this extent, stop their Section 7 conversation. But, this is the essence of the exchange of ideas. After the employer representative has spoken, the employees can respond, or ignore him and continue[] their conversation."), rev. denied 515 F.3d 942 (9th Cir. 2008).

[35] *Intermet Stevensville*, 350 NLRB at 1355–1356.

[36] *Jefferson Stores*, 201 NLRB at 673.

[37] *Alladin Gaming, LLC*, 345 NLRB at 587.

[38] *Intermet Stevensville*, 350 NLRB at 1356 (finding that distribution of literature directly to employees lawful because "all that was '*required*' of [the employees], and all that they did, was to *receive* the Respondent's campaign literature, the content of which is not alleged to be unlawful" (emphasis added)).

The majority does not dispute that an employer has the right to require employees to attend meetings on safety, training on new equipment or work processes, or the like during working time.  As the Board recognized long ago, "[t]he Act, *of course,* does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time.  Working time is for work."[39]  Absent any collectively-bargained agreement to the contrary, an employer has the right to determine what work employees will be required to perform during working time.[40]  Nor can it reasonably be disputed that attending a mandatory meeting during regular working hours, regardless of the subject, is part of an employee's "work."[41]  It follows that, during working time, an employer may lawfully require employees to attend meetings about unionization as well.

This is true even though unions do not have the same ability to compel employees to attend their meetings.  As the Supreme Court has held, the Act "does not command that labor organizations as a matter of abstract law, under all circumstances, be protected in the use of every possible means of reaching the minds of individual workers, nor that they are entitled to use a medium of communication simply because the employer is using it."[42]  Consistent with that principle, an employer's use of captive-audience speeches may not be restricted on the premise that the method of communication is not available to unions or to employees.

In sum, the right of employees to form, join, or assist unions is not unlawfully infringed when they are required to attend a captive-audience speech at which the employer presents its views regarding unionization.  Accordingly, the Board does not have the power to prohibit them.[43]

### 3. Response to the majority

The majority contends that captive-audience speeches interfere with employee Section 7 rights for several reasons, but none of them withstand the slightest scrutiny.  To begin, the majority implies that the Board's decision in *Babcock* was poorly reasoned because it did not provide a detailed explanation for the holding that "the language of Section 8(c) of the amended Act, and its legislative history, make it clear that the doctrine of the *Clark Bros.* case no longer exists as a basis for finding unfair labor practices" when employees are required to attend a captive-audience speech.[44]  But this ignores the fact that *Babcock* was decided by a *unanimous* panel that included Member Houston, who was part of the *Clark Brothers* majority.[45]  It is absurd to suppose that he would have repudiated a decision he had authored only a few years earlier unless he was absolutely sure that the intervening Taft-Hartley Act compelled it.  Although the other member of the *Clark Brothers* majority, Chairman Herzog, chose not to participate in *Babcock,* he surely would have protested the overruling of *Clark Brothers* if he thought he had any basis for doing so.[46]  As the Board's "contemporaneous construction" of Section 8(c), *Babcock* "is entitled to very great respect."[47]  For these reasons, the majority errs in failing to give the considered judgment of the *Babcock* Board the weight it is due.

Nor is it the case that the Board has never examined the issue of mandatory attendance at meetings that implicate Section 7 activity between the issuance of *Babcock* and

---

[39] *Peyton Packing Co.,* 49 NLRB 828, 843 (1943) (emphasis added), enfd. 142 F.2d 1009 (5th Cir. 1944), cert. denied 323 U.S. 730 (1944).

[40] Id.; see also *Daisy Originals Inc., of Miami,* 187 NLRB 251, 255 (1971) (employer lawfully required employees to attend meeting to discuss its decision to withdraw recognition from the union or clock out, and lawfully refused to pay employees who clocked out early), enfd. in part other grounds 468 F.2d 493 (5th Cir. 1972).

[41] See 29 CFR Secs. 785.27-785.28 (holding that attendance at meetings during regular working hours or where attendance is required by the employer is compensable working time).

[42] *NLRB v. United Steelworkers of America, CIO (NuTone, Inc.),* 357 U.S. 357, 364 (1958) (finding that employer lawfully enforced solicitation rule even though it was at the same time engaged in solicitation that would have violated the rule if engaged in by an employee).

[43] In arguing for *Babcock* to be overruled, the General Counsel asserted that required attendance at a captive-audience speech interferes with the statutory right to refrain from Sec. 7 activities.  The majority seemingly endorses the General Counsel's position in this regard, though the only analysis they provide in support is to posit by way of analogy that "an employer could not fire employees for sitting and listening to a speaker advocate for the union, instead of getting up and walking away."  But the analogy fails.  As noted above, Sec. 7 protects an employee's right to form, join, or support a union, to engage in other concerted activities for mutual aid or protection, or to refrain from engaging in any of those activities.  An employee who chooses to listen to a speaker "advocate for the union" during nonworking time is exercising their Sec. 7 right to engage in forming, joining, or assisting a union.  Likewise, an employee who chooses to "get[] up and walk[] away" from a speaker "advocat[ing] for the union" during nonworking time is exercising their Sec. 7 right to refrain from forming, joining, or assisting a union.  But employees are not engaged in forming, joining, or assisting a union when they are required to sit in a room while an employer gives a speech opposing unionization.  Nor does the analogy shed any light on whether the listening employees in either scenario are engaged in concerted activity for mutual protection.  As I have explained, that is not the case.

[44] 77 NLRB at 578.

[45] Chairman Herzog and Member Houston constituted the *Clark Brothers* majority, while Member Reilly dissented.

[46] Moreover, Chairman Herzog, who vehemently opposed the Taft-Hartley Act, was intimately involved with the legislative process that led to its enactment.  See NLRB 80th Anniversary at 37 (Chairman Herzog "opposed the Taft-Hartley amendments and testified against the legislation.  He continued to oppose Taft-Hartley after passage . . . ."), https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-1536/NLRB 80th Anniversary.pdf (last visited 11/12/2024); Legislative History of the Labor Management Relations Act, 1947: P.L. 80-101: Ch. 120, 1st Sess. (1947) at 1847-1937 (Covington & Burling) (testimony and statement of Chairman Herzog opposing Taft-Hartley Act).

[47] *Edwards' Lessee v. Darby,* 12 Wheat. 206, 210 (1827) (quoted in *Loper Bright Enterprises v. Raimondo,* 144 S.Ct. 2244, 2257 (2024)).

today's decision. To the contrary, the Board noted in *Livingston Shirt Co.* that there is nothing in the Act "which even hints at any congressional intent to restrict an employer in the use of his own premises for the purpose of airing his views."[48]  As the Board there explained, no such restriction is needed because the "time-honored and traditional means by which unions have conducted their organizational campaigns . . . are fully adequate to accomplish unionization and accord employees their rights under the Act to freely choose a bargaining agent."[49]  Or as the Supreme Court would put it, "the remedy to be applied is more speech, not enforced silence."[50]

The Board has also repeatedly explained that an employer may compel employees to attend meetings on the employer's premises during normal working time, even when the meeting implicates Section 7 activity, because the employer is "at liberty to determine the use to which it wishe[s] to put the time for which it [is] paying the employees, and the employees [are] not free to make a choice in favor of working."[51]  Contrary to the majority, then, a captive-audience meeting is not an "extraordinary exercise of and demonstration of employer power over employees" but is instead a routine application of the longstanding rule that "working time is for work."  My colleagues may wish that the world did not work that way, but the Act does not empower the Board to make it so.

My colleagues question whether attendance at a captive-audience speech constitutes "working time" though they studiously avoid taking a clear position on the issue.  As noted above, Department of Labor wage and hour regulations (which my colleagues do not address) clearly define time spent at meetings as work and recognize no exception when the subject is unionization.  My colleagues also do not acknowledge the Board's prior holdings that time spent at a meeting about changes in working conditions, or a meeting called for the purpose of informing employees that the employer was withdrawing recognition from the union, i.e., expressing its position on whether the employees were "unionized," is working time as well.[52]  If

the majority is of the view that mandatory meetings are not "work" only when an employer discusses unionization with unrepresented employees, the burden is on them to say so and support it.  This my colleagues have failed to do.

The majority implies that if mandatory meetings about unionization are "work" then an employer could necessarily also define as work "wearing an antiunion button, soliciting other employees to oppose the union, distributing the employer's campaign literature, or reporting on other employees' union activity."  As I have already explained, requiring employees to support the employer's position on unionization is clearly distinguishable from requiring employees to receive information about it.  Our precedent recognizes that distinction; the majority's decision does not.

The majority also raises the specter of endless captive-audience speeches if captive-audience speeches are lawful, positing that "[a]n employer would be free to require employees to attend captive-audience meetings for the entire workday, over a period as long as the employer wishes, until the employer was satisfied that employees had adopted its view as their own."  As my colleagues admit, the law has permitted employers to do that for the last 75 years, yet they cannot cite a single case where it has ever happened.[53]

This should come as no surprise.  After all, employers do have a business to run, and an employer that ceases operations for the purpose of holding captive-audience meetings "for the entire workday," day after day, won't stay in business for long.  Such heavy-handed tactics are likely to backfire in any event, increasing support for the union among employees who resent being pushed around.  Here, as in other contexts, I have confidence in the backbone of American workers.[54]

Further in this regard, it bears emphasis that Section 7 of the Act does not only protect the decision whether to be represented by a union: as noted above, it also protects employees' right to engage in "other concerted activities

---

[48] 107 NLRB at 405–406 ("[A]n employer's premises are the natural forum for him just as the union hall is the inviolable forum for the union to assemble and address employees.").

[49] Id.

[50] *Linmark Associates, Inc. v. Willingboro Township*, 431 U.S. 85, 97 (1977) (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Justice Brandeis, concurring)).

[51] *Addressograph-Multigraph Corp.*, 228 NLRB 6, 8–9 (1977) (finding employer lawfully suspended employees who refused to attend meeting to discuss change in work process opposed by union even though the employees continued production work during the meeting) (quoting *Daisy Originals Inc, of Miami*, 187 NLRB at 255).

[52] *Addressograph-Multigraph Corp.*, 228 NLRB at 8–9 (change in working conditions); *Daisy Originals Inc., of Miami*, 187 NLRB at 255 (employees no longer unionized).

[53] None of the Board cases my colleagues cite demonstrates the "nightmare" scenario they imagine.  Cf. *International Baking Co.*, 342 NLRB 136, 138 (2004) (observing that during an 11-week campaign, the respondent held approximately 80 meetings of varying sizes, ranging from groups of 25-50 employees to groups of 150 employees, in a petitioned-for unit of 331 employees), enfd. mem. 185 Fed.Appx. 691 (9th Cir. 2006); *Andel Jewelry Corp.*, 326 NLRB 507, 507 (1998) (Member Fox, dissenting) (observing that employer held daily meetings with groups of employees for two-and-a-half weeks prior to the election).

[54] Cf. *Stericycle, Inc.*, 368 NLRB No. 93, slip op. at 17 (2019) (Member Kaplan, dissenting) (noting that the majority's "reasonable employee" is the "labor-law equivalent of tort law's 'eggshell skull' plaintiff"); *LA Specialty Produce Co.*, 368 NLRB No. 93, slip op. at 8 (2019) (recognizing "the self-reliance, common sense, and team spirit that have always characterized America's workers").

for mutual aid or protection." If an employer may not lawfully require employees to attend a meeting at which the employer states its position on unionization, as the majority posits, then there would appear to be no principled basis for not similarly prohibiting *any* mandatory meeting at which an employer states its position on *any* term or condition of employment—such as a new safety rule or work process—or, indeed, any subject that affects "employees' interests as employees."[55] Under the majority's (faulty) reasoning, being required to attend a meeting about one of those subjects would interfere with the (supposed) Section 7 right of employees "to choose whether, when, and how to receive information" about that working condition too.

Nor is this merely a theoretical issue. Prior Board decisions have addressed claims that employees could not be compelled to attend a meeting to discuss a new work process or a meeting at which the employer notified employees that it was withdrawing recognition from the union.[56] Similar claims have been advanced under Title VII with respect to mandatory implicit bias training.[57] If the

majority's reasoning for condemning captive-audience speeches were valid, then the Act would prohibit employers from requiring employees to attend meetings about any of those subjects as well.[58]

But the majority's reasoning is not valid: captive-audience meetings do not unlawfully impinge on an employee's Section 7 right to choose the degree to which they will participate in the debate concerning representation. As shown above, employees are not compelled to express a view on union representation simply because they are required to attend a meeting at which someone else expresses their views on that subject.[59] Nor does the Act confer on employees an unbounded right to be "let alone with respect to the exercise of rights under the Act."[60] To the contrary, longstanding precedent draws a clear line between efforts to compel employees to express support for the employer's campaign position, which are prohibited, and requiring employees to receive information about the employer's position, which is permitted regardless of whether employees wish to hear it.[61] The majority's ban

[55] *Eastex, Inc. v. NLRB*, 437 U.S. 556, 563 (1978) (holding that Sec. 7 protects employees when they act concertedly for the purpose of improving working conditions). Considering how broadly my colleagues define the scope of protected concerted activity, it is hard to see how any mandatory meeting could survive scrutiny. See, e.g., *Home Depot USA, Inc.*, 373 NLRB No. 25, slip op. at 21–32 (2024) (Member Kaplan, dissenting); *Miller Plastic Products, Inc.*, 372 NLRB No. 134, slip op. at 9-15 (2023) (Member Kaplan, concurring in the result).

[56] *Addressograph-Multigraph Corp.*, 228 NLRB at 8–9 (change in work process); *Daisy Originals Inc., of Miami*, 187 NLRB at 255 (withdrawal of recognition).

[57] See, e.g., *Vavra v. Honeywell International, Inc.*, 2023 WL 5348764 (N.D. Ill. 2023), affd. 106 F.4th 702 (7th Cir. 2024).

[58] The majority denies that this is the case, but their reasoning is wholly unpersuasive. My colleagues affirm that their decision today singles out mandatory meetings about unionization for prohibition while expressly permitting employers to require employees to attend meetings about any other subject as a condition of employment and to discipline employees who refuse to attend. But they fail to explain how that result can be reconciled with the precedent I have cited. In *Addressograph-Multigraph Corp.*, for example, the Board held that forcing represented employees to listen to the employer's position on a new work procedure *that the union opposed* (a fact in that case that my colleagues do not address) did not unlawfully interfere with those employees' Sec. 7 rights. Rather than reconcile their selective treatment of employer speech with such precedent, my colleagues simply declare that mandatory meetings about changes to any term or condition of employment that employees might concertedly support or oppose "do not implicate the Sec[.] 7 concerns we address."

[59] The majority contends that employees will feel compelled to respond, essentially because their coworkers will judge them if they don't. In support, the majority cites *Allegheny Ludlum*, 333 NLRB 734, where an employer presented a campaign video that depicted employees as opposing the union. As explained above, that situation is materially different because, unlike the video at issue in *Allegheny Ludlum*, attending a captive-audience speech does not indicate anything about the views of the audience. As the Board explained in *Allegheny Ludlum*, "[e]mployees depicted as opposing union representation may be inhibited from subsequently expressing support for the union, as they may be required

to explain the discrepancy between their position as shown on the videotape and their subsequent statements." Id. at 744. Attendance at a captive-audience speech, in contrast, does not "depict" employees as opposing union representation. It is simply not the case that employees are impermissibly compelled to respond in those circumstances. See *Alladin Gaming, LLC*, 345 NLRB at 586 (recognizing that, "[a]fter the employer representative has spoken, the employees can respond, *or ignore him and continue[] their conversation*" (emphasis added)).

At the same time, the majority complains that extant precedent permits employers to direct employees *not* to speak during a captive-audience speech. See *Electrolux Home Products*, 368 NLRB No. 34, slip op. at 4. With all due respect to my colleagues, they are trying to have it both ways.

My colleagues also contend that, "[b]y definition, captive-audience meetings are unfree" and, as a result, that "captive-audience meetings [do not] promote[] the Act's policy of encouraging free debate in the workplace." In advancing this position, my colleagues seem to be peddling a modern-day variant of the "right to reply" doctrine rejected in *Livingston Shirt*, supra. A debate is not "unfree" because the parties have the opportunity to speak at different times and in different ways. See generally *NLRB v. United Steelworkers of America, CIO (NuTone, Inc.)*, supra; *Alladin Gaming, LLC*, supra. Nor can the Board prohibit certain forums for speaking simply because *the Board thinks* other forums will "do a better job of fostering" debate.

[60] The "right to be let alone" cited by the majority is derived from First Amendment principles, and their appeal to it is addressed more fully below in the analysis of the First Amendment problems raised by the majority's decision.

[61] Cf. *Intermet Stevensville*, 350 NLRB at 1349 (employer lawfully required employees to receive its literature); *Scientific Atlanta, Inc.*, 278 NLRB 467, 467 (1986) (employer engaged in objectionable conduct by requiring employees to disseminate its antiunion literature).

My colleagues vainly attempt to distinguish *Intermet Stevensville* on the basis that receiving literature "takes but an instant" while a captive-audience meeting is "a time-consuming affair." Of course, this rationale appears nowhere in the Board's decision in *Intermet Stevensville* (or in *Jefferson Stores*). Even taken at face value, the majority's purported distinction makes little sense. How long is "too long?"

on captive-audience speeches impermissibly obliterates that line.

The majority's assertion that captive-audience meetings "can readily serve as a mechanism for employers to observe and surveil employees as the exercise of their Section 7 rights is addressed" provides no valid basis for their prohibition either. Section 8(c) guarantees employers and unions alike the right to discuss unionization with employees. To state the obvious, the ability of a speaker to observe how a listener responds is inherent in the communication process. Accordingly, it would nullify the right of free speech granted by Section 8(c) to hold that those communications may be prohibited on that basis.[62] That is equally true whether the discussion is held one-on-one or in a meeting attended by many employees. Moreover, the same opportunity to observe employee reactions exists for posters placed on the wall of the workplace, the presentation of a campaign video, or the distribution of leaflets directly to individual employees. Those communications are lawful all the same,[63] and it follows that captive-audience speeches may not be restricted on this basis either.

The majority's claim that employees' interpretation of what is said during a captive-audience speech will necessarily be colored by the fact that attendance is mandatory is wholly unpersuasive as well. That claim flies in the face of Section 8(c), which indisputably "limits the extent to which context can be used to impart sinister meanings to innocuous words."[64] As discussed above, Section 8(c) prohibits the Board from condemning noncoercive communications simply because they are made in a meeting that employees are required to attend. The majority's arguments to the contrary are wholly unpersuasive.

After noting that Section 8(c) does not specifically address captive-audience meetings, the majority concludes that Section 8(c) does not apply to them on the premise that when an employer compels its employees to attend a meeting, it is not "expressing" or "disseminating" any "views, argument, or opinion" in the "ordinary, contemporary, common meaning," of those words. But this analysis disregards the text of Section 8(c), which, as noted above, prohibits the Board from finding that the expression of any views, argument or opinion, "or the dissemination thereof" is an unfair labor practice if "such expression contains no threat of reprisal or force or promise of benefit." A captive-audience speech is, by its very nature, "the dissemination" of the employer's views, and Section 8(c) prohibits the Board from finding that "dissemination" to be an unfair labor practice unless "such expression" contains a "threat of reprisal or force or promise of benefit."[65] The majority's textual analysis fails to grapple with the ordinary meaning of *those* terms in any meaningful way.

To be sure, the Supreme Court stated in *Thomas v. Collins* that the First Amendment's protection for an employer's attempts to persuade employees not to support a union do not apply "[w]hen to this persuasion other things are added which bring about coercion, or give it that character."[66] But this holding provides no support for the majority's view that Section 8(c) therefore does not apply to captive-audience speeches because the requirement to attend is coercive even if the content of the speech is not. First, *Thomas v. Collins* predates the enactment of Section 8(c) and thus says nothing about how that provision is to be interpreted. And the Supreme Court has subsequently made clear that Section 8(c) not only "implements the First Amendment," it "*also* manifest[s] a 'congressional intent to *encourage* free debate on issues dividing labor and management.'"[67] The majority's cramped reading of Section 8(c) stands that policy on its head. Second, requiring employees to attend meetings during working time is not coercive within the meaning of Section 8(a)(1) of the Act in any event, for the reasons stated above.

The majority's argument that it may lawfully prohibit captive-audience speeches because the required attendance is a "threat" outside the protection of Section 8(c) fails for another reason as well. As the majority emphatically notes, their holding is limited to required attendance at meetings about unionization and applies even if the discussion itself was noncoercive. Requiring employees to attend a meeting that addresses any other subject on pain

---

[62] *NCRNC v. NLRB,* 94 F. 4th at 74–75 (citing *NCRNC, LLC, dba Northeast Center for Rehabilitation,* 372 NLRB No. 35, slip op. at 17 (2022) (Member Ring, dissenting in pert. part)); see also *Intertape Polymer Corp. v. NLRB,* 801 F.3d 224, 240 (4th Cir. 2015) (same).

[63] Or perhaps I should say that those communications are lawful *for now*. My colleagues' rationale would seemingly permit a blanket ban on posters, videos, and the distribution of leaflets directly to employees, as well as many other contexts in which an employer communicates with an employee. One cannot help but wonder then whether they would find that the opportunity to observe employees' reactions in these scenarios is an unfair labor practice in need of remedying. Only time will tell just how far my colleagues will curtail employer free speech, but I fear that this is not the last we have heard from them on this subject.

[64] *NLRB v. Golub Corp.,* 388 F.2d at 927.

[65] My colleagues claim that this statement is inconsistent with my statement elsewhere that Congress intended the inquiry into Sec. 8(c) to focus on the content of the employer or union "expression" itself rather than on the circumstances surrounding it. Of course, there is no tension between these statements. The captive-audience speech is a long-approved method of disseminating an employer's views. If there is no threat or coercion contained within that speech, the Board should not declare it unlawful.

[66] 323 U.S. at 537–538.

[67] *Chamber of Commerce v. Brown,* 554 U.S. at 67 (emphasis added); id. at 73 ("The question, however, is not whether [the disputed speech restriction] violates the First Amendment, but whether it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the NLRA." (internal quotation omitted)).

of discipline (a "threat," in the majority's parlance) is, and remains, lawful. As such, it is not the "threat" that sets these different meetings apart, but the subject matter. The fact that a meeting non-coercively addressed unionization is not only used as "evidence of an unfair labor practice," under the majority's holding today, it is an essential element of the unfair labor practice finding. And Section 8(c), by its terms, plainly prohibits that.[68]

The majority's treatment of the legislative history of Section 8(c) is unpersuasive as well.[69] My colleagues acknowledge, as they must, that the only reference to *Clark Brothers* in the legislative history is the statement in the Senate Labor Committee report disapproving it as "too restrictive."[70] They also correctly observe that *Clark Brothers* held that the captive-audience speech at issue in that case was unlawful. But my colleagues go too far when they infer that the Senate Report disapproved of *Clark Brothers* simply because the speech was made on working time and not because attendance was compelled. In *Clark Brothers*, the Board observed that "the employees were compelled by the respondent to assemble at the plant during working time to listen to [anti-Union] campaign speeches of the respondent's officials." 70 NLRB at 804. The Board further observed that "[t]he only way the employees could have avoided hearing the speeches would have been for them to leave the premises, which they were not at liberty to do during working hours." Id.

The Board concluded that "the conduct of the respondent in compelling its employees to listen to a speech on self-organization under the circumstances hereinabove outlined . . . independently constitutes interference, restraint, and coercion within the meaning of the Act." Id. It is clear, then, that the Board found the conduct unlawful based on the totality of the circumstances, not for two independently unlawful reasons, as my colleagues contend. And it was this overall holding—i.e., finding the speech unlawful because it "was made in the plant on working time"—of which the Senate disapproved.

To be sure, the House Report for the Taft-Hartley Act does not specifically address captive-audience speeches. It does, however, state that the House version of Section 8(c) was intended to prohibit the Board "from using as evidence against an employer, an employee, or a union any statement that *by its own terms* does not threaten force or economic reprisal."[71] The majority's captive-audience speech ban certainly finds no support there.

For its part, the Conference Committee Report affirms that the "*purpose* [of Section 8(c) as enacted] is to protect the right of free speech when what the employer says or writes is not of a threatening nature or does not promise a prohibited favorable discrimination."[72] Prohibiting captive-audience speeches when "what the employer says" in the speech contains no threat or promise of benefit hardly furthers that purpose either.

---

[68] *United Site Services of California, Inc*., 369 NLRB No. 137, slip op. at 14 fn. 68 (2020) (holding that "Sec. 8(c) precludes reliance on statements of opinion that neither threaten nor promise as evidence in support of any unfair labor practice finding"); accord *Sasol North America Inc. v. NLRB*, 275 F.3d 1106, 1112 (D.C. Cir. 2002); *Medeco Security Locks, Inc. v. NLRB*, 142 F.3d 733, 744 (4th Cir. 1998); *BE & K Construction Co. v. NLRB*, 133 F.3d 1372, 1375–1377 (11th Cir. 1997) (per curiam); *Holo-Krome Co. v. NLRB*, 907 F.2d 1343, 1345–1347 (2d Cir. 1990).

[69] My colleagues cite to *Linn v. Plant Guard Workers* to suggest that Sec. 8(c) is limited to cases involving employer motive. *Linn* raised the question whether the Act preempts state libel laws when potentially libelous statements are made during a union organizing campaign. As my colleagues acknowledge, the Supreme Court observed in that case that Sec. 8(c) was adopted "to prevent the Board from attributing antiunion motive to an employer on the basis of his past statements." 383 U.S. at 62 fn.5. But the Court made that observation in the course of rejecting the view that Sec. 8(c) was intended to "immuniz[e] all statements made in the course of a labor controversy" and, therefore, preempted state law. Id. Plainly, Sec. 8(c) generally prevents statements and the dissemination thereof from being held to be an unfair labor practice even in cases where, as here, employer motivation is not at issue.

[70] Even so, the majority implies that it should be given less weight because a co-author of the report was a member of the Senate Committee staff named Gerard Reilly, who had previously served as a Board member and dissented in *Clark Brothers*. See Gerard D. Reilly, The Legislative History of the Taft-Hartley Act, 29 GEO. WASH. L. REV. 285, 297 (1960). But the law review article itself states that the Senate Report reflected "the committee's intent." Id. As noted above, Chairman Herzog and Member Houston, who knew former Member Reilly and were intimately familiar with the legislative process that led to the Taft-Hartley Act, clearly believed that the Senate Report reflected the Senate's views as well.

[71] H.R. Rep. No. 80-245 (hereinafter "House Report"), at 8 (1947), reprinted in 1 LMRA Hist. at 299 (emphasis added). The version passed by the House stated that "The following shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act: (1) Expressing any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, if it does not by its own terms threaten force or economic reprisal."

The House Report also states that, under Sec. 8(c), "nothing that anyone says shall constitute or be evidence of an unfair labor practice unless it, by its own express terms, threatens force or economic reprisal. This means that a statement may not be used against the person making it unless it, standing alone, is unfair within the express terms of Sections 7 and 8 of the amended act." Id. at 324. The majority's captive-audience ban finds no support there either.

[72] See H.R. Rep. No. 80-510 (hereinafter "Conference Report"), at 45 (1947), reprinted in 1 NLRB, Legislative History of the Labor Management Relations Act, 1947 at 549. (emphasis added). Rather than meaningfully grappling with this portion of the Conference Report, the majority simply chooses to rely on another section of that report stating that Sec. 8(c) was *necessitated* by the Board's practice "of using speeches and publications of employers concerning labor organizations and collective bargaining arrangements as evidence, no matter how irrelevant or immaterial, that some later act of the employer had an illegal purpose." They also fault me for not pointing to anything in the Conference Report that authorizes captive-audience speeches. But of course, they effectively write off the one statement in the legislative history that does expressly speak to this issue.

In these circumstances, my colleagues go too far when they infer from the fact that the House and Conference Committee reports do not specifically address captive-audience speeches that Congress did not intend that Section 8(c) address them. After all, the driving consideration behind Section 8(c) was to reject prior Board decisions that had gone too far in restricting employer speech. The Senate Report's condemnation of *Clark Brothers* is consistent with that purpose. And the specific reference to captive-audience speeches in the Senate Report outweighs the fact that the House and Conference Reports do not specifically address them under established interpretive principles.[73]

In sum, taking into account the fact that, as noted above, the only mention of *Clark Brothers* in the legislative history is its condemnation as "too restrictive," the related rejection of *Monumental Life Ins. Co.* as improperly relying on context to "impart sinister meanings to innocuous words,"[74] and the considered views of the *Babcock* Board on the subject, the most reasonable interpretation of the legislative history as a whole is that Congress intended to prevent the Board from condemning captive-audience speeches on the basis that attendance was mandatory as well.

### C. The Majority's Captive-Audience Speech Ban is Also Impermissible on First Amendment Constitutional Avoidance Grounds

Even if the majority's prohibition of captive-audience speeches were an otherwise permissible interpretation of the Act, which it is not, that interpretation would still be precluded on First Amendment constitutional avoidance grounds. This is so because the majority's decision today, by its terms, singles out captive-audience speeches about unionization for prohibition while permitting mandatory meetings on other subjects. On its face, then, the

prohibition "target[s] speech based on its communicative content—that is, it applies to particular speech because of the topic discussed or the idea or message expressed."[75] As such, it plainly constitutes a content-based regulation of speech.[76] Content-based restrictions on speech, in turn, "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[77]

The Eleventh Circuit recently applied this principle in *Honeyfund v. Governor, State of Florida.* The Florida law at issue in that case prohibited employers from holding any mandatory employee meeting that endorsed belief in certain topics related to race, color, sex, or national origin.[78] The court found that the Florida law was unconstitutional on two independent bases: (1) it was a content-based regulation of speech; and (2) it also discriminated on the basis of viewpoint.[79] Here, the majority prohibits mandatory meetings in which an employer "expresses its views on unionization." Even assuming that this prohibition does not discriminate on the basis of viewpoint, it is plainly a content-based speech restriction for the same reasons that the Florida law was.[80]

My colleagues disagree but their reasons are unpersuasive. According to the majority, requiring employees to attend a captive-audience speech or face job consequences is a threat of reprisal that the First Amendment does not protect. But this ignores the fact that their decision today expressly permits compelled attendance at meetings about any other subject. The majority contends that this is a function of the Act's scope, but under their interpretation of the Act that is simply not true as I have already explained. In short, the majority is either wrong in their interpretation of the Act or wrong under the First Amendment.

---

[73] See *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153 (1976) (holding that "[i]t is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum").

There is, therefore, no merit to the majority's invocation of the oft-quoted phrase that, in relying on the Senate Report, I have "engaged in an exercise of looking over a crowd and picking out [my] friends . . . . [and] found just one 'friend'—the Senate Report." Rather, it seems from my colleagues' perspective that the room is not crowded at all. They infer from this low attendance that Congress thereby gave the Board carte blanche to outlaw captive-audience speeches. I, on the other hand, see no harm in speaking to the one "person" in the room who has something to say on this very subject. But setting their flawed analogy aside, the House and Conference Committee reports, when read in their full context, support my position too. And, as noted above, my "friends" also include Chairman Herzog and Member Houston, who obviously knew far more than the majority or I do about the legislative process that led to the Taft-Hartley Act, as well as decades of precedent since *Babcock* was decided.

[74] *NLRB v. Golub Corp.,* 388 F.2d at 927.

[75] *City of Austin v. Reagan,* 596 U.S. 61, 69 (2022) (cleaned up).

[76] Id.; see also *Honeyfund.com, Inc. v. Governor, State of Florida,* 94 F.4th 1272, 1278 (11th Cir. 2024) (finding that restrictions are content-based if "enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated" (internal quotation omitted)).

[77] *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015).

[78] *Honeyfund v. Governor, State of Florida,* 94 F.4th at 1275–1276.

[79] Id. at 1277 ("By limiting its restrictions to a list of ideas designated as offensive, the Act targets speech based on its content. And by barring only speech that endorses any of those ideas, it penalizes certain viewpoints—the greatest First Amendment sin.").

[80] The majority vainly attempts to distinguish *Honeyfund* by noting that the Florida law at issue there discriminated on the basis of viewpoint and by citing the financial remedies that law provided in the case of violations. None of those factors was relevant to the court's determination that the law also was a content-based speech restriction, however, nor does their absence preclude a finding that the majority's captive-audience ban is content-based as well. And the remedy for violating the Act, a cease-and-desist order enforceable through contempt proceedings, is certainly sufficient to trigger First Amendment scrutiny.

Accordingly, the majority's ban on captive-audience speeches is nothing like the permissible content-neutral speech regulation at issue in *Hill v. Colorado*.[81] There, the Supreme Court upheld a Colorado law that limited the ability of protesters to approach health facility patrons within 100 feet of the facility. The Court held that the Colorado law was a permissible, content-neutral speech regulation because it applied equally to all protests regardless of the subject. In so holding, moreover, the Court contrasted its prior decision in *Carey v. Brown* regarding an Illinois law that generally prohibited residential picketing but contained an exemption for peaceful picketing a place of employment involved in a labor dispute. In *Carey v. Brown,* the Court held that the Illinois law was unconstitutional because it impermissibly discriminated based on the content of the picketers' messages that is, between labor-related picketing and picketing related to other subjects.[82] That is precisely what we have here: the majority's ban on captive-audience speeches prohibits meetings where the subject is unionization while permitting mandatory meetings about other subjects.

For the purpose of the First Amendment analysis, it is immaterial that the majority's ban only applies to mandatory meetings. As the *Honeyfund* court aptly noted in rejecting the same voluntary versus mandatory attendance argument advanced by the majority here, "another way of putting it would be that the Act's prohibitions apply only when an employer wants to communicate a message badly enough to make meeting attendance mandatory. Stripping this argument down to the essentials thus reveals its infirmity."[83] Nor does it matter that employers remain free to present their message by means other than captive-audience speeches. "The First Amendment protects speech itself, and lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content."[84] The fact that other avenues of expression exist does not excuse the "constitutional problem posed by speech bans."[85]

The majority gains no ground by citing the "right to be let alone." Insofar as the First Amendment itself guarantees a right to be "let alone," that right only applies to restrictions imposed by the government.[86] It has no application to actions by private entities, like the Respondent, or to any other private employer. When used in the broader sense employed by the majority, this "right" is more accurately characterized as an "interest" that the government can choose to protect in certain situations.[87] As explained above, Congress has not protected that interest by proscribing captive-audience speeches. And the Board is without power to go beyond the limits Congress has set. Moreover, governmental efforts to protect the "right to be let alone," or any other interest, through content-based speech restrictions, are presumptively unconstitutional for the reasons stated above. As shown, the majority's ban on mandatory unionization meetings fails that test.[88]

Under these circumstances, the Board is required to apply the doctrine of constitutional avoidance, under which the Act must be construed so as to avoid "serious constitutional problems . . . unless such construction is plainly contrary to the intent of Congress."[89] In other words, even if the Act *could* be read to prohibit captive-audience speeches, "must it be so read?"[90] Applying that standard here, the answer is clear: The Board is not required to interpret the Act to prohibit captive-audience speeches.

---

[81] 530 U.S. 703 (2000).

[82] *Carey v. Brown*, 447 U.S. 457, 460 (1980) ("[I]n exempting from its general prohibition only the peaceful picketing of a place of employment involved in a labor dispute, the Illinois statute discriminates between lawful and unlawful conduct based upon the content of the demonstrator's communication."). Notably, the Illinois law was held unconstitutional even though the exemption for labor picketing applied regardless of which side of the labor dispute the picketing supported.

[83] 94 F.4th at 1281-1282.

[84] Id. at 1282 (internal citations and quotations omitted).

[85] Id.

[86] As a result, my colleagues err by stating that, "[u]nder the Act and the First Amendment, employers undoubtedly have the right to persuade, but that right must accommodate employees' right to be left alone in the sphere protected by the Act, just as in other settings the right of a speaker does not override the right of an unwilling listener." Employees have no First Amendment rights vis-à-vis their employer. And as discussed in this opinion, my colleagues fail to persuade that there is any such right under the Act.

[87] *Hill v. Colorado,* 530 U.S. at 717 fn. 24 (citing *Katz v. United States*, 389 U.S. 347, 350–351 (1967)).

[88] The Supreme Court has recognized a limited exception to the general prohibition of content-based speech restrictions "when the speaker intrudes on the privacy of the home or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975) (citing *Rowan v. U.S. Post Office Dept.*, 397 U.S. 728, 738 (1970) (allowing postal patrons to opt out of delivery of junk mail to their homes); see also *Lehman v. Shaker Heights*, 418 U.S. 298 (1974) (concerning ban on political advertisements in city-owned buses)). This exception, however, is rooted in the need to balance the competing interests of free speech and privacy. *Erznoznik v. City of Jacksonville*, 422 U.S. at 208. As explained above, employees do not have a comparable right to privacy in the workplace during working time. See also *Honeyfund v. Governor, State of Florida,* supra (holding unconstitutional content-based restriction on mandatory meetings in the workplace).

[89] *DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988); see also *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979) (observing that, where an interpretation of the Act "would give rise to serious constitutional questions," there must be an "affirmative intention of the Congress clearly expressed" to permit it (internal quotation omitted)).

[90] *International Union of Operating Engineers Local 150 (Lippert Components),* 371 NLRB No. 8, slip op. at 5 (2021) (Members Kaplan and Ring, concurring).

The Act unquestionably *could* be read in a way that permits captive-audience speeches, for all the reasons stated above. The legislative history of Section 8 (c) confirms that Congress plainly intended that it *should* be read that way. At the very least, my colleagues cannot reasonably argue that interpreting the Act to permit captive-audience speeches is "plainly contrary to the intent of Congress."[91] Nor is there any "affirmative intention of the Congress clearly expressed" to prohibit captive-audience speeches.[92] Far from it. In these circumstances, the doctrine of constitutional avoidance compels the Board to interpret the Act in a way that avoids the Constitutional issue, by finding that captive-audience speeches are lawful.

The Board recently applied this principle to union speech in *Lippert Components*.[93] There, a majority of the Board held that Section 8(b)(4) of the Act did not prohibit a union from displaying stationary banners and an inflatable rat in support of its secondary boycott activities by applying the doctrine of constitutional avoidance.[94] I participated in *Lippert Components*, and I adhere to the views stated in that case. It should go without saying that the Board should accord employer Constitutional rights the same respect that it has shown for union Constitutional rights in the past.

If anything, the case for applying constitutional avoidance is even stronger here than it was in *Lippert Components*. There, the *absence* of any indication in the legislative history that Congress intended for Section 8(b)(4) to apply to the disputed conduct was the basis for the Board's determination.[95] Here, in contrast, the legislative history affirmatively shows that Congress did not intend that the *Clark Brothers* prohibition of captive-audience speeches should survive the enactment of Section 8(c). There is no valid basis for refusing to apply constitutional avoidance principles under these circumstances. For this reason as well, the majority's prohibition of captive-audience speeches cannot stand.

## II. THE RESPONDENT LAWFULLY PROHIBITED A POSTING BY EMPLOYEE DANA JOANN MILLER ON ITS INTERNAL ELECTRONIC MESSAGE BOARD SOLICITING SIGNATURES ON A JUNETEENTH HOLIDAY PAY PETITION

The Respondent maintains a digital message board called Voice of Associates (VOA) that employees use to post messages for viewing by other employees and by management. It also maintains a policy that prohibits "[s]olicitation of any kind by associates on company property during working time" and "[d]istribution of literature or materials of any type or description (other than as necessary in the course of your job) by associates in working areas at any time." An accompanying FAQ lists as examples of solicitation that are "prohibited unless legally protected:"

- Solicitation for memberships, subscriptions, or signatures on petitions.
- Distribution of literature or materials of any kind.

Notably, the FAQ also specifically informs U.S. employees that solicitation is not prohibited by the policy and instead is legally protected if it does not use company electronic systems, is related to terms and conditions of employment, and happens during nonworking time. The FAQ also states that "solicitation involv[ing] distributing materials or literature" is protected and not prohibited if it also occurs outside working areas.

On June 18, 2021,[96] Miller posted a message on VOA requesting holiday pay for the Juneteenth federal holiday. Senior Human Resources Manager Jenna Edwards replied that Juneteenth was a new holiday and no decision had been made to offer holiday pay for it at that time. Another employee echoed the request for holiday pay and received a similar response. Miller and employee Conner Spence thereafter circulated a petition for Juneteenth holiday pay that other employees signed and was delivered to JFK8 General Manager Felipe Santos and a human resources manager on July 8. On July 9, Miller posted on VOA that Santos had not endorsed the holiday pay request and solicited employees to sign the petition at the Union's tent outside the facility.

On July 12, Miller was called into a meeting with Human Resources Business Partner Mike Tanelli, who informed her that the July 9 posting violated the Respondent's solicitation policy and would be removed from VOA. Tanelli took pains to make clear that it was only the solicitation to sign the petition using VOA that was at issue and that Miller had every right to solicit signatures for the petition on nonworking time in break areas of the

---

[91] *DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. at 575.

[92] *NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 500.

[93] 371 NLRB No. 8.

[94] Id., slip op. at 5 (Members Kaplan and Ring, concurring); see also slip op. at 2-3 (Chairman McFerran, concurring).

[95] *Lippert Components* principally relied on *DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, which interpreted Sec. 8(b)(4) to impose no prohibition on the circulation of leaflets in support of a secondary boycott based on constitutional avoidance. 485 U.S. at 575. *DeBartolo*, in turn, was based largely on the *absence* of any evidence that Congress intended that Sec. 8(b)(4) proscribe handbilling. Id. at 583–584, 588 (observing that "we [do not] find any clear indication in the relevant legislative history that Congress intended § 8(b)(4)(ii)(B) to proscribe peaceful handbilling" and "interpreting § 8(b)(4) as not reaching the handbilling involved in this case is not foreclosed either by the language of the section or its legislative history").

[96] All dates hereafter are in 2021 unless otherwise noted.

Respondent's facility: "Just on one of the comments made on the VOA board regarding the ALU and . . . going to the tent to sign up for holiday pay, things like that. . . . Amazon solicitation policy clearly is defined that you can have every right to do that on nonworking time, in break areas. The VOA board is actually not a mechanism you can use that on."[97] Tanelli also assured Miller that she was not being reprimanded, but that "there will be additional follow up if a comment like that goes back up again."

The record includes 388 VOA posts between May 1 and July 15, by many different employees. These included 35 posts by Miller, many of which expressed support for the Union and/or criticized the Respondent. Apart from the posting soliciting signatures on the Juneteenth petition, none of those posts were removed. The record also includes 35 VOA posts by other employees expressing support for the Union. None of those posts were removed either, nor is there any evidence that the Respondent took any action against the employees who posted them. In March 2022, the Respondent did not remove a post announcing that an employee had given out "VOTE NO" t-shirts and another post encouraging employees to "come get one" in the break room. According to Miller's uncontradicted testimony, another posting in March 2022 encouraged employees to pick up prounion t-shirts and pins at the Union tent. That posting was not removed either.

There is no allegation that the Respondent's solicitation policy is unlawful. Nor would there be any basis for alleging that it was. The prohibition of solicitation using VOA is lawful.[98] And it is indisputably lawful for an employer to prohibit solicitation during working time.[99] Rather, the sole question presented is whether the Respondent discriminatorily enforced the policy by removing the Juneteenth petition-signing post while allowing other posts. As the Board held in *Guard Publishing Co. d/b/a The Register Guard*, "discrimination means the unequal treatment of equals. Thus, in order to be unlawful, discrimination must be along Section 7 lines. In other words, unlawful discrimination consists of disparate treatment of activities or communications of a similar character

because of their union or other Section 7-protected status."[100] No such discrimination has been shown here.

First, it is undisputed that the Respondent allowed employees to freely post messages on VOA expressing support for the Union that did not solicit employee signatures. There is no evidence that any post of that character was ever removed. Second, the Respondent affirmatively assured employees that they had a legal right to solicit during nonworking time. This assurance was prominently stated in the solicitation policy FAQ and was explicitly reiterated by Tanelli when he met with Miller on July 12. Indeed, Tanelli also specifically assured Miller that she could solicit employees to sign petitions, during nonworking time in break areas, as well. Third, the only time that the Respondent is alleged to have discriminatorily departed from the policy of prohibiting the use of VOA to solicit signatures on petitions was the "VOTE NO" t-shirt posting in March 2022. Of course, that post was unlike Miller's because it did not solicit employees to sign anything. Instead, it informed employees that they could pick up a shirt in a breakroom, at a time when the employee presumably would be on break. The Respondent's contention that the posting therefore did not violate the solicitation policy is confirmed by its failure to remove a prounion posting encouraging employees to pick up Union paraphernalia at the Union's tent. Fourth, even if the "VOTE NO" t-shirt posting were an instance in which solicitation of "a similar character" to Miller's solicitation of signatures on the Juneteenth petition was permitted, this single instance of tolerated solicitation would be "insufficient to show that the Respondent enforced its no-solicitation rule disparately against union activity."[101]

My colleagues find the violation all the same, based on their view that "the Respondent's singling out of Miller's Juneteenth post for removal while permitting the 'VOTE NO' post constitutes [] impermissible discrimination under its Solicitation Policy." But this finding fails to grapple with the fact that the "VOTE NO" t-shirt posting did not solicit employees to sign anything while Miller's post did, or the fact that the Respondent also did not remove a March 2022 pro-Union posting encouraging employees to

---

[97] Tanelli later reiterated these points as follows:

> Anything related, like, to the ALU, and the tent, things like that like for going and signing up, unfortunately, that's something that we cannot have on the board. . . . It's against the policy, but this is not like . . . you're not in trouble or anything like that, right? I just did want to follow up with you, let you know that the comment will be removed. And that that's not something that you can leverage for the VOA board, right?

[98] *Caesars Entertainment d/b/a Rio All-Suites Hotel and Casino,* 368 NLRB No. 143 (2019) (holding that employees generally do not have a statutory right to use employer equipment, including IT resources, for Sec. 7 purposes).

[99] *Peyton Packing Co.,* 49 NLRB at 843.

[100] 351 NLRB 1110, 1117 (2007), enf. denied in part other grounds 571 F.3d 53 (D.C. Cir. 2009).

[101] *Wal-Mart Stores, Inc.,* 350 NLRB 879, 881 (2007) ("It is well settled that 'isolated incidents of digression from a no-solicitation rule . . . do not reflect the type of widespread worktime solicitation indicative of disparate application of the rule.'" (quoting *Albertson's Inc.,* 289 NLRB 177, 191 (1988)). In *Wal-Mart,* a single instance of tolerated solicitation by one employee in a store that employed more than 400 workers was insufficient to show discrimination. The single alleged instance of tolerated solicitation in this case, in a facility with more than 8000 employees, is therefore insufficient as well.

pick up Union paraphernalia at the Union's tent.[102] Even if the "VOTE NO" t-shirt posting did violate the Respondent's policy, moreover, it is precisely the sort of isolated departure from policy that fails to establish discriminatory enforcement under long-standing precedent.[103] For all of these reasons, the majority's violation finding cannot stand.

### III. THE RESPONDENT LAWFULLY TOLD MILLER THAT FURTHER VIOLATIONS WOULD LEAD TO "ADDITIONAL FOLLOW-UP"

Because the Respondent lawfully enforced its solicitation policy against Miller by prohibiting the Juneteenth petition posting, it necessarily follows that the statement warning of "additional follow-up" if she continued to violate the policy was lawful as well. But that statement was too vague to constitute a threat of discipline in any event. As the judge noted, the reference to "additional follow-up" could mean additional education on the scope of the Respondent's policy. This interpretation is supported by the fact that Tanelli specifically assured Miller that she was not being reprimanded and that the purpose of the July 12 meeting was to educate her on the Respondent's solicitation policy. Under these circumstances, I agree with the judge that the evidence presented is insufficient to show that Miller reasonably would have understood the reference to additional follow-up to mean that she would be disciplined.

*Lush Cosmetics, LLC,* cited by the General Counsel and my colleagues, is readily distinguishable.[104] There, the employer addressed an employee's internal intranet postings critical of the employer and its managers by informing the employee that the posts were "not acceptable" and that if the employee continued "such inappropriate conduct, the Company may consider your actions to amount to misconduct." Although the employer's letter stated that it "does not constitute discipline," the Board found that the employer "strongly suggested" that future postings of the same type would result in discipline based on the specific language used in the letter, which termed the protected postings "not acceptable" and threatened to treat repetitions as "misconduct." But no such facts are present here. The Respondent never characterized Miller's posting as "misconduct" or any similar term. And Tanelli specifically affirmed that Miller had "every right to do that [solicit signatures for the petition] on nonworking time, in break areas." In reversing the judge and finding this violation, the majority unjustifiably fails to give these circumstances the weight they are due.

### IV. THE RESPONDENT LAWFULLY MENTIONED ITS EDUCATIONAL BENEFITS AT ITS CAPTIVE-AUDIENCE SPEECHES

The Respondent has offered employees educational benefits through its Career Choice program since 2012. In September, the Respondent announced improvements to its program. These included a reduction in the service time required to qualify for reimbursement from one year to 90 days and an increase in the cost reimbursement from 80 percent to 100 percent. The Respondent also increased the number of educational expenses that qualified for reimbursement, including classes for GED testing and

---

[102] The majority grudgingly acknowledges the March 22 prounion posting, in a footnote, but dismisses it on the pretext that "there is no documentary evidence regarding such a posting." By doing so, my colleagues have effectively discredited Miller, who is one of the Charging Parties in this case, on this point. However, Miller's testimony regarding the March 22 prounion posting was uncontradicted. Unlike my colleagues, I would not discredit this testimony simply because it was not bolstered by documentary evidence.

The majority also argues that the distinction between solicitation and distribution is too "fine," terming it "a distinction without a difference here." But the distinction does make a difference, as decades of precedent attest. Compare *Stoddard-Quirk Manufacturing Co.*, 138 NLRB 615, 620 (1962) (holding that restrictions on the distribution of literature during working time and in working areas are presumptively lawful), with *Peyton Packing Company, Inc.,* 49 NLRB at 843 (holding restrictions on oral solicitation during working time are presumptively lawful).

My colleagues also find it irrelevant that "the solicitation policy affirmatively assured employees that they had a right to solicit during nonworking time." But this and the other evidence on which I rely bolster my view that the Respondent was not discriminating against Miller's posting based on its pro-union content.

My colleagues additionally criticize me for drawing "such fine distinctions here between protected actions so as to make it difficult for such actions to ever be found to be 'of a similar character,' and hence essentially impossible to find discrimination." What my colleagues find

"impossible," I find quite possible. To offer but one example: If the Respondent had routinely removed solicitations to sign pro-union petitions from its VOX system while routinely allowing solicitations to sign anti-union petitions, it would clearly have violated the Act. But of course, there is no record evidence that the Respondent did so (or otherwise discriminate along Sec. 7 lines). Accordingly, I cannot find that it violated the Act.

[103] The majority distinguishes *Wal-Mart* on its facts, noting that there the permitted solicitation took place seven years before the events at issue in that case. But this disregards the Board's holding in the case that "the General Counsel showed no more than that one employee engaged in one act of tolerated solicitation. As more than 400 people worked at the South Rainbow store, we find that this quantum of proven nonunion solicitation is insufficient to show that the Respondent enforced its no-solicitation rule disparately against union activity." Accord *Albertson's Inc.,* 289 NLRB 177, 191 (1988) ("[I]solated incidents of digression from a no-solicitation rule, when known to management, do not reflect the type of widespread worktime solicitation indicative of disparate application of the rule."); *Uniflite, Inc.,* 233 NLRB 1108, 1111 (1977) ("[T]wo isolated incidents involving low-level supervisors whose digressions from work were for a beneficent cause on the one hand, and an act of employee welfare on the other [do not reflect] the type of widespread worktime solicitation indicative of disparate application of the rule."). My colleagues utterly fail to justify their failure to apply the same principle here.

[104] 372 NLRB No. 54 (2023).

English as a second language. It appears that these improvements were to take effect on January 1, 2023. There is no allegation that the September announcement of the changes, or the implementation of the changes in January, were unlawful.

On October 25, the Union filed a petition to represent a unit of employees at JFK8 in Case 29–RC–285057. On November 10 and 11, the Respondent mentioned the planned improvements to Career Choice during two of its captive-audience speeches as changes that the Respondent was going to implement "because we've listened to our associate[s]" and "a benefit that you have right now for free that is also getting better come January." On November 12, the Union withdrew the petition in Case 29–RC–285057. On December 22, the Union filed a second petition for an election at JFK8 in Case 29–RC–288020. On February 4, 2022, the Union filed a petition to represent a unit of employees at LDJ5.

Granting benefits while a representation petition is pending has a tendency to coerce employees' free exercise of their rights.[105] The conferral of a benefit during the pendency of an election warrants an inference that it violates Section 8(a)(1), which the employer may rebut by showing that the grant of benefits was governed by factors other than the impending election.[106]

> One way in which an employer may explain the conferral of benefits during the pendency of an election is to establish that the grant of benefits "had been conceived and implemented prior to the union's arrival, and that the preelection announcement simply made known to employees a predetermined and existing benefit, legitimately processed and unveiled in accordance with the dictates of business constraints, not union considerations."[107]

And that is precisely what happened here. The Respondent announced the benefit changes in September and it bears emphasis that there is no claim that this announcement was unlawful. The changes were to take effect in January 2022, and there is no allegation that the implementation of the changes in January was unlawful either. In these circumstances, the Respondent's references in November to the forthcoming changes were nothing more than a lawful reminder of "a predetermined and existing benefit."[108] As the judge correctly found, there is no valid basis for finding an unlawful promise of benefits on these facts.

I therefore dissent from the majority's decision to sever this issue, leaving it unresolved. The alleged unfair labor practices took place in 2021, the judge addressed this issue in a carefully reasoned decision, the parties have thoroughly briefed this issue in good faith, and they have been waiting for the Board to decide it *for the last 3 years*. There is nothing complicated about this issue, which involves the application of well-settled legal principles to undisputed facts. Under these circumstances, it is a disservice to the parties and the public for the Board to force them to wait even longer for the issue to be resolved, without any valid justification.

## V. THE RESPONDENT LAWFULLY REMINDED EMPLOYEES OF ITS EXISTING OPEN-DOOR POLICY

The Respondent has a long-standing Open Door policy, under which employees are "welcome to discuss any suggestion, concern, or other feedback with any member of the company's management. Associates are encouraged to bring their ideas to the attention of management." The policy further encourages employees to first discuss concerns with their immediate supervisor. If the concern is not resolved, employees are encouraged to discuss it with the next level of management, Human Resources, or "any member of senior management."[109]

The Respondent reminded employees of its Open Door policy at captive-audience meetings held on November 10 and 11. On November 10, manager Michael Williams stated:

> That Open door policy we talk about all the time. It gives you direct access not just to your AM, but also to your DM, right? Even if you have an issue and someone in HR is not resolving your issue, don't settle for that. Take it to the next level. Go see a VP. If that VP is not resolving your issue, go see the HRM, and so on and so forth. That's the freedom of having open door direct communication and that relationship that we have.

Williams also repeatedly said that he was not making any promises.

---

[105] *NLRB v. Exchange Parts Co.*, 375 U.S. 405 (1964). For the sake of argument, I will assume that this principle applies here even though the only petition that was pending on November 10 and 11 was voluntarily withdrawn by the Union the following day.
[106] *MEMC Electronic Materials, Inc.*, 342 NLRB 1172, 1174 (2004).
[107] Id. (quoting *Gordonsville Industries*, 252 NLRB 563, 575 (1980)).
[108] Id.
[109] The policy relevantly states:

> The majority of misunderstandings are satisfactorily resolved by a thorough discussion and mutual understanding between the parties involved. In general, it is best to discuss any concerns with your immediate supervisor first. If you are unable to reach a satisfactory resolution with your supervisor or are not comfortable discussing the issue with your supervisor, you are welcome to discuss the matter with the next level of management, with Human Resources, or with any member of senior management. When you bring a concern to Human Resources, it will be reviewed, and if appropriate, action will be taken. Human Resources will communicate with you regarding the outcome.

On November 11, Mike Rebell stated:

> That open door avenue, directly access management. That's kind of that direct working relationship that open door policy. We continue to strive that if you are going to your AM or maybe on the floor HR, if they are not able to answer your questions and get it resolved, escalate that up, go to the next level. Maybe it's the Ops Manager, maybe it's an HR Manager. But currently you have that direct working relationship all the way up to the GM and honestly even above and outside of the building if you choose to do that.
>
> . . . .
>
> [I]f you feel that you are not getting the response that you want or feel that you deserve, you can also escalate that, if you are not getting that response you can go request a meeting with . . . whether it's a senior leader that responded to that . . . depending on what it is, like if it's a safety thing, maybe it's you're requesting a meeting with the safety manager to get more information. If it's operations, maybe it's requesting a meeting with the AGM, Assistant General Manager or maybe an Ops Manager. But if you are not getting that response you want currently you have that direct working relationship with all the way to the GM, get the answer, continue to escalate that so you can get the answer.

The Board has held that the solicitation of employee grievances during a union organizing campaign "raises an inference that the employer is promising to remedy the grievances," particularly when "an employer has not previously had a practice of soliciting employee grievances."[110] However, "an employer with a past practice of soliciting employee grievances through an open door or similar-type policy may continue such a policy during a union's organizational campaign."[111] Once again, that is precisely what happened here. The Respondent's Open Door policy long predated the Union's organizing campaign, and none of the Respondent's statements during the campaign indicated that it planned to change that policy in any way. To the contrary, the entire point of the Respondent's remarks on November 10 and 11 was that employees already had the ability to use the Open Door policy to communicate with any level of management they chose. Those remarks, in turn, accurately described the Respondent's policy, which said just that. Nor is there any evidence that the Respondent actually changed the policy. Under these circumstances, the statements about the policy on November 10 and 11 were lawful, as the judge properly found.

The majority reverses the judge all the same, but their justification for doing so is wholly unpersuasive. My colleagues claim that "there was no past practice of large meetings held by unknown agents of the Respondent telling employees that '[w]e can't make improvements if we don't know . . . your concerns,'" but this, of course, simply reflects the fact that the Respondent was touting its existing Open Door policy *as part of its campaign*.[112] An employer is entitled to campaign against representation and in doing so it is entitled to remind employees of existing benefits. An employer is also entitled to campaign through representatives of its own choosing, regardless of whether they have appeared at the facility before, just as a union is entitled to campaign through representatives of its choosing, some or all of whom may be strangers to the employees as well. The majority's reliance on the fact that the Respondent exercised those rights as a basis for finding that it violated the Act is yet another blatant violation of Section 8(c).[113] Nor did the Respondent change its past practice by "urging employees to scale the entire chain of command as they saw fit until they got what they wanted."[114] To the contrary, the Open Door policy by its

---

[110] *Garda CL Great Lakes, Inc.*, 359 NLRB 1334, 1334 (2013) (citing *Amptech Inc.*, 342 NLRB 1131, 1137 (2004), enfd. 165 Fed.Appx. 435 (6th Cir. 2006)).

[111] *Wal-Mart Stores, Inc.*, 340 NLRB 637, 640 (2003) (citing *Kingsboro Medical Group*, 270 NLRB 962, 963 (1984), enfd. 400 F.3d 1093 (8th Cir. 2005)).

[112] My colleagues emphasize the "coercive manner in which [the Open Door policy] was presented to employees"—i.e., through captive-audience meetings. But as I have explained above, these meetings are not inherently coercive, as my colleagues hold.

[113] See *Intertape Polymer Corp. v. NLRB*, 801 F.3d at 240 (observing that the Board's finding that supervisors "had never leafleted employees prior to the union campaign" adds nothing to the coerciveness inquiry because the union campaign itself was "out of the ordinary").

[114] At bottom, my colleagues seem to see something sinister about reminding employees that, pursuant to a long-standing policy, they have the right to appeal inaction or what they perceive to be the incorrect action by a less senior manager to a more senior manager. But of course,

the right to appeal to a higher authority is deeply ingrained in our system of government, including the NLRA itself, and in many collective-bargaining agreements through grievance-arbitration clauses.

I note as well that my colleagues went to great lengths in *Siren Retail*, 373 NLRB No. 135, slip op. at 12 fn. 23, to hold, over my dissent, that an employer's statement "that it will end its existing open-door policy if employees organize" is inconsistent with Sec. 9(a) and, therefore, amounts to a threat of loss of benefit. (As a reminder, Sec. 9(a) provides that "any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment.") Today, they find that it is also unlawful for employers to remind employees of long-standing open-door policies allowing employees to seek such individual adjustments. It would seem then that, from my colleagues' perspective, the only way for an employer

terms encouraged employees to discuss their concerns "with any member of senior management" if the employee was "unable to reach a satisfactory resolution with [his or her] supervisor." The Respondent's communications on November 10 and 11 were entirely consistent with that provision. Under these circumstances the majority's claim that they were instead a "sea change" in the Respondent's approach is wholly unfounded.

CONCLUSION

Since its creation in 1935, the Board has repeatedly attempted to restrict the ability of employers to express their views concerning representation. Those past efforts have consistently been condemned by Congress and by the Supreme Court. And I think that my colleagues' decision today will fare no better. The majority's idea of good labor policy may include suppressing captive-audience speeches, but the policy established by Congress is "to encourage free debate on issues dividing labor and management."[115] The reason for encouraging a "free debate" on labor issues, as with any other issue, is that "right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we [Americans] have staked upon it our all."[116] The Board should strive to advance *that* policy. Today's decision contradicts it, and I must therefore respectfully dissent.

Dated, Washington, D.C. November 13, 2024

<br>

Marvin E. Kaplan,              Member

NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT selectively and disparately enforce our Solicitation Policy against you for engaging in protected concerted activity.

WE WILL NOT threaten you with discipline if you engage in protected concerted activities.

WE WILL NOT solicit grievances from you and impliedly promise to remedy them in order to discourage you from supporting the Union.

WE WILL NOT threaten you that we will withhold improvements in wages and working conditions if you engage in activities on behalf of the Union and/or if you select the Union as your bargaining representative.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

AMAZON.COM SERVICES LLC

The Board's decision can be found at www.nlrb.gov/case/29-CA-280153 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



Emily Cabrera, Esq. and Lynda Tooker, Esq., for the General Counsel.
Juan Enjamio, Esq. (Hunton Andrews Kurth LLP) of Miami, Florida Kurtis Powell, Esq. (Hunton Andrews Kurth LLP), of Atlanta, Georgia, for the Respondent.
Retu R. Singla, Esq. (Julien, Mirer & Singla) of New York, New York and Seth Goldstein, Esq. (Law Office of Seth Goldstein), of Cherry Hill, New Jersey, for the Charging Party Union.

[115] *Linn v. Plant Guard Workers*, 383 U.S. at 62.
[116] *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y. 1943), affd. 326 U.S. 1 (1945).

---

*not* to violate the Act is for it to sit silently on the sidelines. But this view was categorically rejected by Congress in Sec. 8(c) and is precisely the type of speech-stifling regulation that the First Amendment is meant to prevent.

## DECISION

### STATEMENT OF THE CASE

BENJAMIN W. GREEN, Administrative Law Judge. The Respondent operates, in Staten Island, New York, a fulfillment center designated as JFK8 and a storage center designated as LDJ5. (Tr. 254.) This case largely concerns alleged unlawful statements made by the Respondent's admitted agents to employees during mandatory meetings held at JFK8 and LDJ5 as part of a campaign to convince employees not to sign union authorization cards and elect union representation. The complaint further alleges that the Respondent discriminatorily enforced its solicitation policy by removing certain posts of employee Dana Miller from its Voice of Associates Board (VOA) and threatening Miller with discipline for those posts.[1]

The charges in this case were filed on dates between July 16, 2021,[2] and May 12, 2022. An amended consolidated complaint issued on August 11, 2022, and the Respondent filed an answer on August 25, 2022.[3] This case was tried before me by Zoom virtual technology on September 19-21 and October 4–5, 2022.

In this case, the General Counsel argues that certain Board precedent should be overruled. In support of complaint paragraphs 7–8 and 20, the General Counsel seeks to overturn Board law in effect since *Tri-Cast Inc.*, 274 NLRB 377 (1985), to the extent it allows employers to misrepresent the law under Section 9(a) of the Act. In support of complaint paragraph 9–12, the General Counsel seeks to overturn *Guard Publishing Co. d/b/a Register Guard*, 351 NLRB 1110 (2007), to the extent it narrows the circumstances under which the Board will find that an employer has discriminatorily limited employee solicitation. In support of paragraph 13–14, the General Counsel seeks to overturn Board law in effect since *Babcock & Wilcox Co.*, 77 NLRB 577 (1948), to the extent it allows employers to require employees to attend mandatory antiunion meetings. However, I am required to apply current law. Accordingly, herein, I will not address arguments that existing precedent be overruled. And since the General Counsel has relied exclusively on arguments that I reject Board law in support of complaint paragraphs 7(a), 8(a), 13–14, and 20, those allegations are dismissed.

Of the remaining allegations, as discussed below, I find that the Respondent violated the Act by discriminatorily enforcing its solicitation policy and threatening to withhold wage increases and improved benefits from employees if they elect a union as their bargaining representative. (Complaint ¶¶ 11(a), 18(A)(b), 19(a).) The rest of the allegations are dismissed. (Complaint ¶¶ 7(b), 8(b), 11(b), 15(a)-(b), 16(a)-(b), 16(c), 17(a)-(b), 18(A)(a), 19(a).)

On the entire record, including my observation of the demeanor of the witnesses, and after considering the post-hearing briefs filed by the General Counsel and the Respondent, I render these

## FINDINGS OF FACT

### JURISDICTION AND LABOR ORGANIZATION STATUS

The Respondent admits that it satisfies the commerce requirements for jurisdiction and has been, at all relevant times, an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Accordingly, I find that this dispute affects commerce and the Board has jurisdiction pursuant to Section 10(a) of the Act.

In its answer to the complaint, the Respondent denied having sufficient information to admit that the Amazon Labor Union (the Union or ALU) is a labor organization within the meaning of Section 2(5) of the Act. Section 2(5) states:

> The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

The Respondent stipulated to the Union's 2(5) status in prior representation cases and, in briefing this case, the Respondent makes no argument to the contrary. (GC Exh. 32–33.) Indeed, the evidence indicates that the Union meets the statutory definition. In April, a group of the Respondent's employees founded the ALU and began a campaign to organize the Respondent's workers on Staten Island for the purpose of improving working conditions through collective bargaining. (Tr. 59–60, 187.) The Union's Constitution and By Laws, at Section 1.5, includes the following "Objectives" (GC Exh. 9):

> (a). To improve the wages, benefits, working conditions, terms of employment, job security, and general welfare of its members and other workers.

> (b). To organize unorganized workers.

The Respondent's employees have held leadership positions in the Union, obtained authorization cards, circulated petitions, and otherwise engaged in organizing. (Tr. 59–60, 187–188.) Since employees participate in the Union and the Union exists for the purpose of dealing with an employer concerning employees' wages, hours, and other terms and conditions of employment, the Union is a labor organization within the meaning of Section 2(5) of the Act. See *Alto Plastics Mfg. Corp.*, 136 NLRB 850, 851–852 (1962).

### ALLEGED UNFAIR LABOR PRACTICES

#### The Respondent's Solicitation Policy

The Respondent's "Owner's Manual and Guide to Employment" (Owner's Manual) summarizes the Respondent's personnel policies and practices, including the following "Solicitation" policy (GC Exh. 58, p. 5, 24) (Tr. 359–360, 437):

---

[1] The General Counsel has moved to withdraw complaint par. 11(c), which alleged that the Respondent unlawfully revoked Miller's permission to post on the VOA. I grant that motion.

[2] All dates herein refer to 2021 unless stated otherwise.

[3] A copy of the complaint which corrects a typographical error (i.e., two paragraphs with the number 18) was entered into evidence as GC Exh. 26.

Solicitation

The orderly and efficient operation of Amazon's business requires certain restrictions on solicitation of associates and the distribution of materials or information on company property. This includes solicitation via company bulletin boards or email or through other electronic communication media.

The following activities are prohibited:

- Solicitation of any kind by associates on company property during working time;
- Distribution of literature or materials of any type or description (other than as necessary in the course of your job) by associates in working areas at any time; and
- Solicitation of any type on company premises at any time by non-associates.

Examples of prohibited solicitation include the sale of merchandise, products, or services (except as allowed on for-sale@Amazon alias), soliciting for financial contributions, memberships, subscriptions, and signatures on petitions, or distributing advertisements or other commercial materials.

The only exceptions to this policy are communications for company-sponsored activities or benefits, or for company-approved charitable causes, or other specific exceptions formally approved by the company. All communications under these exceptions must also have prior approval of Human Resources. Violation of this policy may result in immediate disciplinary action, up to and including termination of employment.

The Respondent has also maintained a list of frequently asked questions regarding the solicitation policy, which include the following (GC Exh. 29) (Tr. 42):

Solicitation Policy FAQ

1. What are some examples of solicitation that are prohibited, unless legally protected?
    - The sale, advertisement, or marketing of things like merchandise, products, subscriptions, or services (except as allowed on for-sale@ alias).
    - Distributing advertisements, marketing communications, or other commercial materials.
    - Solicitation for financial or other contributions (e.g., money, time, services) for any cause, including a charity.
    - Solicitation for memberships, subscriptions, or signatures on petitions.
    - Distribution of literature or materials of any kind.
    - Organizing or seeking participation in political, charitable, or protest activities.
    - Encouraging others to sign up for a mailing or distribution list used for any of the above purposes.

2. What is included in company property?
    - All company property including meeting spaces, offices, cafes, lobbies, and outdoor areas.
    - All company equipment including bulletin boards, furniture, mail slots, elevators, and posters.
    - All company electronic systems including email, Phone Tool, Amazon Wiki, Chime, and calendaring.

3. What are the exceptions?

As exceptions to this policy, solicitation is permitted for:

- Company-sponsored benefits (e.g., health plans and employee discount programs).
- Company-sponsored business activities (e.g., internal marketing and advertising, company events, and learning activities).
- Company-approved charitable causes.
- Specific exceptions approved by Human Resources
- All legally protected activity as defined under local law.

4. In the US, when is solicitation legally protected?

In the US, solicitation is legally protected if it:

- **Does NOT** use any company electronic systems (e.g., email, Phone Tool, Amazon Wiki, Chime, and calendaring), company equipment (e.g., bulletin boards, furniture, mail slots, elevators, and posters); _and_
- Relates to terms and conditions of employment. Terms and conditions of employment include pay, work hours, benefits, and job duties. They do not include the products we sell, our customers, and non-work related social or political causes; _and_
- Happens during non-working time.

Additionally, if solicitation involves distributing materials or literature, to be legally protected in the US, it must _also_ occur outside working areas (spaces where work is done, as opposed to break rooms, cafes, etc.).

The VOA, Open Door Policy, Gemba Walks, Birthday Roundtables, and Connections

The VOA is a digital message board which allows the Respondent's employees at JFK8 to post messages for viewing by management and other employees. Employees often post messages which express concerns about their terms and conditions of employment. (GC Exh. 27) Management can respond in writing to a post and employees may indicate their agreement with a post by adding a thumbs-up emoji. The VOA can be viewed on screens at that facility. The VOA can also be accessed by

employees on the Respondent's "A to Z" app[4] and from kiosks at the facility. (Tr. 75, 81–88, 122–128, 414–418, 441–444) (GC Exh. 27.)

The Owner's Manual which was entered into evidence[5] contains the following provision regarding an "Open Door Policy and Conflict Resolution" (GC Exh. 58, p. 7):

> Amazon believes that candid and constructive communication is essential to the smooth functioning of our workplace and to maintaining an atmosphere of mutual respect. Accordingly, we have an "open door" policy, which means that you are welcome to discuss any suggestion, concern, or other feedback with any member of the company's management. Associates are encouraged to bring their ideas to the attention of management.
>
> The majority of misunderstandings are satisfactorily resolved by a thorough discussion and mutual understanding between the parties involved. In general, it is best to discuss any concerns with your immediate supervisor first. If you are unable to reach a satisfactory resolution with your supervisor or are not comfortable discussing the issue with your supervisor, you are welcome to discuss the matter with the next level of management, with Human Resources, or with any member of senior management. When you bring a concern to Human Resources, it will be reviewed, and if appropriate, action will be taken. Human Resources will communicate with you regarding the outcome.
>
> If you believe that you or another associate has been subject to workplace harassment, pursuant to the provisions of the Workplace Harassment policy in this Manual, you should immediately report this to any manager or member of Human Resources. See the Workplace Harassment policy for more information

The Respondent also conducts "Gemba walks" and holds "birthday roundtables." Gemba walks are when managers walk the floor of a facility and ask employees what they like and do not like about the company. (Tr. 216–218, 380–382.) Birthday roundtables are monthly meetings held for employees whose birthdays fall within the month to talk and raise concerns with the general manager or assistant general manager of the facility. (Tr. 218, 310–311, 317–318.)

Beyond in-person contact, the Respondent uses a computer system called "connections" to ask employees questions when they first sign on for a shift. Employees may raise concerns in response to these questions. (Tr. 312, 317–319.)

### The Respondent's Career Choice Program

Since 2012, the Respondent has offered a Career Choice Program (CCP) of refunding employees for certain educational expenses. Prior to September, employees with a year of service were reimbursed for 80 percent of qualifying educational expenses. (Tr. 375–377.)

In September, the Respondent announced certain company-wide improvements to the CCP which would take effect in January 2022. (R. Exh. 2) These improvements included a reduction in the employment service required to qualify for reimbursement from 1 year to 90 days and an increase in the cost reimbursement from 80 percent to 100 percent. The Respondent also increased the number of educational expenses which qualified for reimbursement, including classes for GED testing and English as a second language. The record contains no indication that the Respondent referenced the Union or the Union's organizing campaign when it announced these improvements to the CCP in September. (Tr. 375–377, 396–399) (R. Exh. 2).

### The Respondent's Practice of Providing Wage Increases

The Respondent provides employees with certain regular wage increases based upon the amount of time they work for the company. (Tr. 234–235, 254–255, 384–385) (R. Exh. 4).

### The Union Organizing Campaign and Representation Petitions

As noted above, the Union was formed and began a campaign to organize employees at JFK8 in April. The Union campaign was based in a tent at a bus stop across the street from the facility. In this tent, the Union distributed literature and authorization cards, collected signed authorization cards, had speakers and cookouts, and the like. (Tr. 59–61.) The Respondent responded to the Union's organizing activity with a campaign of its own to dissuade employees from signing union authorization cards and electing union representation. (Tr. 72–80.) During the campaign, employees posted VOA messages for and against the Union. (Tr. 82) (GC Exh. 20).

On October 25, the Union filed its first petition (29-RC-285057) to represent a unit of employees at JFK8. The Union later withdrew that petition and filed another one (29–RC–288020) on December 22. On February 4, 2022, the Union filed a petition to represent a unit of employees at LDJ5. (GC Exh. 30(a-c).)

### Dana Miller VOA Posts and the Respondent's Response

Miller is an employee who has posted many messages on the VOA, including prounion messages and messages critical of the Respondent. (Tr. 163–167) Miller testified that, in June, she saw VOA posts from employees asking if the new Juneteenth paid federal holiday would be recognized by the Respondent. (Tr. 132) On June 18, Miller posted the following VOA message (GC Exh. 22, 27):

> Since Juneteenth is now a federal holiday shouldn't we get holiday pay as we do for all the other holidays. It's all over every news channel and in the papers as well that June 19 is now a federal holiday.

Senior Human Resources Manager Jenna Edwards posted the following VOA message in response to Miller's post (GC Exh. 22, 27):

---

[4] The Respondent's A to Z app also allows employees to perform certain human resource functions such as viewing their schedules, requesting time off, transferring shifts, and receiving notices from management. (Tr. 75, 81–88)

[5] The Owner's Manual which was entered into evidence is dated January 2019. Apparently, a more recent manual issued in 2021. However, Senior Human Resources Manager Jenna Edwards testified that she believed the Owner's Manual was last updated in 2019 and has not been changed. (Tr. 436–437.)

Hi Dayna, thank you for your comment. The news of Juneteenth becoming a federal holiday is very recent, and at this point there has not been communication about whether this will be a paid holiday. We will let you know as more information becomes available. If you have a scheduled shift and choose to take the day to reflect, you can use existing time off options, paid or unpaid, and record that via your normal time off reporting mechanism. Thank you.

On June 18, a different employee posted the VOA message, "[m]ost of your staffs are African American. No acknowledgement of Juneteenth, a federal holiday. Really JFK8???" Edwards posted a response similar to her earlier response to Miller. (GC Exh. 22, 27.)

Miller and Conner Spence, a JFK8 employee and then Union vice president of membership, subsequently circulated a petition among employees which asked the Respondent to recognize Juneteenth as a paid holiday. (Tr. 89.)

On July 8, Miller and Spence delivered the Juneteenth petition to JFK8 General Manager Felipe Santos and a human resources manager. Santos told the employees he did not know of any company plan to recognize Juneteenth as a paid holiday and that he could not do anything more for employees regarding the issue. (Tr. 89–91, 134–135) (GC Exh. 13).

On July 9, Miller posted the following VOA message which invited employees to sign the Juneteenth petition at the Union tent (Tr. 136) (GC Exh. 13):

6/21/21: ALU AA's spoke to G.M. for holiday pay on Juneteenth. Dismissed, ALU put together a petition and is gathering signatures, over 50+ now! 7/8/21: Presented again, Felipe confirmed that he wouldn't use any energy/effort to make positive change for workers! So you're invited to come sign the petition for well-deserved holiday pay at the ALU tent, speak up for yourself and help make history.

That same day, July 9, certain managers had the following discussion on the Respondent's "Chime" messaging platform regarding Miller's post (GC Exh. 51):

Edwards – 17:16:32 – I'm shocked Stephanie is suggesting to remove a VOA comment but I'm aligned 100%

Assistant General Manager Marc Zachary – 17:17:19 – Yea awesome

Edwards – 17:17:39 – It is not asking any type of question and instead antagonizing and trying to rally a group of people. We should not stand for that

Zachary – 17:18:22 – agreed, it's definitely not appropriate for VOA and probably violates the solicitation policy

Zachary – 17:18:22 – next comment from random AA will be "please come see me if you want to buy my _____" or support my business etc

HR Manager Anna Leonardi – 17:18:50 – Yeahh. After reading the user guide too it def falls under that category

On July 12, Miller was called into a meeting with Human Resources Business Partner John Tanelli. (Tr. 137–142) (GC Exh. 28). The conversation was recorded and entered into evidence. (GC Exh. 52.) During the conversation, Tanelli told Miller that her July 9 post would be removed from the VOA because it violated the Respondent's solicitation policy. The exchange included the following comments (GC Exh. 52 - [2:47-3:20]):[6]

Tanelli: Just on one of the comments made on the VOA board regarding the ALU and going… going to the tent to sign up for holiday pay, things like that.

Miller: Yea for the petition, yea.

Tanelli: So Amazon solicitation policy clearly is defined that you can have every right to do that on nonworking time, in break areas. The VOA board is actually not a mechanism you can use that on.

Miller: But why not?

Tanelli: That's a mechanism for you to talk directly to management, right?

Tanelli later made the following additional comments regarding VOA posts that violate the solicitation policy (GC Exh. 52–[3:38-4:02]):

Tanelli: Anything related, like, to the ALU, and the tent, things like that like for going and signing up, unfortunately, that's something that we cannot have on the board. . . . It's against the policy, but this is not like . . . you're not in trouble or anything like that, right? I just did want to follow up with you, let you know that the comment will be removed. And that that's not something that you can leverage for the VOA board, right?

Tanelli assured Miller she could communicate with her peers on nonworking time in break areas. Miller asked for a written copy of the solicitation policy, indicated that she believed the policy was illegal, and said she would contact her attorney. Tanelli stated that "the VOA board is not something that you can leverage for that specific comment that you made, right, asking people to go there to sign up like for additional holiday pay, that's unfortunately, something that is not going to be able to be on the board." (GC Exh.—[4:50-5:02].) Miller denied that the post was an invitation to sign up for additional holiday pay and said she originally posted the message on her break. Miller also said she would repost it. Tanelli responded as follows (GC Exh. 52—[5:22-5:37]):

Tanelli: Okay, well, I'm telling you now, like, this is not a conversation for you to be reprimanded. Right? This is me to educate you on the solicitation policy. You cannot put that on the board, unfortunately. And there will be additional follow up if a comment like that goes back up again.

After Miller met with Tanelli, on July 12, the Union

---

[6] Herein, references to time ranges within audio recordings are in brackets (e.g. [2:47-3:20]).

organizing committee advised her to repost the Juneteenth message and she did so. The Respondent removed that post as well. At 5:59 p.m., after her shift ended, Miller tried to repost her message, but was unable to access the VOA. (Tr. 141–143, 418–421, 437, 441–446, 450–452) (GC Exh. 23).

On July 13, Miller was able to gain access to the VOA and reposted the message soliciting signatures for the Juneteenth petition. Again, the Respondent removed it. (Tr. 437.) Miller also posted the following message, which was not removed (GC Exh. 24) (Tr. 143-145):

> I put a petition up and was told it was solicitation and against policy. It wasn't. I wasn't shown that in writing (though requested), I was unfairly targeted and disciplined (as a black woman; they apologized to my white male comrade), and I wasn't made aware of the illegal repercussions they enforced (I tried to post it again and my permissions were taken away). HR silences voices, not the ALU.

That same day, July 13, Leonardi posted the following response (GC Exh. 25) (Tr. 143–145):

> Hi Dana. The VOA Board is available for employees to communicate with site leadership to ask questions and raise concerns. It is not a forum for solicitation. We support employees' right to solicit in according with Amazon policy, which prohibits solicitation via Company electronic communication methods. This includes the VOA boards. A copy of the policy can be found within the Amazon.com Owner's Manual accessed through the Code of Conduct link or Inside Amazon. Leadership explained this to you in person on July 12th. We have not and will not revoke anyone's ability to post on the VOA board however, we will continue to ensure that comments comply with Company policy. If you have additional questions about this we would [happy to] discuss.

The Respondent did not discipline Miller for her VOA Juneteenth posts. (Tr. 176.)

The evidence did not indicate that, before Miller's July 9 post, the VOA had been used by an employee to solicit signatures. (Tr. 104.)

The Respondent has not maintained a practice, before and after Miller's Juneteenth petition posts, of removing messages from the VOA.[7] Thus, the Respondent has not removed posts in favor of a paid Juneteenth holiday or posts encouraging employees to vote for or against the Union. In March 2022, the Respondent did not remove a post announcing that an employee had given out "VOTE NO" T-shirts and another post encouraging employees to "come get one" in the break room. (GC Exh. 20) Likewise, the Respondent has not removed employee posts concerning their terms and conditions of employment, including concerns about health and safety. (Tr. 81–88, 103, 122–131, 163–168) (GC Exhs. 17–20, 22, 24–25, 27.)

The Respondent's Response to the Union Organizing

### Campaign

#### Distribution of Materials

The Respondent initially campaigned against union organizing by distributing materials on breakroom tables, in bathrooms, and in electronic formats. In May or June, the Respondent left flyers on JFK8 breakroom tables which stated, in part (GC 10, 16) (72–75, 119–122):

> What does signing a card mean?
> Union authorization cards are legally binding and authorize the union to act as your exclusive representative. You may be asked to physically sign a card or click a link that asks for your signature online. This means you give up the right to speak for yourself. Signing a union authorization card may also obligate you to pay the union a monthly fee.

In May or June, the Respondent sent JFK8 employees a message on the A to Z app which stated, in part (GC 11) (Tr. 76–77):

> **Speak For Yourself:** Union authorization cards are **legally binding** and authorize the union to act as your exclusive representative. This means you give up the right to speak for yourself.

> **Don't Sign Away Your Choices:** Signing a union authorization card may also obligate you to pay the union a monthly fee out of your paycheck.

> **Protect Your Signature and Your Privacy:** Ask questions, do the research, and don't sign anything without reading it closely.

#### Statements in Mandatory Meetings

The Respondent stipulated, for this case only, that it required employees to attend meetings in which its admitted agents made statements in opposition to union representation and the Union. (Tr. 339.)[8] Managers generally went in person to notify employees that they were scheduled to attend mandatory meetings and escorted them to the meeting rooms. Managers also scanned the ID badges of employees in order to digitally record that those employees attended the meeting. Some of the managers who performed these functions worked at the Staten Island facilities (JFK8 or LDJ5) and some managers were brought in from other facilities. (Tr. 78–81, 103–105, 114–119, 179, 190–195, 204, 214–216, 229–230, 237–247, 250, 255–260, 278–279, 292, 296, 305, 315, 369–371, 385–396, 401–404.) Certain employees recorded the meetings in which the Respondent allegedly made unlawful statements and those recordings were entered into evidence. (GC Exh. 2–7.)

#### November 10 Meeting at JFK8

On November 10, Michael Williams held a mandatory meeting with employees at JFK8. (Tr. 10–11, 231–232, 305–310) (GC Exh. 2). During the meeting, Williams made the following

---

[7] Miller initially testified that the Respondent removed a VOA post from someone at the ALU who was offering services to employees with questions, but later testified that she was only aware of her own post being removed. (Tr. 166–167.) Edwards testified that she never heard of a VOA post being removed before Miller's Juneteenth posts. (Tr. 428–

429.) I find that no posts other than Miller's were removed from the VOA.

[8] The transcript incorrectly transcribed the stipulation as referring to statements in opposition to the "Union by presentation." The actual stipulation referred to "Union representation."

comments regarding the CCP (GC Exh. 2):

[1:00-2:15] - At JFK8 we have an amazing team, and we truly believe that by working together with our associates and direct interaction with our associates, allows us to make rapid improvement, course correct, and improve our workplace. And we are able to do that because of our relationship we have formed with our associates. Having your voice, alright, listening to you, responding to you, what you say, when you express your concerns about whatever issue may be. . . . Again, we value that relationship. That relationship also allows us . . . to provide programs and create opportunities for you guys. . . . And that is important because it's not all about work. We have to have your best interest at hand as well, in terms of your development. And that's why Amazon, effective January 1st, we will be paying 100% tuition, college tuition, education tuition. You guys have heard of that? If you haven't, if you don't have a social degree or you don't have bachelor's degree, and that's what you want, that's at your disposal. That is something Amazon is going to implement because we have listened to our associates.

Williams also made the following comments regarding the open door policy and the right of employees to raise concerns to the attention of management (GC Exh. 2 - [2:15-3:42]):

[2:15-3:42] - That Open door policy we talk about all the time. It gives you direct access not just to your AM, but also to your DM, right? Even if you have an issue and someone in HR is not resolving your issue, don't settle for that. Take it to the next level. Go see a VP. If that VP is not resolving your issue, go see the HRM, and so on and so forth. That's the freedom of having open door direct communication and that relationship that we have. Here are some of the mechanisms that we utilize, which affords you the opportunity to voice your concerns, and these are no strangers to you. You know all of these. But I want to focus on the one - connections. I realize that some people don't get an answer the connections questions because they feel that leadership, management knows who answers what question and how they answer that question. I'm here to tell you that that's not true. I will tell you though, we rely on your feedback, through connections, to make adjustments, to make modifications to improve the workplace. That is one mechanism where you have direct access to tell your leadership team what issues, what concerns you have.

[3:42-4:29] - I've been in meetings, where the entire meeting is focused on connections. Yes, the associate that's wondering what are we doing . . . to improve the workplace based on the feedback that we've received. So, I say all that to tell you that the leadership team takes connections very seriously. So, when it pops up on your screens, I encourage you to take the time out to answer the questions. Be honest. Be totally honest. Be brutally honest. If you see something that you believe is unsafe, answer the question that way. If you think you have a fantastic manager, answer the question that way. We can't make improvements, if we don't know what you're thinking, if we don't know your concerns.

[4:30-5:52] - GEMBA walks. You've seen leadership walking around doing GEMBA walks. Tell your manager – "Hey, I want to be a part of that because, I want them know what I have to say." Yeah, I've seen you all including Michael. Michael is not going to really tell them what's going on. I'm going to tell them what's going on, so be a part of that. Okay? And, again, if you put something on the VOA board because your AM or your OM has not responded, before you put it up there, the first thing I would do is say, "Hey, I need to see the GM or I need to see Senior Ops." It's the open door communication. Yeah, you can put it on the VOA board, but some people don't like using the VOA board because they don't want everyone to know they're thinking, right? So escalate. That's the truth. Escalate. There's nothing wrong with that. You have a voice, we want you to use that voice. Okay. We respect your opinions. I've said this and I'm going to say it again, I truly believe this and I'm not up here just speaking the company line. I truly believe this. I've been with Amazon for nine years, I truly believe this. We have a dynamic workforce and that direct relationship that we have with our associates allows us to take care of customers globally, worldwide.

[7:48-8:35] - So I want to make sure that there is no confusion about where Amazon stands and where that group stands. Two opposing sides, and like I said earlier, that's okay … that's okay. But, we're really here to make sure you understand and have the facts, right? Because it's your choice. Regardless of what you decide to do or don't do, it is your choice, it is your right. I'm not here to tell you what to do. Okay? But, I will tell you that that group may promise you anything and they may. I won't, I can't, I'm not allowed [inaudible].

[15:51-15:58] - Our job, every day, yea, our job every day is to listen to associates' concerns and try to remove barriers. That's our job.

Williams made the following statements regarding the Union and employees' decisions to unionize (GC Exh. 2):

[7:02-7:13] - Some third parties don't agree with our goings on, our relationship, that direct relationships with our associates, right, and one of those third parties is ALU.

[10:18-11:16] - So, what should you do if you're approached? I'm going to be totally transparent, totally honest with you. That's entirely up to you. I'm not here to tell you what to do. That's up to you. It is your right. Okay. I just want you to make an informed decision. That's it. I'm not telling you to go this way or that way. Again, that is your right, your decision, and we respect that. We're only here to provide you with the facts, as we see it. We're not promising you anything. We're not telling you to go left or go right. That's up to you. But, if you don't have all of the information, you can make the wrong decision. Okay? If you've got questions, talk to your leadership, speak with HR. Just gain as much insight into the process as you possibly can. Okay?

[11:25-12:23] - Protecting your rights is important to us. Right? Protecting your signature is important to us. Make sure you understand what it is you're signing and what does that means, because signing something you can potentially be obligated to that. Okay? Listen, I'm a tell you, we're not perfect. [inaudible]. Some things we do right and some things we do wrong, and sometimes we don't always get that totally right. Listen careful now, right. It doesn't mean you stop talking. It doesn't mean you stop trying to get your voice across. Respect you more than anything. That's what I told you from the beginning. It is your decision, your opinion. We just want you to have and make an informed decision.

### November 11 Meeting at JFK8

On November 11, Mike Rebell and Ron Edison held a mandatory meeting with employees at JFK8. (Tr. 191–202) (GC Exh. 3). During the meeting, Rebell made the following comments regarding the CCP (GC Exh. 3):

[2:35-3:46] - So who here has heard of the Career Choice Program? A couple
right? So you have a lot of benefits right now. I'm just going to dive in a little bit to that one because we're constantly looking at ways to improve those type of programs. For instance, Career Choice today, you have to be employed with Amazon for a year and then it would pay roughly about 80% of that tuition. Come January that benefit is getting better. It's going to go down to only being here 90 days before you can take advantage of that and it's going to pay 100% of that tuition. And that's for programs . . . that help you stay here with Amazon or something that's just needed in the community. I've seen things like from CDL licensing that maybe you stay with Amazon and work with the transportation or the TOM team or maybe you could go to an outside business or heck even start your own business for trucking but also things like medical billing and coding and into the health field. From IT different things and getting those certificates or degrees. I've seen HVAC. Many different programs that are offered at that. And again that's a benefit that you have right now for free that is also getting better come January. So that's just one thing.

Edison and Rebell also made the following comments about employees raising concerns to the attention of management and "open door avenues" (GC Exh. 3):

Edison - [1:53-2:23] - We have an amazing team and we believe working directly together is the best way to improve the workplace and respond to your feedback. Working directly together allows us to focus on our one team approach because it makes improvement happen quickly. Providing the programs and opportunities you care about most. Open door avenues that give you direct access to management and HR.

Rebell - [4:43-5:11] - That open door avenue, directly access management. That's kind of that direct working relationship that open door policy. We continue to strive that if you are going to your AM or maybe on the floor HR, if they are not able to answer your questions and get it resolved, escalate that up, go to the next level. Maybe it's the Ops Manager, maybe it's

an HR Manager. But currently you have that direct working relationship all the way up to the GM and honestly even above and outside of the building if you choose to do that.

**Edison** - [5:15-7:30] - Alright let's talk about the ways we work directly together. We want to hear from you. Here's how we can help make our team better. Speak with your manager. There should be an open door of communication with you and your manager so feel free first line to talk directly to your direct process path manager. If there is ever a barrier with your managers you immediately have operations managers that are in the process path as well and then it goes up from there. But that should be your direct line of contact, is directly with your direct process path manager. Connections. Is everybody familiar with the connections system? So as you go into your process path, you work or log onto your machines and computers if you have tasks that require that. You get the daily connections. It's asking you about your experiences, asking you things about the safety of the building, et cetera. And these are the opportunities for us to really get some true feedback that take those as opportunities for job improvements or find out what we are doing really well at and continue that on. GEMBA walks. So the senior team comes around on a weekly basis. You will see them coming through your process path and they are talking to the leadership and they are talking to associates to find out what are the barriers in those process paths? You are working those jobs every single day. You are putting your hands on the process. What are the barriers in those processes and how can we correct those when we go back in action against those so GEMBA walks are another. Birthday roundtables. Birthday roundtables is another way that we pull associates in during your birthday month and it's your chance to get a nice treat, do a fun activity, but it's also a communication time where we can talk about hey, again, what's going well? What are some opportunities? What do you want to see some more of? What can we do to create a good culture? So again birthday roundtables is something we also will continue.

Edison - [8:01-8:33] - Then the last part is the VOA or the voice of the associate board. Is everybody familiar with the VOA board? Have you seen it before? If you have an electronic board you can go in through your A to Z app, find my voice and this is where you can enter feedback if you like. It's used for something you can seek opportunities with but I've also seen it where people use it to point out some things that they think are going well. But again, this is your voice. This is another opportunity for you to speak and….

Rebell - [8:37-9:19] - And on the VOA board I just want to add to what Ron is saying. Obviously you can access it through your A to Z app, you can access it on some kiosks around, but also if you feel that you are not getting the response that you want or feel that you deserve, you can also escalate that, if you are not getting that response you can go request a meeting with…whether it's a senior leader that responded to that…depending on what it is, like if it's a safety thing, maybe it's you're requesting a meeting with the safety manager to get more information. If it's operations, maybe it's requesting a

meeting with the AGM, Assistant General Manager or maybe an Ops Manager. But if you are not getting that response you want currently you have that direct working relationship with all the way to the GM, get the answer, continue to escalate that so you can get the answer.

Rebell made the following comments about the Union as a third party unfamiliar with the Respondent's philosophy (GC Exh. 3):

> [9:22-9:50] - So let's talk about Amazon and third parties. You have an amazing workforce and our direct relationship with Associates like you has been a key factor to our ability to deliver the best possible services globally to our customers. We continue to be a target for third parties that do not understand our pro-employee philosophy, and seek to disrupt the direct relationship between Amazon and our Associates.

An employee interjected and argued that the Union is not a third party because it was created by and consists exclusively of the Respondent's employees. Rebell maintained that the Union is a third party organization which would be representing employees and is not affiliated with Amazon. (GC Exh. 3 – [9:53-13:55]) Later, Rebell and Edison made the following comments (GC Exh. 3):

> **Edison -** [17:20-18:03] - So let's talk about our commitment to you. We are proud of the relationship that we have established at JFK8 and we don't believe the ALU would make us more successful or stronger as a team so here is what we are committing. Protecting your rights, listening to you, respecting your opinions and being open and honest with you. Take the time to check facts, keep an open mind, ask questions of your leadership and do your own research.
> **Rebell –** [18:03-18:56] - I want to hit a little bit more on the do your own research, alright? Ron and I, you have heard us for a half hour, you don't know us from anybody. Right? Who are we? Nobody to you right? When we say do your own research that also goes with if you are hearing something outside from whoever, maybe a coworker, make sure you are doing your own research as well and going to like unbiased type of websites. Go straight to the National Labor Relation Board's website is a great one. Unionfacts.org is a great one to go to where you can make a decision for yourself whether before or after you sign the card, whatever it is. Just do some research so that you can help inform and if we do go to a vote you can make the best decision for you and your family. Alright? That's really…the purpose of it is make sure you are doing your own research. That's the most important thing that you can do.

Rebell made the following comments regarding money the Union would charge employees (GC Exh. 3):

> [13:32-15:12] - Alright just to further clarify that ALU is not part of Amazon, it is not authorized to speak for Amazon. The ALU is a newly formed third party group that wants to represent all Associates at all four Staten Island campuses even

though it has no experience. It will charge its members dues, fees, fines and assessments in exchange for their representation. So we will dive into some of the cards that may have been signed, maybe Associates asked about the cards. Whether it's a physical card like the right side or an electronic card right? And the purpose of this slide is really to make sure that you are protecting your signature. Before you sign something just read the fine print. You have every legal right to sign it, to listen to what's being said. 100%. But make sure that you are reading the fine print of what is on that card alright? You may be approached by an ALU organizer or an associate wearing a vest who is going to ask you to sign something. That's perfectly fine. They are legally able to do that but make sure that you are just reading the fine print of what that authorization card is applying. By signing either you could be authorizing the ALU to speak on your behalf or you could also be obligated to pay union dues and it's important you read everything closely but just make sure that you are reading the fine print whether it's on a QR code that you click, just make sure that you are reading what you are putting your information on first.

### February 16 Meeting at JFK8

On February 16, Charlotte Bowers held a mandatory meeting with employees at JFK8. (Tr. 191-202) (GC Exh. 4). During the meeting, Bowers made the following comments regarding union dues (GC Exh. 4):

> [0:50-1:41] - There could be a hundred people on this site vote, and 51 vote yes, all 8,000 plus associates will then be represented by the union. So what that means is everyone's terms and conditions of employment will be up for negotiation, and you will also be liable to pay what's called "union dues" which are a representation fee that will be taken straight out of your paycheck and given to the ALU. They haven't told us how much they're going to charge yet and they haven't told us how often they're going to take that out, but, in New York, there is no cap as to how much they can charge. So that's why it's incredibly important that you go out and have your voice heard and make sure that you vote. Because this election has significant and binding consequences and if the union wins, not just for yourselves, but for future associates, for your co-workers and potentially for your family if the paycheck and your budget is going to change.

> [10:05-10:31] - If the ALU wins, they'll represent you whether you voted for them or not or whether you voted at all. Even if you didn't vote they will be your representative, and as I mentioned before, you will be liable to pay union dues or another representation fee, even if you voted no or you didn't vote at all, everyone is liable to pay those union fees. You can't opt out and everyone will follow a contract once it gets negotiated even if you don't like what's in it. So, electing a union is not like trying out my Netflix subscription for thirty days. It's very difficult to unelect the union once you elected them. You have to go through the transfer but in reverse. That's why it's really, really important that you have all the facts and, you consult various resources before you make a decision. So what I would recommend, consult Amazon, consult the ALU, go on the

NLRB government website. You make sure you're doing all that due diligence to make a decision that's right for you. It can have binding consequences.

Bowers also had the following exchange with JFK8 employee and Union Vice Present Derrick Palmer regarding terms and conditions of employment potentially getting worse as a result of negotiations (GC Exh. 4):

**Bowers** - [12:18-12:53] - So, with a union, terms and conditions of employment must be negotiated before changes can be made and they must be negotiated in good faith. Now good faith means that neither party can come to the table and say, "I want this or it's nothing." Both parties have to compromise, both parties have to give and take and… until changes can be made. So, the negotiations process is called collective bargaining and, in negotiations, there are no guarantees. Nobody can predict these results from the good faith bargaining process. And you can end up with better, the same, or worse than you currently have. There are no guarantees as to what the outcome will be.

**Palmer** – [12:53-12:58] - So, wait, you're saying we could end up with worse? What does that mean by that?

**Bowers** – [12:58-13:19] So, there are no guarantees as to what will happen, right? So, we can't make any promises that things will get better or stay the same. Cause it could get worse. We can't promise what's going to happen. Amazon can't promise you that they're going to walk into negotiations and the negotiations will start from the same. It could start from minimum wage for instance. I'm not saying that that will happen but it is a possibility.

At the time these statements were made, all JFK8 and LDJ5 employees earned more than minimum wage. (Tr. 384-385)

March 15 Meeting at JFK8

On March 15, Eric Warrior held a mandatory meeting with employees at JFK8. (Tr. 191–202) (GC Exh. 5). During the meeting, Warrior made the following comments regarding employees' terms of employment during negotiations (GC Exh. 5):

[3:45-3:58] - You have to keep the status quo. That means we have to keep everything the same during the election and during negotiations if the union is voted in, pay… benefits, and work rules.

[5:05- 5:17] - There is no time limit to negotiations. Sometimes it could take months, even years, to complete this process. Sometimes the two sides can never agree.

[9:22-9:40] - Negotiating a contract, particularly the first contract, can take a long time, months and sometimes years. And during negotiations there are typically no changes to wages, benefits, or work rules, and what happens if the parties can't agree to a contract?

Warrior also made the following comments regarding union shop clauses (GC Exh. 5):

[5:17-5:51] - The union comes to the table with things that it wants. Union shop clauses. Clause. The union shop clause is not a check-off clause. So, when a union shop clause… and why do unions ask for it? A union shop clause would require Amazon to fire you if you don't want to join the union and pay union dues. I'll repeat that again. So, a union shop clause would require Amazon to fire you if you do not want to join the union.

April 10 Meeting at LDJ5

On April 10, Rebecca Smith held a meeting with employees at LDJ5. Smith made the following comments (GC Exh. 6):

**Smith** - [9:40-10:27] - The sticking point about all of this though is there is nothing in federal law that is gonna force the employer or the union into an agreement they don't want to make. Okay? Nothing in federal law forces either the employer or the union into an agreement they do not want to make, and that's very important. There is no time limit on this process. Okay? The federal law doesn't say "Hey, you could get a contract in six months. Hey, you'll get a contract in a year." Federal law says, "however long it takes." Okay. "We're not putting a time limit on it." So, while you're going through this process though, does everybody understand what status quo is? No? Okay. You know what status quo is, don't you?

**Employee** - [10:27-10:32] - Yeah, status quo means everything remains the same.

**Smith** - [10:32-11:36] - Okay, so once the union files a petition, and she's correct, once the union files a petition, okay, everything must remain the same. I can't give you anything and I can't take anything away. There's actually a logic behind it although a lot of times employees don't like the law. . . . This law was written in 1935. Logic behind it was if you guys have a union election coming up and I give you things, I might be bribing you into voting no or if I take things away from you, I might be punishing you for bringing in a union, right? Neither of those things are legal. So you stay at status quo. The problem comes in with status quo, a lot of employees feel, is that when they vote a union in and they expect changes to happen right away, status quo says nothing can change until and if you reach an agreement, and I use the word "if" because actually there is nothing in federal law that guarantees you a contract at the end of the process. Okay. So that's why this law is important, and I know we didn't push it enough and I'm sure nobody in here is saying "oh yeah I can't wait to go home and read this thing" Right? But it dictates how this thing is gonna go down.

April 18 Meeting at LDJ5

On April 18, Katie Lev held a mandatory meeting with employees at LDJ5. (Tr. 293–294) (GC Exh. 7). During the meeting, Lev talked extensively about union dues, union security clauses, and dues check off. Lev's comments including the following statements regarding union security clauses (GC Exh. 7).

[14:45-16:58] - So the parties are going to ask for different things that they want. The union has things that they want that are different from what you guys want. For example, union shop clause. Anybody know what happens if you don't pay dues in the State of New York, you're covered by the union contract with a shop clause. So I've been in a union. If I didn't pay my dues I was terminated. Not paying your dues isn't an option, you are fired. So when I was in the union, I didn't think the union… I was in a union here as a room service girl for a large hotel, when I was a room service girl, if I didn't pay my dues I was terminated, so I paid my dues. My frustration with that and it's part of my opinion this is an organization that's supposed to be helping me, I did not think they were helping me but I still had to pay. So my little way of thinking about things is if I hire a plumber to fix my toilet and he doesn't fix my toilet, I don't want to pay him. So if they're not fixing things for me, they're making things worse for me, I don't want to pay them. If I didn't pay them, I would be terminated. That didn't make sense to me in the whole hiring someone to do something for you and not having to pay them if they don't actually do anything. So that's what union shop clause is. It is not an option not to pay your dues, you are terminated. If you are having this conversation in Florida, I'd be like, don't worry about it. If you don't like the contract, if the union is not helping you, just don't pay them. The State of Florida said, that is not okay to fire someone for something that has nothing to do with your performance at your job.  They're not allowed to fire people because of that. Michigan, Florida, Texas, 28 states have said that's illegal. But in the State of New York to pay dues is a condition of employment, that's the law permits that. So that's the union shop clause.

Lev also made the following comments regarding employee increases and improvements while a contract is being negotiated with a union representative (GC Exh. 7):

**Lev** - [27:20-28:04] - Okay, so, less I be accused again of being a liar, this is from Bloomberg law. So they did a study.  The average contract takes 409 days to reach an agreement. So over at JFK8, a year goes by and other places have gotten increases, and other changes and improvements have been made at other buildings, but JFK8, they're in a collective bargaining process, that's frozen, and if employees are standing up going, "it's been a year, we haven't gotten anything, I thought we were going to do this." Maybe their picture gets taken, maybe they dig up something in their past, this is what they do if you disagree with them. They put a little "wanted" poster out for you. Yes?

**Employee** - [28:04-28:06] - Is that why I can't change my schedule?

**Lev** - [28:10-28:49] - Yeah, they are not allowed to make any changes. You guys are in the same status quo as they are. The difference is, you guys are in the preelection status quo, they are in the pre-collective bargaining status quo. Exactly the same impact. So if you ask to make a change now, your managers are like "Oh, I can't, we'll talk to you about it later." Because while this process is going on, everything is frozen. So,

409 days, if they're on average, they will not have a contract a year from now. … I would expect 8,000 would be longer, but maybe it's shorter, nobody knows.

**Employee** - [28:49-28:54] - If the Union is voted in, I would have to wait the average, like that much days to fix my schedule?

**Lev** - [28:54-30:22] - Yeah. That's the average but again, it could be much shorter, it could be much shorter. Like I'm trying to say, like, both sides. I know I sound so negative, but it could be more, it could be less, it could be the same. That's not negative. I know reading this sounds negative, but like I'm sorry but it's raining outside. That's negative. But that's not fear mongering. I've never said anything that's fear mongering. This is just a fact. If this frightens you, then you should vote no, if it doesn't frighten you, then you could vote yes. But telling someone the truth shouldn't be scary. I'm not saying anyone's going to lose anything, but I'm also saying I don't know if anyone is going to gain anything. You can decide whether you want to roll the dice and be bound by this. So, 409 days on average, some other data, this comes from the Economic Policy Institute, this is from 2021, more than half of all workers who vote to form a union are still without a collective bargaining agreement a year later, 37% are without an agreement over two years later. Does that mean you should vote no? Of course not, it just means that expect to be really, really patient because it's a long process. That doesn't mean the ALU is bad, it doesn't mean unions are bad, it just means this is the data on how long it takes.

ANALYSIS

Discriminatory Enforcement of the Solicitation Policy

The complaint alleges that the Respondent violated Section 8(a)(1) by discriminatorily enforcing its solicitation policy when it removed messages that Miller posted on the VOA inviting employees to sign a Juneteenth petition at the Union tent and by threatening Miller with discipline for those postings.  (Complaint ¶ 11)  The General Counsel concedes that "an employer does not violate the Act by restricting the nonbusiness use of its IT resources absent proof that employees would otherwise be deprived of any reasonable means of communicating with each other, or proof of discrimination."  *Caesars Entertainment*, 368 NLRB No. 143, slip op. 8 (2019).  Nevertheless, the General Counsel, relying exclusively on *Guard Publishing Co. d/b/a The Register Guard*, 351 NLRB 1110 (2007), contends that the Respondent discriminatory enforced its solicitation policy along Section 7 lines.

*Removal of Miller's Post*

In *Register Guard*, the Board found lawful an employer's enforcement of a policy prohibiting the use of its email system for "non-job related solicitations" by issuing written warnings to an employee for emails urging other employees to support the union by wearing green and participating in a union entry in a parade. Id. at 1119–1120.  The Board refused to find the warnings discriminatory even though the employer allowed employees to send personal e-mail messages (i.e., emails concerning social

gatherings, jokes, baby announcements, offers of sports tickets, and requests for services such as dog walking) because the employer did not have a practice of permitting emails which solicited support for groups, causes, or organizations. Id. at 1117, 1119. The union-related emails were found to be "unprotected" because they violated a lawful solicitation policy in the absence of evidence that other email "solicitations" were allowed. Conversely, the Board found unlawful a warning issued to an employee that simply clarified facts about the union rally and "was not a solicitation." Id. 1119. Since the Respondent allowed other non-solicitation emails, the only difference between the prohibited and permitted emails "was union-related." Id. 1119.

In describing the appropriate analysis regarding the alleged discriminatory enforcement of a solicitation policy, the Board stated as follows:

> We find that the Seventh Circuit's analysis, rather than existing Board precedent, better reflects the principle that discrimination means the unequal treatment of equals. Thus, in order to be unlawful, discrimination must be along Section 7 lines. In other words, unlawful discrimination consists of disparate treatment of activities or communications of a similar character because of their union or other Section 7-protected status. See, e.g., *Fleming, supra, 349 F.3d at 975* ("[C]ourts should look for disparate treatment of union postings before finding that an employer violated *Sec. 8(a)(1)*."); *Lucile Salter Packard Children's Hospital at Stanford v. NLRB, 321 U.S. App. D.C. 126, 97 F.3d 583, 587 (D.C. Cir. 1996)* (charging party must demonstrate that "the employer treated nonunion solicitations differently than union solicitations").

> For example, an employer clearly would violate the Act if it permitted employees to use e-mail to solicit for one union but not another, or if it permitted solicitation by antiunion employees but not by prounion employees. In either case, the employer has drawn a line between permitted and prohibited activities on Section 7 grounds. However, nothing in the Act prohibits an employer from drawing lines on a non-Section 7 basis. That is, an employer may draw a line between charitable solicitations and noncharitable solicitations, between solicitations of a personal nature (e.g., a car for sale) and solicitations for the commercial sale of a product (e.g., Avon products), between invitations for an organization and invitations of a personal nature, between solicitations and mere talk, and between business-related use and nonbusiness-related use. In each of these examples, the fact that union solicitation would fall on the prohibited side of the line does not establish that the rule discriminates along Section 7 lines. For example, a rule that permitted charitable solicitations but not noncharitable solicitations would permit solicitations for the Red Cross and the Salvation Army, but it would prohibit solicitations for Avon and the union.

Id. at 1117–1118

Here, the General Counsel initially contends that all "Section 7-protected" VOA posts are of a similar character and, therefore, once the Respondent permits some Section 7-protected posts it must allow all Section 7-protected posts, including Miller's messages inviting employees to sign a Juneteenth petition at the Union tent. However, in *Register Guard*, the Board found that an employer may prohibit solicitation while permitting communications that do not rise to the level of solicitation. Id. at 1119. Thus, currently, the Board does not consider a solicitation versus non-solicitation distinction to be the "unequal treatment of equals" or the disparate treatment of communications of a "similar character." This rationale would logically apply even if the prohibited solicitation and allowed non-solicitation were both union-related or concertedly related to wages, hours, and other terms and conditions of employment.[9]

The General Counsel does identify as "solicitation" certain VOA messages which were not removed by the Respondent even though they were posted in support of a group, cause, or organization. Employees routinely posted VOA messages which sought other employees to "vote yes" or "vote no" in the union election. One employee posted a message asking other employees to "come get" a "VOTE NO" shirt in the breakroom. Employees posted concerted messages about safety and health concerns. Employees posted concerted messages in support of Juneteenth as a paid holiday, including this post by Miller on June 18:

> Since Juneteenth is now a federal Holiday shouldn't we get holiday pay as we do for all the other holidays. It's all over every news channel and in the papers as well that June 19 is now a federal holiday.

The Respondent argues that it did not discriminatorily enforce its solicitation policy along Section 7 lines, but simply enforced a Section 7-neutral policy which prohibits solicitation for "signatures on petitions." As noted in *Register Guard*, "an employer clearly would violate the Act if it permitted employees to use e-mail to solicit for one union but not another, or if it permitted solicitation by antiunion employees but not by prounion employees." Id. at 1118. Although such posts are all union-related, by enforcing a policy in a manner that takes the side of one union over another or one union over no union, "the employer has drawn a line between permitted and prohibited activities on Section 7 grounds." Id. Until July, the Respondent did not remove union-related posts and did not remove posts promoting Juneteenth as a paid holiday. Accordingly, it is not so obvious that the Respondent drew a line between prohibited and permitted solicitations along Section 7 lines.

The issue presented here is a difficult one and I look to the totality of the circumstances to answer it. The Respondent essentially maintained the VOA as an open forum and did not, until

---

[9] The General Counsel also claims that the Respondent's application of its solicitation policy to remove Miller's post is "fallacious" because the policy exempts communication that "relates to terms and conditions of employment." However, solicitation policy FAQ number 4 echoes the law in *Register Guard* by prominently noting that solicitation is

legally protected only if it "**Does NOT**" use company electronic equipment "*and*" relates to terms and conditions of employment. The VOA is an electronic system and, therefore, VOA posts are not exempt from the solicitation policy.

July, remove any posts. In a Chime exchange, Edwards said, "I'm shocked Stephanie is suggesting to remove a VOA comment but I'm aligned 100%" because "[i]t is not asking any type of question and instead antagonizing and trying to rally a group of people."[10] The VOA post which sticks out as particularly similar to Miller's message inviting employees to sign a Juneteenth petition at the Union tent is another VOA post which invited employees to come get a "VOTE NO" shirt in the breakroom. The post regarding "vote no" shirts appears to violate the solicitation policy (as clarified by FAQ number 1) against distribution in the same way Miller's post violated the policy against the solicitation of signatures for petitions. The Respondent removed posts from the VOA for the first time during a union organizing campaign it opposed and the removed posts referenced a petition available for signing at the Union tent. At the time, the Respondent was already circulating literature designed to dissuade employees from signing union authorization cards which were available at the Union tent. On July 12, when Tanelli told Miller her post would be removed as a violation of the solicitation policy, he said the post prohibited "anything related, like, to the ALU, and the tent, things like that like for going and signing up." Although it is a close question under current law, the context could reasonably cause an employee to believe that the Respondent was discriminatorily enforcing its solicitation policy by prohibiting posts regarding the signing of documents at the Union tent along Section 7 lines while allowing other solicitations of a similar character to remain.

Accordingly, I find that the Respondent violated Section 8(a)(1) of the Act by discriminatorily enforcing its solicitation policy when it removed Miller's VOA messages inviting employees to sign a Juneteenth petition at the Union tent. (Complaint ¶ 11(a).)

### Threat of Discipline

The General Counsel contends that Tanelli unlawfully threatened Miller with discipline for reposting the VOA message which invited employees to sign a Juneteenth petition at the Union tent. (Complaint ¶ 11(b).)

I do not find the alleged violation because Tanelli did not threaten Miller with discipline during their July 12 meeting. Tanelli specifically told Miller she was not in trouble and was not being disciplined for violating the solicitation policy. Tanelli told Miller the meeting was just for the purpose of educating her about the solicitation policy. Tanelli did tell Miller that there would be "additional follow up" if she reposted the message. However, "additional follow up" does not necessarily imply anything more than another educational meeting. Tanelli's comment did not dissuade Miller from reposting the message and Miller was not disciplined for doing so. The lack of an disciplinary "follow up" would tend to confirm that there had been no threat of discipline in the first place.[11] Accordingly, I will dismiss the allegation that the Respondent violated Section 8(a)(1)

of the Act by threatening Miller with discipline for reposting her July 9 VOA message. (Complaint ¶ 11(b).)

### Promises to Improve the Career Choice Program

The General Counsel contends that, on November 10 and 11, the Respondent violated Section 8(a)(1) by promising employees improved benefits for rejecting the Union. (Complaint ¶¶ 15(a), 16(a).) More specifically, the General Counsel contends that the Respondent unlawfully promised to improve the CCP.

"An employer violates Section 8(a)(1) when it promises, either explicitly or impliedly, improved benefits contingent on employees giving up union representation." *Unifirst Corp.*, 346 NLRB 591, 593 (2006), citing *Bakersfield Memorial Hospital*, 315 NLRB 596, 600 (1994). However, employers may make truthful statements to employees concerning benefits available to their unrepresented employees and ask those employees not to unionize on that basis. *Unifirst Corp.*, 346 NLRB at 593 (2006), citing *TCI Cablevision of Washington*, 329 NLRB 700 (1999). Further, an employer may reference, during an organizing campaign, a benefit which was announced before the union campaign as a reason for employees not to unionize. *Horseshoe Bossier City Hotel & Casino*, 369 NLRB No. 80 (2020), citing *Hampton Inn NY-JFK Airport*, 348 NLRB 16, 17–18 (2006). Thus, the Board makes a distinction between (1) an employer referencing its existing or lawfully announced benefits as a reason not to unionize and (2) the promise of new benefits as a reason not to unionize. Only the latter is unlawful.

Here, in about April, the Union conspicuously began its organizing campaign at JFK8. In September, the Respondent announced company-wide improvements to the CCP. At a mandatory meeting held on November 10, Williams made the following comments:

> At JFK8, we have an amazing team, and we truly believe that by working together with our associates and direct interaction with our associates, allows us to make rapid improvement, course correct, and improve our work place.
> . . .
> And that's why Amazon, effective January 1, we will be paying 100% tuition, college tuition, education tuition. You guys have heard of that? [unidentified voice answers "yea."] Yeah? If you haven't, if you don't have an associate degree or bachelor's degree, and that's what you want, that's at your disposal. That is something that Amazon is going to implement because we've listened to our associated.

At a mandatory meeting held on November 11, Rebell made the following comments regarding changes to the CCP:

> So who here has heard of the Career Choice program? A couple right? So you have a lot of benefits right now. I'm just going to dive in a little bit to that one because we're constantly looking

---

[10] The General Counsel did not allege that the employer's enforcement of the solicitation policy was motivated by a discriminatory purpose and I do not address the same herein. (Tr. 428–430) See *Kroger Ltd. Partnership*, 368 NLRB No. 64 slip op. 11–12 (2019).

[11] The General Counsel relies on certain evidence that the Respondent did, in fact, consider disciplining Miller. (GC Exhs. 55–56.) However,

the General Counsel concedes that the 8(a)(1) threat analysis is an objective one from the perspective of a "reasonable employee." The Respondent's disciplinary deliberations are irrelevant because they were not communicated to Miller.

at ways to improve those type of programs. For instance, Career Choice today, you have to be employed with Amazon for a year and then it would pay roughly about 80% of that tuition. Come January that benefit is getting better. It's going to go down to only being here 90 days before you can take advantage of that and it's going to pay 100% of that tuition. And that's for programs . . . that help you stay here with Amazon or something that's just needed in the community. I've seen things like from CDL licensing that maybe you stay with Amazon and work with the transportation or the TOM team or maybe you could go to an outside business or heck even start your own business for trucking but also things like medical billing and coding and into the health field. From IT different things and getting those certificates or degrees. I've seen HVAC. Many different programs that are offered at that. And again that's a benefit that you have right now for free that is also getting better come January. So that's just one thing.

The General Counsel cites *Manor Care Health Services-Easton*, 356 NLRB 202, 219–223 (2010), and *MEMC Electronic Materials, Inc.*, 342 NLRB 1172, 1175 (2004), for the proposition that the Board will presumptively infer interference with Section 7 rights when an employer announces or grants benefits during a union organizing campaign, unless the employer can show it had a legitimate business reason for the change.

In *Manor Care*, 356 NLRB 202, 219–223 (2010), a union began a multistate organizing campaign of an employer's facilities in September 2007. In October 2007, the employer unlawfully solicited employee grievances regarding pay and promised to remedy them "without a second party involved." 356 NLRB at 220-221. In November 2007, the employer granted employee wage increases and lump sum payments. Id. at 222. The Board affirmed the judge's ruling that the pay increases violated Section 8(a)(1). Id. at 202, fn. 3. The complaint alleged that the wage increases also violated Section 8(a)(3), but the judge found it unnecessary to reach that allegation as the remedy would be the same as the 8(a)(1) violation. Id. at 223.

In *MEMC Electronic Materials, Inc.*, 342 NLRB 1172, 1174–1176 (2004), wage cuts became a key issue in a union campaign. Just 4 days after the employer and union entered into a stipulated election agreement, the employer reversed course and announced to employees that half the wage cuts would be restored shortly before the scheduled election and the other half would be paid out thereafter in monthly lump payments. Id. at 1173. The employer made subsequent remarks to employees implying that the pay restoration was intended to quell worker anger which caused the union campaign. The Board found that the employer violated Section 8(a)(1)[12] by announcing and implementing the wage restorations, and stated:

In conferral-of-benefits cases, the board has consistently inferred a violation of Section 8(a)(1) from nothing more than conferral itself during the pendency of an election, leaving it to the employer to make an affirmative showing that the grant of benefits was governed by factors other than the impending election. See, e.g., *Speco Corp.,* 298 NLRB 439, 443 (1990); *Brooks Bros.,* 261 NLRB 876, 882 (1982); *Gordonsville Industries,* 252 NLRB 563, 575 (1980).

. . .

One way in which an employer may explain the conferral of benefits during the pendency of an election is to establish that the grant of benefits "had been conceived and implemented prior to the union's arrival, and that the preelection announcement simply made known to employees a predetermined and existing benefit, legitimately processed and unveiled in accordance with the dictates of business constraints, not union considerations." *Gordonsville Industries*, 252 NLRB at 575.

The instant case is significantly different than *Manor Care* and *MEMC Electronic Materials* in that the complaint does not allege that the Respondent unlawfully, as a violation of Section 8(a)(1) or 8(a)(3), announced changes to the CCP program in September or implemented unlawful CCP changes in January 2022. Unlike in those cases, here, the September company-wide announcement was not made at a time or in a manner which would dissuade employees' from supporting the Union.[13] Absent such an allegation, the Respondent's references in November to CCP changes legally announced two months earlier effectively functioned as a reminder of a lawful predetermined benefit. As noted above, employers may ask employees not to unionize based upon their current benefits. It would make little sense if an employer's decision and announcement of a change in benefits was lawful but a subsequent reference to that change was not.[14] Accordingly, I will dismiss the allegations that the Respondent violated Section 8(a)(1) of the Act by promising employees improvements to the CCP to discourage them from electing a union representative. (Complaint ¶¶ 15(a), 16(a).)

Solicitation of Grievances and Implied Promises to Remedy Them

The General Counsel contends that, on November 10 and 11, the Respondent violated Section 8(a)(1) by soliciting the grievances of employees and impliedly promising to remedy them to discourage union support. (Complaint ¶¶ 15(b), 16(b).)

The Board has held that the solicitation of employee grievances during a union organizing campaign "raises an inference that the employer is promising to remedy the campaign," particularly when "an employer has not previously had a practice of soliciting employee grievances." *Garda CL Great Lakes, Inc.*, 359 NLRB 1334 (2013), citing *Amptech Inc.*, 342 NLRB 1131, 1137 (2004). However, "an employer with a past practice of

---

[12] The Board found it unnecessary to pass on an 8(a)(3) allegation in the complaint.

[13] That CCP changes were announced 5 months after organizing began and before representation petitions were filed on a company-wide basis without any reference to union organizing would tend to negate an inference that it was a coercive promise to convince employees not to unionize. See *Nalco Chemical Co.*, 163 NLRB 68, 70–71 (1967).

[14] As the General Counsel did not allege that the September announcement of CCP changes was unlawful, I do not believe it is appropriate to initially infer that the announcement interfered with employees' Section 7 rights (even though it occurred during an organizing campaign). Regardless, the Respondent had a legitimate business reason to reference the predetermined changes in opposition to union organizing.

soliciting employee grievances through an open door or similar-type policy may continue such a policy during a union's organizational campaign." *Wal-Mart Stores, Inc.*, 340 NLRB 637, 640 (2003), citing *Kingsboro Medical Group*, 270 NLRB 962, 963 (1984). Ultimately, "it is not the solicitation of grievances itself that violates the Act, but rather the employer's explicit or implicit promise to remedy the solicited grievances that impresses upon employees the notion that representation is unnecessary." *Wal-Mart Stores, Inc.*, 340 NLRB 637, 640 (2003), citing *Maple Grove Health Care Center*, 330 NLRB 775 (2000), and *Uarco, Inc.*, 216 NLRB 1, 2 (1974). Thus, an employer's statement to employees that it can make no promises tends to work against the finding of a violation. See *Southern Monterey County Hospital*, 348 NLRB 327, 329 (2006), citing *Uarco, Inc.*, 216 NLRB 1, 2 (1974). Likewise, an employer's failure to offer any solution to a grievance tends to work against the finding of a violation. Id.

Here, I do not find that the Respondent, by Williams on November 10, violated the Act. Williams twice told employees he could not promise them anything.[15] Williams did not actually solicit employee grievances at the meeting and, therefore, was not in a position to offer any specific solutions.[16] Rather, Williams urged employees to direct their complaints to management at various levels pursuant to an open door policy and in forums that were already available.[17] These factors tend to diminish any inference of coercion and weigh against the finding of a violation. See *Southern Monterey County Hospital*, 348 NLRB 327, 329 (2006).

The General Counsel asserts that the Respondent failed to present evidence of an open door policy or establish that employees had an existing right to escalate complaints to higher management if those complaints were not remedied at a lower level. However, the Owner's Manual which was entered into evidence includes a provision titled "Open Door Policy and Conflict Resolution."[18] That policy indicates that employees "are welcome to discuss any suggestion, concern, or other feedback with any member of the company's management. Associates are encouraged to bring their ideas to the attention of management." (GC Exh. 58 p. 7). The policy further states (GC Exh. 58 p. 7):

> The majority of misunderstandings are satisfactorily resolved by a thorough discussion and mutual understanding between the parties involved. In general, it is best to discuss any concerns with your immediate supervisor first. If you are unable to reach a satisfactory resolution with your supervisor or are not comfortable discussing the issue with your supervisor, you are

welcome to discuss the matter with the next level of management, with Human Resources, or with any member of senior management.

The remainder of Williams' comments did not establish a context which implied that he was soliciting grievances and promising to remedy them if employees rejected the Union. Williams stated that it is "our job every day to listen to associates' concerns and try to remove barriers." In so stating, Williams gave no indication that the Respondent would do less for employees if they unionized or more for employees if they did not. Williams said he was "not here to bash anybody, I'm just giving you my opinion," and there are "two opposing sides" and "that's okay." Williams assured employees that, "regardless of what you decide to do or don't do, it is your choice, it is your right." In talking about what employees should do if they were approached by the Union, Williams stated:

> I'm going to be totally transparent, totally honest with you. That's entirely up to you. I'm not here to tell you what to do. That's up to you. It is your right. Okay. I just want you to make an informed decision. That's it. I'm not telling you to go this way or that way. Again, that is your right, your decision, and we respect that. We're only here to provide you with the facts, as we see it. We're not promising you anything. We're not telling you to go left or go right. That's up to you. But, if you don't have all of the information, you can make the wrong decision.

In my opinion, Williams' comments never spilled over into an implied promise that, if employees did not unionize, their complaints would be presented in new forums, processed in a different way, be taken more seriously, or be remedied more favorably than they had been in the past. Under current law, the Respondent was not forbidden from campaigning against unionization by asserting that employees already have the ability to approach management at all levels and in various forums to present their grievances. Under current law, the Respondent is entitled to tell employees that it wants to maintain a direct relationship with employees that does not include what it perceives to be the intervention of a third party union. Certainly, employees might not agree with the Respondent and take issue with a characterization of a union as a "third party," but that does not render the comments unlawful.

Similarly, I do not find that the comments of Rebell and Edison, on November 11, were unlawful. Their presentation largely concerned an explanation of existing policies and forums for

---

[15] Compare *ManorCare Health Services-Easton*, 356 NLRB 202, 220 (2010), cited by the General Counsel, in which the employer specifically told employees that they "had heard there was a lot of complaints and concern. And that they're here to try to fix it without a second party involved."

[16] Compare *Aldworth Company, Inc.*, 338 NLRB 137, 179 (2002), cited by the General Counsel, in which the employer made notes of employee grievances during a meeting and responded by issuing a letter with specific remedies.

[17] Compare *Edward A. Utlaut Foundation, Inc.*, 249 NLRB 1153, 1156 (1980), cited by the General Counsel, in which the employer changed its method of soliciting grievances from a generally neglected

suggestion box to an announcement that complaints about sick leave policy could be changed and "taken care of."

[18] Although not entirely clear, the General Counsel perhaps asserts that the Respondent presented no evidence about its open door policy because the 2019 Owner's Manual was entered into evidence and the 2021 version was not. However, Edwards testified that she believed the 2019 Owner's Manual was not changed. Further, we are concerned, here, with the Respondent's policy that has historically been in effect. There was an open door policy in effect in 2019 and there is no evidence that it changed before the Respondent's agents made reference to it in November.

employees to express and resolve complaints. Like Williams, Rebell and Edison did not solicit particular grievances or offer to resolve them. While Rebell and Edison did not expressly state that the Respondent could not promise employees anything, Rebell did suggest that employees do research and "go straight to the National Labor Relations Board's website." I do not find that Rebell and Edison ever moved beyond a recitation of the Respondent's existing policies and practices, and into an implied promise to remedy complaints in a new or different way.

Based upon the foregoing, I will dismiss the allegations that the Respondent violated Section 8(a)(1) of the Act by soliciting employee grievances and impliedly promising to remedy them to discourage union support. (Complaint ¶¶ 15(b), 16(b).)

### Threats to Reduce Employees' Wages as a Result of Union Dues

The General Counsel contends that in anti-union literature and in mandatory meetings held on November 11, February 16, and April 18, the Respondent violated Section 8(a)(1) by threatening to withhold employees' wages if they chose to be represented by the Union. (Complaint ¶¶ 7(b), 8(b), 16(c), 17(a), 19(a)) More specifically, the General Counsel contends that the Respondent unlawfully threatened employees with reduced wages by stating that the Union would charge them certain monetary amounts, including dues and fees.

In *Office Depot*, 330 NLRB 640, 642 (2000), the Board stated as follows in rejecting an allegation that the employer violated Section 8(a)(1) by telling employees they would need to pay union dues if the union were elected:

> We find nothing unlawful in the Respondent's statement that the employees would have to pay [u]nion dues if they selected the [u]nion. It is an economic reality that unions may collect dues from the employees they represent. The Respondent's statement about dues simply conveys to employees this reality. It does not convey any explicit or implicit threat of reprisal against employees for exercising their statutory right to select a union as their exclusive collective-bargaining representative. Even if the Respondent's statement could be considered untruthful, in that not all employees in union-represented units "have" to pay union dues, it is still nothing more than a misrepresentation about unions' ability to enforce payment of dues and not a threat of adverse action by the Respondent. We, therefore, find that the Respondent's statement about Union dues does not violate Section 8(a)(1) of the Act. *New Process Co.*, 290 NLRB 704, 707 enfd. Mem. 872 F.2d 413 (3d Cir. 1989).

Similarly, in *Syncor International Corp.*, 324 NLRB 8, 8 (1997), the Board found lawful the statement, "if the Union should come in, then [employees] would be making less money after [they] paid dues to the Union." The Board explained:

> Viewed in context, [the employer's] remark about "making less money" cannot reasonably be interpreted as a threat to reduce employees' wages because of their union support. Rather, the clear implication of his remark was to serve as a reminder that the payment of union dues would result in an expense not currently borne by the employees.

Id. See also *Southern Monterey County Hospital*, 348 NLRB 327, 328 (2006) (supervisor's statement that unions just want employees' money and that employees would have to pay union dues without a guarantee of receiving benefits in return is lawful).

Here, in distributed literature, the Respondent advised employees that signing a union authorization card may obligate them to pay the Union a monthly fee out of their paychecks. On November 11, Rebell told employees the Union "will charge it's members dues, fees, fines, and assessments in exchange for representation." Rebell also told employees that, by signing an authorization card, "you could be authorizing the ALU to speak on your behalf or you could also be obligated to pay the union dues." On February 16, Bowers told employees that, if the Union is elected, "everyone's terms of employment will be up for negotiation and you will also be liable or payable for union does which are a representation fee that they take straight out of your pay check and give it to the ALU." Bowers also said that, as a result, employees' paychecks and budgets would change. On April 18, Lev told employees that, as an employee previously represented by a union, "if I didn't pay may dues, I was terminated. Not paying your dues isn't an option, you are fired." These statements are no more unlawful as threats of reduced wages than employer statements deemed legal in the cases cited above.

The cases relied upon by the General Counsel are inapposite.[19] In *Shamrock Foods*, 366 NLRB No. 17 (2018), and *Reno Hilton*, 319 NLRB 154 (1995), the employers made generalized assertions that employees would suffer harm as a result of organizing in the context of other unlawful threats of plant closure, termination, and the reduction of benefits. As noted by the Board in *Shamrock Foods*, while discussing the decision in *Reno Hilton*, the "numerous other unfair labor practices, including threats of closure, discharge, and loss of benefits, . . . gave the [general] assertion 'both specificity and force.'" *Shamrock Foods*, 366 NLRB at slip op. 14. The statements at issue here were not generalized threats, but specific statements about the impact of union dues, which the Board has found to be lawful.[20] Further, the alleged unlawful statements were not made in a context rife with unfair labor practices.

Based upon the foregoing, I will dismiss the allegations that the Respondent violated Section 8(a)(1) of the Act by threatening the reduction of employees' wages as a result of the assessment

---

[19] In their brief, the General Counsel essentially concedes that statements regarding the payment of union dues, alone in isolation, might not be unlawful. (GC Br. pp. 41, 82)

[20] In *Clements Wire & Mfg. Co.*, 257 NLRB 206, 213 (1981), cited by the General Counsel, the employer unlawfully told employees they would be "making less money, not more." Although the employer also discussed union dues, the employer did not tell employees they would make less money *because* they paid union dues. The statement about making less money and paying dues were separate. The General Counsel also relies on the dissent in *Tesla, Inc.*, 370 NLRB No. 101 (2021), but I am bound to apply current Board law, including majority opinions.

of union dues or fees.  (Complaint ¶¶ 7(b), 8(b), 16(c), 17(a), 19(a).)

Threats of Loss of Existing Wages and Benefits as a Result of Bargaining

The General Counsel contends that, on February 16, the Respondent violated Section 8(a)(1) by threatening to withhold employees' existing wages if they chose to be represented by the Union.  (Complaint ¶ 17(b).)

The Board has noted that "[a]n employer can tell employees that bargaining will begin from 'scratch' or 'zero' but the statements cannot be made in a coercive context or in a manner designed to convey to employees a threat that they will be deprived of existing benefits if they vote for the union."  *Somerset Welding & Steel, Inc.*, 314 NLRB 829, 832 (1994), citing *Belcher Towing Co.*, 265 NLRB 1258 (1982).  "Additionally, employees can be told that bargaining will start from zero but they cannot be threatened with the loss of benefits and left with the impression that all they will 'get' is what the union can restore to them."  *Somerset Welding & Steel, Inc.*, 314 NLRB at 832, citing P*lastronics, Inc.*, 233 NLRB 155 (1977).  Thus, the Board distinguishes "between (1) a lawful statement that benefits could be lost through the bargaining process and (2) an unlawful threat that benefits will be taken away and the union will have to bargain to get them back."  *So-Lo Foods, Inc.*, 303 NLRB 749, 750 (1991).

The Board has recognized that "'bargaining from scratch' is a dangerous phrase which carries within it the seed of a threat that the employer will become punitively intransigent in the event the union wins the election."  *Coach and Equipment Sales Corp.*, 228 NLRB 440, 440 (1977).  In *Coach and Equipment Sales*, 228 NLRB at 440–441, the Board explained the evaluation of such statements as follows:

[W]here a bargaining-from-scratch statement can reasonably be read in context as a threat by the employer either to unilaterally discontinue existing benefits prior to negotiations, or to adopt a regressive bargaining posture designed to force a reduction of existing benefits for the purpose of penalizing employees for choosing collective represent, the Board will find a violation.  Where, on the other hand, the clearly articulated thrust of the bargaining-from-scratch statement is that the mere designation of a union will not automatically secure increases in wages and benefits, and that all such items are subject to bargaining, no violation will be found.  A close question sometimes exists whether bargaining-from-scratch statements constitute a threat of economic reprisal or instead constitute an attempt to portray the possible pitfalls of the collective bargaining process.  The presence of contemporaneous threats or unfair labor practices is often a critical factor in determining whether there is a threatening color to employer's remarks.

In *Tufts Brothers Inc.*, 235 NLRB 808, 808 (1978), an employer was found to have unlawfully told employees that the law required him to freeze all benefits and start from scratch if the union were elected.  The Board observed as follows in finding the comments unlawful:

It is permissible to inform employees of the realities of collective bargaining, which include the possibility the Union, in order to secure some other benefits, might trade away some existing benefits.  However, in this case the totality of the circumstances surrounding the bargaining-from-scratch statements demonstrated that the risk of loss stems not from the give and take of good-faith bargaining, but from a regressive bargaining posture predetermined by the employer.

Id.

On February 16, Bowers had the following exchange with a JFK8 employee:

**Bowers:**  So, with a union, terms and conditions of employment must be negotiated before changes can be made and they must be negotiated in good faith.  Now good faith means that neither party can come to the table and say, "I want this or it's nothing."  Both parties have to  compromise, both parties have to give and take and… until changes can be made.  So, the negotiations process is called collective bargaining and, in negotiations, there are no guarantees.  Nobody can predict these results from the good faith bargaining process.  And you can end up with better, the same, or worse than you currently have.  There are no guarantees as to what the outcome will be.

**Palmer:**  So, wait, you're saying we could end up with worse?  What does that mean by that?

**Bowers:**  So, there are no guarantees as to what will happen, right?  So, we can't make any promises that things will get better or stay the same.  Cause it could get worse.  We can't promise what's going to happen.  Amazon can't promise you that they're going to walk into negotiations and the negotiations will start from the same.  It could start from minimum wage for instance.  I'm not saying that that will happen but it is a possibility.

I note first that this is not clearly a case, like those cited by the General Counsel,[21] in which the Respondent unlawfully threatened to reduce employees' wages and require the union to bargain to get them back.  Bowers initially noted that "terms and conditions of employment must be negotiated before changes can be made and they must be negotiated in good faith."  From that premise (i.e., wages would not be reduced before negotiations occur), although perhaps stated somewhat clumsily, Bowers indicated that the Respondent might start with the bargaining position that employees should receive a pay reduction to the minimum wage (employees currently earn more than the minimum wage).

Bowers did, however, raise the possibility that the Respondent

---

[21] *Taylor-Dunn Mfg. Co.*, 252 NLRB 799, 800 (1980); *Noah's New York Bagels*, 324 NLRB 266, 266–267 (1997); *Noah's Bay Area Bagels,* *LLC*, 331 NLRB 188, 188 (2000); *Coach and Equipment Sales Corp.*, 228 NLRB 440 (1977).

would take a regressive bargaining posture. Presumably, the Respondent has an economic reason (i.e., hiring and keeping employees) for paying employees their current wages and benefits. The Board has tended to find employer statements lawful when they include at least some indication that wages or benefits might be reduced as a result of "trading" or the give-and-take of negotiations. See e.g., *Sunbelt Mfg., Inc.*, 308 NLRB 780, 791 (1992) aff'd 996 F.2d 305 (5th Cir. 1993); *Lear-Siegler Management Service*, 306 NLRB 393 (1992); *Bi-Lo*, 303 NLRB 749, 750 (1991); *Uarco*, 286 NLRB 55 (1987). Bowers did so in telling employees, "[b]oth parties have to compromise, both parties have to give and take . . . until changes can be made." In *Mediplex of Connecticut, Inc.*, 319 NLRB 281, 281 (1995), the Board stated that employees are "capable of evaluating" such "campaign propaganda" that union representation "might result in less desirable benefits." The comments by Bowers seem to fall within the scope of precedent finding such comments to be lawful. Finally, as noted above, Bowers did not make her comments in a context rife with other unfair labor practices.[22]

Accordingly, I will dismiss the allegation that the Respondent violated Section 8(a)(1) of the Act by threatening employees with the loss of existing wages as a result of collective bargaining. (Complaint ¶ 17(b).)

### Threat of Unlawful Discharge Pursuant to a Union-Security Clause

The General Counsel contends that, on March 15, the Respondent violated Section 8(a)(1) by threatening employees with discharge if they chose to be represented by the Union. (Complaint ¶ 18(A)(a).) More specifically, the General Counsel contends that the Respondent unlawfully threatened employees with discharge pursuant to a union security clause.

On March 15, Warrior told JFK8 employees that a "union shop clause would require Amazon to fire you if you don't want to join the union and pay union dues."

The General Counsel and Respondent both cite *Didlake, Inc.*, 367 NLRB No. 125 (2019). In that case, an employer told employees that, if the union wins, "[f]irst thing they will require you to do is join the union. . . . And if you don't, you will not be able to work here." Id. slip op. at 2. The employer also told employees that, if the union wins, "you have to join as a condition of your employment to be here, and you will be paying the union dues." The Board majority acknowledged that the employer's comments "misstated the law when they characterized union membership and the payment of dues as a 'condition of employment if the [u]nion won the election." Nevertheless, the Board majority found that "the employer's statements to employees respecting their dues obligation are not coercive . . . even if they contain misstatements of law." Id. slip op. at 2, citing *Midland National Life Insurance Co.*, 263 NLRB 127 (1982).

The General Counsel invites me to rely on the dissent in *Didlake* rather than the majority decision. The dissent reasoned that the employer's misstatements of law were objectionable because they "threatened employees that if they chose the [u]nion, the [e]mployer certainly would require them to join the [u]nion and

pay dues or be fired." Id. at 5. While this reasoning might command a majority in the instant case, I must apply current Board law, including majority decisions. Accordingly, I will dismiss the allegation that the Respondent violated Section 8(a)(1) of the Act by threatening employees with unlawful discharge pursuant to a union security clause if they chose to be represented by the Union. (Complaint ¶ 18(A)(a).)

### Threats to Withhold Improved Wage and Benefits while Bargaining Takes Place

The General Counsel contends that on March 15, April 10, and April 18, the Respondent violated Section 8(a)(1) by threatening to withhold improvements in wage and benefits from employees if they chose to be represented by the Union. (Complaint ¶¶ 18(A)(b), 18(B), 19(b)) More specifically, the General Counsel contends that the Respondent told employees their terms of employment would be frozen and not improve while lengthy bargaining takes place.

The Board has found that an employer violates Section 8(a)(1) by advising employees that their wages would be frozen or put on hold during negotiations and that they would not share in traditional wage increases which may be received by nonunion employees. *DHL Express, Inc.*, 355 NLRB 1399, 1399–1400 (2010); *California Gas Transport, Inc.*, 347 NLRB 1314, 1314, 1349 (2006); *Jensen Enterprises*, 339 NLRB 877, 877–878 (2003); *Teksid Aluminum Foundry, Inc.*, 311 NLRB 711, 717 (1993). In *DHL Express*, the Board distinguished certain cases—*Mantrose-Haeuser Co.*, 306 NLRB 377 (1992) and *Uarco*, 286 NLRB 55 (1987)[23]—in which the employer lawfully referenced a potential freeze in employees' terms of employment while contemporaneously assuring them that the status quo would require that union represented employees share in wage increases of a type they previously enjoyed.

The Respondent has a practice of granting regular wage increases based upon time of service. On April 18, Lev told LDJ5 employees, "[t]he average time to reach an agreement is 409 days. A year goes buy and other guys have received increases and improvements." Threats that the pay of unionized employees would be frozen in place during lengthy negotiations while nonunion employees receive regular increases and improvements is a violation of Section 8(a)(1). *DHL Express, Inc.*, 355 NLRB 1399, 1399–1400 (2010); *California Gas Transport, Inc.*, 347 NLRB 1314, 1314, 1349 (2006); *Superior Emerald Park Landfill, LLC*, 340 NLRB 449, 261 (2003); Jensen *Enterprises*, 339 NLRB 877, 877–878 (2003); *Teksid Aluminum Foundry, Inc.*, 311 NLRB 711, 717 (1993).

Conversely, I do not find Smith's April 10 comments to LDJ5 unlawful. Smith told employees that federal law imposes no time limit on collective bargaining or guarantee that union represented employees would obtain a contract in 6 months or year. Smith also explained the law as it pertains to the "status quo" as follows:

> Okay, so once the union files a petition, and she's correct, once the union files a petition, okay, everything must remain the

---

[22] In so finding, I note that the statements I have found to be unlawful were not made by Bowers on February 16.

[23] Both cases are relied upon by the Respondent.

same. I can't give you anything and I can't take anything away. This law was written in 1935. Logic behind it was if you guys have a union election coming up and I give you things, I might be bribing you into voting no or if I take things away from you, I might be punishing you for bringing in a union, right? Neither of those things are legal. So you stay at status quo. The problem comes in with status quo, a lot of employees feel, is that when they vote a union in and they expect changes to happen right away, status quo says nothing can change until and if you reach an agreement, and I use the word "if" because actually there is nothing in federal law that guarantees you a contract at the end of the process.

Although Smith did not expressly tell employees they would continue to receive regular wage increases, she did assure them that they would not be punished for unionizing. In my opinion, Smith's comments fall within the scope of statements the Board has found to be lawful. See *Mantrose-Haeuser Co.*, 306 NLRB 377 (1992); *Uarco*, 286 NLRB 55 (1987).

Warrior's March 15 comments to JFK8 employees fall between those of Lev and Smith. Warrior told employees that "contracts typically take months or years and typically there are no changes in wages or benefits, and what happens if the parties can't agree to a contract?" Warrior did not expressly state that union represented employees would not share in improvements of unrepresented employees, but impliedly raised the prospect without offering any contemporaneous reassurance to the contrary. Thus, Warrior's comments come within the scope of cases the Board finds unlawful. *DHL Express, Inc.*, 355 NLRB 1399, 1399–1400 (2010); *California Gas Transport, Inc.*, 347 NLRB 1314, 1314, 1349 (2006); *Jensen Enterprises*, 339 NLRB 877, 877–878 (2003); *Teksid Aluminum Foundry, Inc.*, 311 NLRB 711, 717 (1993).

Based upon the foregoing, I find that the Respondent, by Warrior and Lev, on March 15 and April 18, respectively, violated Section 8(a)(1) of the Act by threatening to withhold improvements in employees' wages and benefits during negotiations. (Complaint ¶¶ 18(A)(b), 19(b)) I will dismiss the allegation that the Respondent, by Smith on April 10, did the same. (Complaint ¶ 18(B).)

CONCLUSIONS OF LAW

1. The Respondent, Amazon.Com Services LLC, is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union, Amazon Labor Union, is a labor organization within the meaning of Section 2(5) of the Act.

3. The Respondent violated Section 8(a)(1) of the Act by

discriminatorily enforcing its solicitation policy along Section 7 lines.

4. The Respondent violated Section 8(a)(1) of the Act by threatening to withhold employee improvements in wages and benefits while collective bargaining takes place.

5. The unfair labor practices committed by the Respondent affect commerce within the meaning of Section 2(6) and (7) of the Act.

6. The remainder of the complaint allegations are dismissed.

THE REMEDY

Having found that the Respondent, Amazon.com Services LLC, engaged in unfair labor practices, I shall order the Respondent to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

The Respondent will be ordered to post, in English and Spanish, at its Staten Island JFK8 and LDJ5 facilities, the notice attached hereto as "Appendix."

As a remedy to the unlawful disparate enforcement of the Respondent's solicitation policy, the General Counsel argues that *AT&T Mobility*, 370 NLRB No. 121 (2021), be overruled and the solicitation policy be rescinded. However, I am not at liberty to overrule Board precedent.

The General Counsel has requested certain atypical remedies, including a notice reading and supervisor training by a Board agent. I deny these requests. I have not found many unfair labor practices and the ones I did find were not entirely obvious or clear cut. Accordingly, I find that the Board's traditional remedies are sufficient to effectuate the policies of the Act in this matter.

On these findings of fact and conclusions of law, and on the entire record, I issue the following recommended order[24]

ORDER

The Respondent, Amazon.Com Services LLC, Staten Island, New York, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Discriminatorily enforcing its solicitation policy along Section 7 lines.

(b) Threatening to withhold employee improvements in wages and benefits while collective bargaining takes place.

(c) In any like or related manner interfering, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days after service by the Region, post in English and Spanish at its JFK8 and LDJ5 facilities in Staten Island, New York, copies of the attached notice marked "Appendix."[25]

---

[24] If no exceptions are filed as provided by Section 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Section 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[25] If the facilities involved in these proceedings are open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region. If the facilities involved in these proceedings are closed or not staffed by a substantial complement

of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facilities reopen and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that

Copies of the notice, on forms provided by the Regional Director for Region 29, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed one or both of the facilities involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, copies of the notice to all current employees and former employees employed by the Respondent at any time since July 12, 2021.

(b) Within 21 days after service by the Region, file with the Regional Director for Region 29 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C., January 30, 2023.



APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT discriminatorily enforce our solicitation policy by removing messages posted on the Voice of Associates Board which are protected under Section 7 of the National Labor Relations Act.

WE WILL NOT threaten to withhold employee improvements in wages and benefits while collective bargaining takes place.

AMAZON.COM SERVICES LLC

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/29-CA-280153 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

---

"This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."