# In the United States Court of Appeals for the Eleventh Circuit

---

AMAZON.COM SERVICES, LLC,
*Petitioner-Cross-Respondent,*

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent-Cross-Petitioner.*

---

On Petition for Review and Cross-Application for Enforcement
from the National Labor Relations Board
Agency Nos. 29-CA-280153, 29-CA-286577, 29-CA-287614,
29-CA-290880, 29-CA-292392, and 29-CA-295663

---

## PETITIONER-CROSS-RESPONDENT'S PRINCIPAL BRIEF

---

Amber Rogers
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
arogers@hunton.com

Elbert Lin
Kurt G. Larkin
Kevin S. Elliker
David N. Goldman
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
elin@hunton.com
klarkin@hunton.com
kelliker@hunton.com
dgoldman@hunton.com

*Counsel for Amazon.com Services LLC*

## CORPORATE DISCLOSURE/
## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rules of Appellate Procedure 7.1 and 26.1, 11th Cir. L.R. 26.1-1, 11th Cir. L.R. 26.1-2, and 11th Cir. L.R. 26.1-3, the undersigned counsel of record for Petitioner-Cross-Respondent Amazon.com Services LLC ("Amazon"), a private limited liability company organized under the laws of the State of Delaware with its principal place of business in Seattle, Washington, hereby files this Certificate of Interested Persons and Corporate Disclosure Statement. The sole owner of Amazon.com Services LLC is Amazon.com Sales, Inc. The sole owner of Amazon.com Sales, Inc. is Amazon.com, Inc. Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Amazon.com, Inc. does not have a parent company, and no publicly held corporation owns 10% or more of Amazon.com, Inc.'s stock.

Amazon hereby certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

The following persons have an interest in the outcome of this particular case:

1.     Amazon.com, Inc. (NASDAQ: AMZN)

2.     Amazon.com Sales, Inc.

3.     Amazon.com Services LLC

4.     Amazon Labor Union (Charging Party)

5.      Burdick, Ruth E., Deputy Associate General Counsel Appellate and Supreme Court Litigation Branch of the National Labor Relations Board ("NLRB")

6.      Cabrera, Emily (Counsel for the NLRB General Counsel)

7.      Cowen, William B., Acting General Counsel of the NLRB

8.      Elliker, Kevin of Hunton (Counsel of record for Amazon)

9.      Green, Benjamin (Administrative Law Judge)

10.     Goldman, David of Hunton (Counsel of record for Amazon)

11.     Goldstein, Seth Lewis (Counsel for Charing Parties)

12.     Hunton Andrews Kurth LLP ("Hunton") (Law firm representing Amazon)

13.     Julien Mirer & Singla, PLLC (Counsel for Charging Parties)

14.     Larkin, Kurt of Hunton (Counsel of record for Amazon)

15.     Law Office of Seth Goldstein (Counsel for Charging Parties)

16.     Lin, Elbert of Hunton (Counsel of record for Amazon)

17.     Miller, Dana Joanna (Charing Party)

18.     Mirer, Jeanne (Counsel for Charging Parties)

19.     Cahn Stephanie, Acting Deputy General Counsel of the NLRB

20.     Poor, Teresa, Regional Director of Region 29 of the NLRB

21.     Region 29 of the NLRB

22.    Rogers, Amber of Hunton (Counsel of record for Amazon)

23.    Rucker, Jaime (Counsel for the NLRB General Counsel)

24.    Singla, Retu (Counsel for Charging Parties)

25.    Spence, Connor (Charging Party)

26.    The National Labor Relations Board

27.    Tooker, Lynda (Counsel for the NLRB General Counsel)

## STATEMENT REGARDING ORAL ARGUMENT

This challenge raises important issues of constitutional law and statutory interpretation as well as a host of other challenges to the Decision and Order of the National Labor Relations Board, which, among other things, overruled more than 70 years of Board precedent. Amazon desires oral argument and believes that it would be helpful to the Court's decision-making process.

## TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE/ CERTIFICATE OF INTERESTED PERSONS .....i

STATEMENT REGARDING ORAL ARGUMENT .............................................iv

TABLE OF CONTENTS.............................................................................v

TABLE OF AUTHORITIES ....................................................................ix

JURISDICTIONAL STATEMENT ..........................................................1

INTRODUCTION ..................................................................................2

STATEMENT OF ISSUES .....................................................................3

STATEMENT OF THE CASE..................................................................4

      A.   Factual Background .......................................................4

           1.   Amazon holds small group meetings to provide Associates with factual information regarding unionization. ......................4

           2.   Amazon emphasizes open communications with Associates....................................................................6

           3.   Amazon's presenters remind Associates about the Open Door Policy during small group meetings. ...............7

           4.   Amazon removes Associate Dana Miller's VOA post for violating the Solicitation Policy................9

           5.   Amazon reminds Miller about the Solicitation Policy. ..........10

B.    Procedural History ........................................................12

C.    Standards of Review ....................................................14

SUMMARY OF ARGUMENT ................................................15

ARGUMENT ..........................................................................18

I.    The Board's Mandatory-Meeting Rule Violates the NLRA and the

First Amendment. ...................................................18

A.    Congress enacted Section 8(c) to protect free expression in

labor matters....................................................19

B.    The mandatory-meeting rule uses an employer's expression of

views as evidence of an unfair labor practice in violation of

Section 8(c). ...................................................22

1.    The Plain Text.......................................23

2.    Legislative History.................................25

3.    Constitutional avoidance.........................28

C.    The mandatory-meeting rule violates the First Amendment. .........28

1.    The mandatory-meeting rule is content-based and triggers

strict scrutiny.......................................29

i.    The mandatory-meeting rule cannot be squared with

this Court's ruling in *Honeyfund.com*. ...........................30

ii.     Mandatory meetings do not fall within the First Amendment's limited captive-audience doctrine...........32

iii.    Neither *Hill* nor *Gissel* give the Board's rule a First-Amendment free pass. ...................................................34

2.      The mandatory-meeting rule fails strict scrutiny....................36

i.      The Board has not put forth a compelling interest. ........37

ii.     The mandatory-meeting rule is not narrowly tailored....41

II.     Amazon Did Not Unlawfully Solicit and Promise to Remedy Grievances. ...............................................................................43

A.      Employers may continue their preexisting practice of soliciting grievances during an organizing campaign.....................................43

B.      The Board's conclusion that Amazon unlawfully solicited grievances is not supported by substantial record evidence and ignores Amazon's Section 8(c) rights...............................................46

i.      The Board's conclusion is not supported by substantial evidence. ........................................................46

ii.     The Board also ignored Section 8(c). ............................47

III.    Amazon Did Not Disparately Enforce Its Solicitation Policy. ..............48

A.      Discrimination under the Act requires unequal treatment of equal conduct...................................................................................48

B.    The Board's finding that Amazon disparately enforced its

Solicitation Policy is not supported by substantial evidence..........49

IV.    Amazon Did Not Unlawfully Threaten Miller........................................52

A.    An employer does not threaten an employee unless the

statement would tend to interfere with the employee's Section 7

rights..............................................................................................53

B.    The Board's conclusion that Tanelli threatened Miller ignores

controlling precedent and is not supported by substantial

evidence..........................................................................................54

CONCLUSION.......................................................................................................57

CERTIFICATE OF COMPLIANCE.......................................................................58

CERTIFICATE OF SERVICE ...............................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com Servs. LLC,*

    373 NLRB No. 136 (Nov. 13, 2024) ....................................................1

*Amptech, Inc.,*

    342 NLRB 1131 (2004) ............................................................ 43-44

*Babcock & Wilcox,*

    77 NLRB 577 (1948) .................................................... 13-15, 21, 41

*BE & K Constr. Co. v. NLRB,*

    133 F.3d 1372 (11th Cir. 1997) (per curiam) ....................................20

*Bostock v. Clayton Cnty.,*

    590 U.S. 644 (2020)................................................................ 26-27

*Brown v. Entmt. Merchants Ass'n,*

    564 U.S. 786 (2011)................................................................ 39-40

*Butler Specialty Co.,*

    93 NLRB 608 (1951) .......................................................................21

*Calcutt v. FDIC,*

    598 U.S. 623 (2023) (per curiam)....................................................43

*Carey v. Brown,*

    447 U.S. 455 (1980)........................................................................31

*CBS Inc. v. PrimeTime 24 Joint Venture*,

245 F.3d 1217 (11th Cir. 2001) ..........................................................26

*Chamber of Com. of U.S. v. Brown*,

554 U.S. 60 (2008).................................................................... 20-21

*Clark Bros. Co.*,

70 NLRB 802 (1946), *enfd. on other grounds*, 163 F.2d 373 (2d

Cir. 1947) ........................................................................ 19-21, 26, 40

*Consolidated Bus Transit, Inc.*,

350 NLRB 1064 (2007), *enfd.*, 577 F.3d 467 (2d Cir. 2009) (per

curiam) ..................................................................................53

*Cox v. Louisiana*,

379 U.S. 536 (1965)..................................................................31

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades

Council*,

485 U.S. 568 (1988)..............................................................28, 36

*Erzoznik v. City of Jacksonville*,

422 U.S. 205 (1975).................................................................. 32-33

*Faurecia Exhaust Sys., Inc.*,

353 NLRB 382 (2008) ..............................................................49

*Food Mktg. Inst. v. Argus Leader Media*,

588 U.S. 427 (2019)......................................................................25

*Hill v. Colorado*,

530 U.S. 703 (2000)................................................................. 34-35

*Honeyfund.com Inc v. Governor*,

94 F.4th 1272 (11th Cir. 2024) ................................. 2, 16, 30-33, 35, 42

*Johnson Tech., Inc.*,

345 NLRB 762 (2005), *overruled on other grounds by Purple*

*Comm'cns, Inc.*, 361 NLRB 1050 (2014).................................... 44-45

*Kennedy v. Bremerton Sch. Dist.*,

597 U.S. 507 (2022)......................................................................37

*Linn v. United Plant Guard Workers of Am., Local 114*,

383 U.S. 53 (1966)..................................................................20, 26

*Longview Fibre Paper & Packaging, Inc.*,

356 NLRB 796 (2011) ............................................................. 44-45

*Loper Bright Enterprises v. Raimondo*,

603 U.S. 369 (2024)......................................................................15

*Lush Cosmetics, LLC*,

372 NLRB No. 54 (2023) ...............................................................55

*MacDonald Machinery Co., Inc.*,

    335 NLRB 319 (2001) ........................................................................44

*Miller v. Johnson*,

    515 U.S. 900 (1995)..........................................................................38

*NAACP v. Button*,

    371 U.S. 415 (1963).........................................................................42

*New York v. Ferber*,

    458 U.S. 747 (1982)....................................................................37, 40

*NLRB v. Gimrock Constr., Inc.*,

    247 F.3d 1307 (11th Cir. 2001) .................................................. 14-15

*NLRB v. Gissel Packing Co.*,

    395 U.S. 575 (1969)................................................. 20, 24, 34-35, 42

*NLRB v. Golub Corp.*,

    388 F.2d 921 (2d Cir. 1967) ...........................................................19

*Noah's Bay Area Bagels, LLC*,

    331 NLRB 188 (2000) ................................................................21, 41

*Oncale v. Sundowner Offshore Servs., Inc.*,

    523 U.S. 75 (1998).........................................................................27

*Otto v. City of Boca Raton*,

    981 F.3d 854 (11th Cir. 2020) ...................................... 28, 30, 36, 38-40

*Police Dept. of City of Chi. v. Mosley*,

    408 U.S. 92 (1972)....................................................... 28-29, 31

*Prof'l Med. Transp., Inc.*,

    362 NLRB 144 (2015) ....................................................51

*Pulsifer v. United States*,

    601 U.S. 124 (2024).......................................................27

*R.A.V. v. City of St. Paul*,

    505 U.S. 377 (1992).......................................................31

*Reed v. Town of Gilbert*,

    576 U.S. 155 (2015)................................................ 28-29, 36

*Rest. Corp. of Am. v. NLRB*,

    827 F.2d 799 (D.C. Cir. 1987)...........................................48

*Rockwell Automation/Dodge*,

    330 NLRB 547 (2000) ....................................................51

*Rosenberger v. Rector & Visitors of Univ. of Va.*,

    515 U.S. 819 (1995).......................................................29

*Rowan v. U.S. Post Office Dep't*,

    397 U.S. 728 (1970)................................................... 32-33

*Royal Canin U.S.A., Inc. v. Wullschleger*,

    604 U.S. 22 (2025).........................................................36

*Sable Comm'cns of Cal., Inc. v. FCC,*

 492 U.S. 115 (1989)...................................................................39, 42

*SEC v. Chenery,*

 318 U.S. 80 (1943).........................................................................37

*SEC v. Chenery,*

 332 U.S. 194 (1947).......................................................................43

*Shaw v. Hunt,*

 517 U.S. 899 (1996).......................................................................37

*Snyder v. Phelps,*

 562 U.S. 443 (2011).......................................................................32

*Suburban Elec. Eng'rs/Contractors, Inc.,*

 351 NLRB 1 (2007) ......................................................................54

*T-Mobile USA, Inc.,*

 369 NLRB No. 50 (Apr. 2, 2020) .............................................. 48-49

*The Guard Pub'g Co. d/b/a The Register Guard,*

 351 NLRB 1110 (2007), *enfd. in part and set aside in part,* 571

 F.3d 53 (D.C. Cir. 2009) ........................................................... 48-50

*Thomas v. Collins,*

 323 U.S. 516 (1945).......................................................................19

*TNT Logistics N. Am., Inc.*,

    345 NLRB 290 (2005) ................................................................. 44-45

*United States v. Eichman*,

    496 U.S. 310 (1990) ........................................................................38

*United States v. Playboy Entmt. Grp., Inc.*,

    529 U.S. 803 (2000) ................................................29, 35-37, 39-42

*Vitolo v. Guzman*,

    999 F.3d 353 (6th Cir. 2021) ..........................................................38

*In Re Wal-Mart Stores, Inc.*,

    340 NLRB 637 (2003), *enfd. as modified*, 400 F.3d 1093 (8th Cir.

    2005), *overruled on other grounds by Wynn Las Vegas, LLC*, 369

    NLRB No. 91 (May 29, 2020) ...................................................44, 47

*Wal-Mart Stores, Inc.*,

    350 NLRB 879 (2007) ............................................................. 51-52

*Whitney v. California*,

    274 U.S. 357 (1927) ........................................................................34

*Williams-Yulee v. Fla. Bar*,

    575 U.S. 433 (2015) ........................................................................37

*Wollschlaeger v. Governor*,

    848 F.3d 1293 (11th Cir. 2017) (en banc) ...........................29, 32-34, 37, 39-40

*Woodlawn Hospital v. NLRB*,

    596 F.2d 1330 (7th Cir. 1979) ...............................................................54

*Wynn Las Vegas, LLC*,

    369 NLRB No. 91 (May 29, 2020).....................................................54

**Statutes**

5 U.S.C. § 551(4)-(7) ...............................................................................43

5 U.S.C. § 706...........................................................................................15

29 U.S.C. § 151..................................................................................36, 38

29 U.S.C § 156...........................................................................................43

29 U.S.C. § 157............................................22-24, 32, 41, 48, 50, 53, 54

29 U.S.C. § 158(a)(1)................................... 3, 4, 22, 27, 42, 48, 49, 51

29 U.S.C. § 158(a)(3)................................................................................27

29 U.S.C. § 158(c) ......................... 2, 15-16, 18-28, 43, 46-47, 54, 56-57

29 U.S.C. § 160(a) .......................................................................................1

29 U.S.C. §160(f) ..................................................................................1, 14

Administrative Procedure Act (5 U.S.C. § 551 *et seq.*).....................15, 43

National Labor Relations Act (29 U.S.C. §§ 151, *et seq.*)
    ................................................ 1, 3, 13-15, 18, 20, 36, 43, 48, 54, 57

Labor Management Relations Act, 1947 (also known as the Taft-
    Hartley Act), ch. 120, 61 Stat. 136 .........................13, 19-20, 25-26, 40

**Other Authorities**

H.R. Rep. No. 510, 80th Cong., 1st Sess. 45 (1947) (Conf. Rep.) ..........25

S. Rep. No. 105, 80th Cong., 1st Sess. (1947)............................ 19-20, 26

U.S. Const. amend. I ............................. 2-3, 14, 16, 18, 20, 28, 31-36, 38-39, 43, 57

## JURISDICTIONAL STATEMENT

On November 13, 2024, the National Labor Relations Board ("NLRB" or "Board") entered the challenged Decision against Amazon. 373 NLRB No. 136, 2024 WL 4774441 (NLRB Nov. 13, 2024), AR1443-1484.[1] The NLRB had jurisdiction under 29 U.S.C. § 160(a) of the National Labor Relations Act ("NLRA" or "Act"). Amazon timely filed a petition for review on November 21, 2024. *Id.*; ECF.1. This Court has subject-matter jurisdiction pursuant to 29 U.S.C. §160(f). The parties agree the Decision is final under 29 U.S.C. § 160(f) and that Amazon is "aggrieved" by it. ECF.18; ECF.20.

---

[1] Administrative Record cites refer to the black Bates numbering in the upper-right hand corner of that document, not the blue ECF pagination.

## **INTRODUCTION**

This case is primarily about whether the federal government can shut down a private employer's right to speak to its employees on one topic the government disfavors. To describe the question is to arrive at the obvious answer: no, it cannot.

To reach the opposite conclusion, the Board strays off a path it has correctly followed for decades. In 1947, Congress enacted Section 8(c) of the NLRA, which expressly protects an employer's ability to state "any views, argument, or opinion" so long as "such expression contains no threat of reprisal or force or promise of benefit." For three quarters of a century, the NLRB abided by the direction of Congress set forth in this clear statutory mandate. But no longer. In its Decision, the Board throws aside decades of precedent and holds that an employer may not "require[] employees to attend a meeting at which the employer expresses its views on unionization." That attempt to rewrite history violates both Section 8(c) and the First Amendment, and cannot be squared with this Court's decision in *Honeyfund.com Inc v. Governor*, 94 F.4th 1272 (11th Cir. 2024).

The Board's contempt for freedom of expression and its effort to exert greater government control over speech in the private workplace, along with several other errors described below, require vacatur of the Board's decision.

## STATEMENT OF ISSUES

1.     For over 75 years, the Board recognized that employers did not violate the NLRA by holding mandatory meetings to address employees on union-organizing. Here, the Board overturned that precedent, adopting a new rule that directly contradicts the NLRA. Does this new rule violate the NLRA's protection of employer expression or the First Amendment's prohibition against content-based speech restrictions?

2.     Board precedent permits employers to solicit and encourage employee feedback using channels that predate union organizing. During the organizing campaign here, Amazon highlighted such long-established avenues for seeking out employee concerns. Is the Board's conclusion that Amazon's statements violated Section 8(a)(1) of the NLRA consistent with law and supported by substantial evidence?

3.     The Board found that Amazon violated Section 8(a)(1) of the NLRA when it enforced a facially neutral solicitation policy and removed from the company's electronic forum an employee's post soliciting signatures for the union, without any evidence that Amazon applied that policy inconsistently. Is the Board's conclusion consistent with law and supported by substantial evidence?

4.     When informing the employee her post had been removed, Amazon mentioned "additional follow up" if new posts went up, but did not discipline the

employee or suggest any possible discipline. Was the Board's conclusion that the mention of "additional follow up" constituted an unlawful threat under Section 8(a)(1) of the Act consistent with law and supported by substantial evidence?

## STATEMENT OF THE CASE

### A.    Factual Background

This case arises out of a union organizing campaign in 2021 and 2022 at two Amazon facilities in Staten Island, New York. In April 2021, a group of current and former Amazon employees formed the Amazon Labor Union ("ALU") and attempted to organize the hourly workforce at Amazon's JFK8 fulfillment center ("JFK8"). The ALU filed election petitions with the NLRB at JFK8 and later at Amazon's LDJ5 sortation center ("LDJ5") located across the street from JFK8. AR717, 719.

### 1.    Amazon holds small group meetings to provide Associates with factual information regarding unionization.

In response to the ALU's organizing campaign, Amazon sought to educate its employees ("Associates") about the pros and cons of unionizing. AR368:7-369:5. Amazon held a series of small group meetings, with each meeting covering a different topic relative to the ALU organizing campaign. AR368:20-369:5. Topics included information about employment with Amazon, AR587 at 1:37-7:00 (open-door policy); AR589 at 2:23-5:10 (employee benefits); the NLRB election process, AR591 at 0:00-0:58; union authorization cards, AR589 at 14:08-17:20; and the

ALU, AR587 at 7:03-10:07 (explaining that the ALU is new); AR589 at 9:24-14:08 (discussing the ALU amidst interruptions from union supporters). Associates were asked to attend only one of each meeting in the series, which were held during Associates' working time. AR396:2-14.

Although the meetings were mandatory, Associates who failed or refused to attend were not disciplined. AR268:20-269:1, 339:18-21, 373:2-20; *see* AR401:18-23 (stating that employees could leave). Associates who *did* attend were not forced to listen or pay attention. Many spent the meetings on their phones, talking to other Associates, watching videos, and even sleeping. AR229:4-10, 301:5-8, 315:9-20, 369:19-370:5, 403:16-404:9. Amazon did not administer any test or quiz to evaluate whether Associates were paying attention during meetings. AR104:25-105:3, 229:15:19, 251:15-18, 281:19-24, 301:9-12, 315:21-24, 370:6-9, 404:10-13.

The meetings were typically led by Amazon supervisors without direct supervisory authority over Associates at JFK8 or LDJ5. AR191:10-15, 230:2-6, 251:2-5, 314:8-15, 368:20-369:2; AR743-758. Presenters followed a script with PowerPoint presentations and talking points. AR743-758, 893-907, 1010-1028, 1125-1146, 1151-1153. They encouraged Associates to share opinions and challenge Amazon's positions, and allowed Associates to discuss their views on unionization and the meetings themselves. AR260:2-8, 268:20-269:1, 278:21-279:16, 300:14-24, 315:25-316:16, 370:10-23, 402:20-403:15. Presenters repeatedly encouraged

Associates to "[d]o your own research," double-check Amazon's statements, and "[g]et all the facts before you decide how to vote." AR885, 895; AR316:16-20.

### 2. Amazon emphasizes open communications with Associates.

Long before the ALU's formation and organizing efforts, Amazon encouraged constructive workplace dialogue between Associates and managers through policies that foster an atmosphere of engagement and continuous improvement. AR216:11-217:7; 373:21-374:25. Its Open Door Policy explains that "candid and constructive communication is essential to the smooth functioning of our workplace." *See* AR1237. Associates "are welcome to discuss any suggestion, concern, or other feedback with any member of the company's management," and also "encouraged to bring their ideas to the attention of management." *Id*. The Policy invites Associates to raise concerns with their immediate supervisor, then elevate to higher levels or human resources if not satisfied.

To bring the Open Door Policy to life, Amazon has implemented a variety of feedback mechanisms (all of which also predate the ALU). Those include:

- "Connections," an application that solicits anonymous feedback from Associates through survey questions about what Amazon is doing well, or needs to improve. AR312:4-13, 317:5-7, 318:14-20. Questions pop up automatically when Associates log in at the beginning of their shift. *Id*.

- "Gemba Walks," floor visits by managers who engage Associates to discuss what is working and what needs improvement. AR380:22-382:1.

- "Birthday Roundtables," monthly meetings between senior management and Associates having birthdays in that month, where Associates are invited to share ideas, thoughts, and concerns. AR310:24-311:2.

- The "Voice of the Associate Board" ("VOA Board"), an electronic platform where Associates can "ask questions, provide feedback, and provide recognition to their managers or peers." AR414:12-18; *see also* AR121:25-122:6. Only JFK8 Associates can post on JFK8's VOA Board. AR414:19-20.

### 3. Amazon's presenters remind Associates about the Open Door Policy during small group meetings.

Among other things, at issue here are statements made by Amazon presenters Mike Williams and Mike Rebel during two small group meetings on November 10 and 11, 2021, respectively. *See* AR587, 589 (audio recordings). Williams and Rebel began their meetings by highlighting the direct working relationship that Associates have with management, and how it "allows us to focus on our one team approach because it makes improvement happen quickly." AR589 at 2:01-10; AR587 at 1:00-1:32; *see* AR743-758. Williams and Rebel also reminded Associates of the Open Door Policy and the avenues available for raising concerns. AR587 at 2:14-5:53; AR589 at 1:50-9:20. They encouraged Associates to use these mechanisms and emphasized Associates' voice in Amazon's operations and culture. AR587 at 4:30-5:25; AR589 at 4:40-9:19; AR745-758.

In its Decision, the Board isolated specific sentences (italicized below), but the fuller context shows the comments merely describing how Amazon's practices work. For example, Williams described the Open Door Policy and the extensive access it provides:

> An open door policy is what we talk about all the time. It gives you direct access not to just your AM, but also to your DM. Right? *Even if*

*you have an issue and someone in HR is not resolving your issue. Don't settle for that. Take it to the next level. Go see a VP. If that VP is not resolving your issue, go see the HRM, and so on and so forth.* That's the beauty of having open door, direct communication and that relationship that we have.

AR587 at 2:15-2:47. Rebel similarly described the Policy and how it backstops the

VOA Board:

> And on the VOA Board I just want to add to what Ron is saying. Obviously you can access it through your A to Z app, you can access it on some kiosks around, but also *if you feel that you are not getting the response that you want or feel that you deserve*, you can also escalate that, if you are not getting that response *you can go request a meeting with*…whether it's a senior leader that responded to that…depending on what it is, like if it's a safety thing, maybe you are requesting a meeting with *the safety manager* to get more information. If it's operations, *maybe it's requesting a meeting with the AGM, Assistant General Manager [inaudible] or maybe an Ops Manager.* But if you are not getting that response you want currently you have that direct working relationship with all the way to the GM, get the answer, continue to escalate that so you can get the answer.

AR589 at 8:35-9:19. Williams also described in detail Amazon's Connections

program and why it was important for Associates to answer the prompts at their

workstations:

> We rely on your feedback, through Connections, to make adjustments, to make modifications to improve the workplace. That is mechanism where you have direct access to tell your leadership team what issues, what concerns you have. Totally transparent. In my site, I'm gonna give you this one, I've been in meetings, where the entire meeting is focused on Connections. Yes, the associate that's wondering, that is wondering what are we doing to improve the workplace based on the feedback that we've received. So, I said all of that to tell you that the leadership team takes Connections very seriously. So, when it pops up on your screens, I encourage you to take the time out to answer the questions. Be honest.

Be totally honest; be brutally honest. If you see something that you believe is unsafe, answer the question that way. If you think you have a fantastic manager, answer the question that way. *We can't make improvements, if we don't know what you're thinking, if we don't know your concerns.*

AR587 at 3:20-4:28. The presentations concluded with Williams and Rebel reminding Associates to "take your time to get the facts before deciding whether or not to sign anything the ALU gives you," to "[t]ake your time to check the facts" and "[d]o your own research." AR755-757.

### 4. Amazon removes Associate Dana Miller's VOA post for violating the Solicitation Policy.

A separate issue in this case involves Amazon's Solicitation Policy, which prohibits solicitation on Amazon's electronic systems, including VOA Boards. AR415:9-16; AR1254. Associates may not use the VOA Board for "the sale of merchandise, products, or services …, soliciting for financial contributions, memberships, subscriptions, *and signatures on petitions*, or distributing advertisements or other commercial materials." AR1254 (emphasis added); *see also* AR416:5-8; AR711-713.

On July 9, 2021, Associate Dana Miller posted a message to the VOA Board that violated this Policy (the "Signature Solicitation Post"). Miller wrote about the ALU's efforts to lobby management for holiday pay on Juneteenth:

> 6/21/21: ALU AA's spoke to [General Manager] about holiday pay for Juneteenth. Dismissed, ALU put together a petition and is gathering signatures, over 50+ now!

> 7/8/21: Presented again, [JFK8 GM] Felipe confirmed that
> he wouldn't use any energy/effort to make positive change
> for workers! *So you're invited to come sign the petition for
> well-deserved holiday pay* at the ALU tent, speak up for
> yourself & help make history.

AR636 (emphasis added). Three days later, the HR team "hid" the Signature

Solicitation Post from view because, as one HR manager explained, "it violated

[Amazon's] solicitation policy by asking Associates to sign a petition." AR418:22-

419:15, 155:14-19. The post was not hidden because of its pro-ALU content.

AR419:6-15.

Miller acknowledged that Amazon permitted dozens of pro-ALU and

Juneteenth posts to remain on the VOA, including her own pro-ALU posts.

AR167:5-168:5, 421:15-422:15. Between May 1 and July 15, 2021, Miller posted

35 times to the VOA. The only posts that were hidden contained the same or a

substantially similar solicitation of Associates to sign the Juneteenth petition.

AR681-708. During the same period, dozens of pro-ALU posts appeared on the

VOA Board. None were removed. *Id*. Miller admitted she saw one VOA message

announcing that Associates could obtain ALU pins, buttons, lanyards, and shirts at

the ALU tent, which was never hidden. AR129:17-24, 131:11-24.

### 5. Amazon reminds Miller about the Solicitation Policy.

On July 12, 2021, HR Business Partner Mike Tanelli met with Miller to

explain Amazon's decision to hide the Signature Solicitation Post. AR155:20-

156:11. Tanelli explained the post violated Amazon's Solicitation Policy by asking Associates to sign a petition. AR156:4-9; *see also* AR1199 at 4:55-5:00; AR1184-1186. He emphasized that Miller was "not in trouble or anything like that," that "this is not a conversation for you to be reprimanded … this is for me to educate you about the solicitation policy," and that he "just wanted to follow-up with [her to let her] know that the comment [would] be removed." AR1199 at 3:50-4:00, 5:24-5:31; *see also* AR1184-1186. Tanelli affirmed that Miller had "every right to [solicit signatures] on nonworking time, in break areas," which she should "feel free to continue" to do. AR1199 at 3:04-3:10, 4:43-4:55.

In response, Miller stated that, if Amazon hid her post, she would "put it back up." AR1199 at 5:22-5:24; *see also* AR421:2-14; AR709. Tanelli replied that she "cannot put that on the board, unfortunately. And there will be additional follow up if a comment like that goes back up again." AR1199 at 5:22-5:37.

Miller then asked Tanelli when he would "follow up" with her "in writing" regarding the decision to hide the post. *Id.* at 5:37-5:50. Tanelli responded that he was planning to "follow up with [his] team directly after [the meeting] and would see if [he could] touch base with [Miller] sometime some point today," to which Miller responded "that would be cool." *Id.* Tanelli reiterated two more times that he would "follow-up" with Miller about whether he could provide her something in writing. *Id.* at 6:28-6:40.

11

Miller reposted substantially the same post on five occasions between July 12 and 15, 2021, and Amazon hid the post each time as violations of the Solicitation Policy. AR421:2-15; AR709. Amazon never disciplined Miller for the posts. AR176:15-25, 419:16-420:6.

On March 23, 2022, more than eight months later, another Associate posted a message to the VOA Board stating that t-shirts were available in the breakroom (the "T-shirt Post"):

> Good morning JFK8 Fam! I have more VOTE NO T Shirts in sizes L, XL & 2X today. Please come get one on the 1st floor South, break room during both breaks & represent YOUR VOICE. Thank you!

AR658. This post was not hidden.

### B. Procedural History

The ALU filed the underlying unfair labor practice charges, alleging that: (1) Amazon's small group meetings were unlawful because Associates were required to attend; (2) Williams and Rebel unlawfully solicited Associate grievances and impliedly promised to remedy them; (3) Amazon disparately enforced its Solicitation Policy by removing the Signature Solicitation Post; and (4) Tanelli threatened Miller during their July 12, 2021 meeting.

The General Counsel issued a consolidated complaint. After a five-day hearing, the administrative law judge (ALJ) issued his decision on January 30, 2023. AR1485, 1503. Citing longstanding Board precedent, he rejected the contention that

Amazon's group meetings were unlawful. He also rejected the claim that Williams' and Rebel's comments about Amazon's Open Door Policy were unlawful solicitations. The ALJ ruled that Amazon's removal of Miller's Signature Solicitation Post, while a "difficult" and "close question," violated the NLRA, but dismissed the contention that Tanelli threatened her. AR1495-1496. Both sides filed exceptions to the ALJ's decision.

On November 13, 2024, the Board issued the Decision, ruling against Amazon on each issue. First, the Board reversed the ALJ and overruled an eighty-year-old precedent (*Babcock & Wilcox*, 77 NLRB 577 (1948)), holding for the first time since the passage of the 1947 Taft-Hartley Act that an employer violates the Act when it requires employees to assemble on company time for the purpose of listening to the employer's message on unionization. Next, the Board reversed the ALJ's dismissal of the Williams and Rebel allegations, concluding their comments solicited employee grievances and impliedly promised to remedy them. The Board affirmed the ALJ's finding that removing Miller's Signature Solicitation Post was a violation. And finally, the Board reversed and ruled that Tanelli threatened Miller, asserting that an employee in Miller's position would have felt threatened by the notion of

"follow up" in the midst of Amazon's "aggressive anti-union response." AR1446-1447.[2]

Member Kaplan dissented. He argued that the Board's decision to overturn *Babcock & Wilcox* found no support in the text or history of the NLRA, and violated the First Amendment. He also concluded that the Board's rulings regarding the alleged solicitation of grievances, Miller's Signature Solicitation Post, and Tanelli's alleged threat were not supported by substantial evidence and ignored settled Board law. AR1479-1484. This Petition followed.

### C.    Standards of Review

When reviewing a Board decision, "[t]his Court must examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its decision." *NLRB v. Gimrock Constr., Inc.*, 247 F.3d 1307, 1309 (11th Cir. 2001) (quotation marks and citation omitted). Factual findings "supported by substantial evidence on the record considered as a whole" are deemed "conclusive." 29 U.S.C. § 160(f). But "[s]ubstantial evidence is more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Gimrock Constr.*, 247 F.3d at 1309 (citation omitted). And

---

[2] The ALJ and Board also found that two other Amazon presenters violated the NLRA when they suggested that Associate benefits would be frozen during any collective bargaining negotiation with the ALU. AR1443 n.3. Amazon does not raise that issue here.

any reasoning must be both "logical and rational." *Id.* (citation omitted). "While this Court will not displace the Board's choice between two reasonable positions, this Court will not act as a mere enforcement arm of the Board." *Id.* at 1309-10 (citation omitted).

The standard of review differs for questions of law. Because the Administrative Procedure Act ("APA") instructs that "'the reviewing court'—not the agency whose action it reviews—is to 'decide *all* relevant questions of law' and 'interpret … statutory provisions,'" this Court "must exercise independent judgment in" interpreting the NLRA. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 398 (2024) (quoting 5 U.S.C. § 706) (emphasis and ellipsis in original). So too, the Court affords the Board no deference in interpreting and applying the Constitution. 5 U.S.C. § 706; *Loper Bright*, 603 U.S. at 392.

<u>**SUMMARY OF ARGUMENT**</u>

**I. A.** For more than 75 years, an employer could share its opinion on union-organizing without fear that those words could be turned against it in an unfair labor proceeding. In 1947, Congress enacted Section 8(c) to brush back earlier attempts by the Board to restrict employer speeches. Absent "threat of reprisal or force or promise of benefit," Section 8(c) prohibits the use of "any views, argument, or opinion" as the basis for or evidence of an unfair labor practice. The Board fell in line, holding in the *Babcock & Wilcox* decision that the NLRA does not ban an

employer from requiring employees to assemble on company time to hear its message on unionization, but instead focused only on whether the message itself included or conveyed a threat or promise. Consistent with that decades-long practice, Amazon required attendance at small-group meetings where managers shared information, expressed the company's views, and invited Associates to make up their own minds.

In the Decision below, the Board abandoned this precedent. In its place, the Board contrived a bright-line rule that an employer may not "express[] its views on unionization" at mandatory workplace meetings. AR1461.

**B.** That new approach is irreconcilable with the plain language of Section 8(c). The Board insisted this novel mandatory-meeting rule regulates conduct rather than speech, but that "clever framing" fools no one. *Honeyfund.com Inc v. Governor*, 94 F.4th 1272, 1278 (11th Cir. 2024). The only way the Board can identify violations of its new rule is by considering the employer's "expressi[on]" of "views." 29 U.S.C. § 158(c). That walks right into Section 8(c)'s prohibition.

**C.** Moreover, because the rule targets speech on a single topic, it must withstand strict scrutiny under the First Amendment. Unsurprisingly, the rule falls far short. The Board makes little effort to carry its burden to satisfy strict scrutiny, which is alone fatal to the rule. Regardless, there is no compelling governmental interest in quelling debate on weighty questions such as whether employees should

bring an exclusive union representative into their workplace. Nor is there a good argument that the rule is narrowly tailored, as eight decades of experience shows that less restrictive means are available to protect employee rights.

**II.** The Board's mistakes do not end there. The Board also erred—factually and legally—in finding that Williams and Rebel unlawfully solicited grievances with promises to resolve them. Factually, the Board cherry-picks snippets of their remarks to suggest that the managers were presently soliciting grievances. In reality, the full context shows the managers merely describing Amazon's preexisting Open Door Policy and related feedback mechanisms. Moreover, the Board faults Amazon for discussing these policies in a setting not previously used: so-called "captive audience" meetings. But regardless, even if Amazon managers *were* actually doing so, Board precedent is clear that an employer lawfully may talk about such mechanisms and/or continue to solicit employee grievances, even during organizing campaigns.

**III.** Next, the Board erred in finding that Amazon disparately enforced its Solicitation Policy when it hid Miller's Signature Solicitation Post. The Board offered no examples of Amazon permitting other signature-seeking posts to remain on the message board, and thus lacks any evidence to support its finding. The Board points to a single "comparator" post, made eight months later, that concerned distribution of pro-Amazon t-shirts—not collection of signatures. But under Board

precedent, that is no comparator at all, because the later post was both isolated and too attenuated in time to show disparate treatment.

**IV.** Finally, the Board wrongly determined that Amazon unlawfully threatened Miller when Tanelli stated the company would "follow up" if she re-posted the Signature Solicitation Post. The record shows Tanelli repeatedly told Miller she was "not in trouble," and the reference to "follow up" came only after the employee said she would post the solicitation again—which she did, several times, each time without being disciplined. That is no evidence, let alone substantial evidence. The Board also inappropriately bolstered its finding by noting the "follow up" remark came in the midst of an "aggressive anti-union response."

The Board's Decision should be vacated.

## **ARGUMENT**

## I. THE BOARD'S MANDATORY-MEETING RULE VIOLATES THE NLRA AND THE FIRST AMENDMENT.

The mandatory-meeting rule contravenes both the NLRA and the First Amendment to the Constitution. Section 8(c) prohibits the Board from considering an employer's "expressi[on] of … views," standing alone, as "evidence" of an "unfair labor practice." But no violation of the mandatory-meeting rule can be proven without introducing that exact evidence. Moreover, because the rule singles out speech on one subject (unionization), the First Amendment requires it to withstand strict scrutiny. The mandatory-meeting rule also fails those requirements.

**A.    Congress enacted Section 8(c) to protect free expression in labor matters.**

In 1947, Congress enacted Section 8(c) as part of the Taft-Hartley Act in response to the Board's history of "condemn[ing] almost any anti-union expression by an employer." *NLRB v. Golub Corp.*, 388 F.2d 921, 926 (2d Cir. 1967) (Friendly, J.). That history had culminated in *Clark Brothers Co.*, a Board decision holding that "compelling ... employees to listen to a speech on self-organization" "at the plant during working time" was, on its own, an unfair labor practice. 70 NLRB 802, 804 (1946), *enfd. on other grounds*, 163 F.2d 373 (2d Cir. 1947). The Board concluded that the "freedom" it had recognized under the Act "to receive aid, advice, and information from others" was "meaningless ... unless the employees [were] also free to determine whether or not to receive such aid, advice, and information." *Id.* at 805. Accordingly, mandatory meetings constituted an unfair labor practice "wholly apart from the fact that the speech itself may be privileged under the Constitution." *Id.*

Congress's direct response was to "insure both to employers and labor organizations full freedom to express their views to employees on labor matters" so long as there were no "threats of violence, intimation of economic reprisal, or offers of benefit." S. Rep. No. 105, 80th Cong., 1st Sess. 23 (1947) (Senate Report). Despite the Supreme Court's recognition that "the Constitution guarantees freedom of speech on either side in labor controversies," *id.* (citing *Thomas v. Collins*, 323 U.S. 516 (1945)), the Board "ha[d] placed a limited construction upon [the Court's]

19

decisions by holding such speeches by employers to be coercive … if the speech was made in the plant on working time," *id.* (citing *Clark Bros.*, 70 NLRB 60). That "limited construction" was, in Congress's view, "too restrictive." *Id.* at 23-24.

To that end, Section 8(c) created a carve-out from the NLRA's definition of an unfair labor practice:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

Labor Management Relations Act, 1947, ch. 120, § 101, 61 Stat. 136, 142 (codified at 29 U.S.C. § 158(c)).

The statute's protection of the "rights of employer expression" is thus "unequivocal[]." *BE & K Constr. Co. v. NLRB*, 133 F.3d 1372, 1376 (11th Cir. 1997) (per curiam). With Section 8(c), Congress did more than "'implement[] the First Amendment'" into the Act; Congress "manifested a 'congressional intent to encourage free debate on issues dividing labor and management.'" *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 67 (2008) (quoting first *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969), then *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 62 (1966)). Indeed "[i]t is indicative of how important Congress deemed such 'free debate' that Congress amended the NLRA rather than leaving to

the courts the task of correcting the NLRB's decisions on a case-by-case basis." *Id.* at 67-68.

The Board received the message loud and clear. Just one year later, the Board announced in *Babcock & Wilcox* that "the language of Section 8(c) of the amended Act, and its legislative history, make it clear that the doctrine of the *Clark Brothers* case no longer exists as a basis for finding unfair labor practices in circumstances such as this record discloses." 77 NLRB 577, 578 (1948). And for nearly eight decades, that was the settled law.

Employers, of course, were not off the hook for anything said during a mandatory meeting. But whether there was an unfair labor practice in any one case depended on whether the employer made an unlawful threat or promise at the meeting, not the fact of compulsory attendance. For example, a speech that included a "threat that the employees would be deprived of existing benefits if they selected the Union to represent them" was an unfair labor practice, notwithstanding whether it occurred during a mandatory meeting. *Noah's Bay Area Bagels, LLC*, 331 NLRB 188, 188 (2000). But where the speech "contained no threats or promises" and merely expressed a view on unionization, it was protected by Section 8(c). *Butler Specialty Co.*, 93 NLRB 608, 609 & n.2 (1951).

The decision below throws all that out, seeking a return to the world before Section 8(c). Echoing *Clark Brothers*, the Board attacked employers' ability to

"compel employees, under threat of discipline or discharge, to attend meetings where they are required to listen to the employer's views on whether they should unionize or not." AR1454. The Board reasoned that such mandatory meetings: "impinge on an employee's 'Section 7 right to choose, free from any employer coercion, the degree to which they will participate in the debate concerning representation'"; provide employers "a mechanism … to observe and surveil employees as they address the exercise of employees' Section 7 rights"; and, "because the employer has compelled employees to attend [the] meetings on pain of discipline or discharge," lead employees to "reasonably conclude that, in fact, they do not have free choice concerning union representation." AR1456. Accordingly, the Board adopted the following mandatory-meeting rule: "an employer violates Section 8(a)(1) of the Act," *i.e.*, commits an unfair labor practice, "if it requires employees to attend a meeting at which the employer expresses its views on unionization." AR1461.

B.     **The mandatory-meeting rule uses an employer's expression of views as evidence of an unfair labor practice in violation of Section 8(c).**

The mandatory-meeting rule violates the text, context, and history of Section 8(c). Under the rule, the employer's expression of certain views is evidence of an unfair labor practice. But that is precisely what Section 8(c) prohibits.

### 1. The Plain Text

The Decision makes clear that a mandatory meeting constitutes an unfair labor practice *only if* "the employer expresses its views on unionization" at the meeting. AR1461. Mandatory meetings in which "an employer [does not] express[] its views for or against unionization to its employees" remain lawful. AR1463; *see* AR1465 ("[O]ur focus is on the employer's requirement that employees attend the meeting and listen to the employer's views [on unionization]."). In other words, the difference between a lawful mandatory meeting and an unlawful one is the employer's "expressi[on] of [its] views." That walks right into the teeth of Section 8(c), which forbids using "[t]he expressing of any views" as "evidence of an unfair labor practice … if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

To escape the plain text, the Board engages in misdirection. First, it insists that the new rule targets conduct rather than speech, because it is the employer's act of compelling attendance that interferes with Section 7 rights. AR1458-1459, 1464. But as described above, the Board itself concedes (as it must) that to know whether or not a mandatory meeting is lawful, the General Counsel must prove that the employer expressed views on unionization. The employer's speech is thus central— without it, there is no violation.

Second and alternatively, the Board claims that, to the extent the mandatory-meeting rule accounts for speech, the context of the mandatory meeting removes the protection of Section 8(c). According to the Board, requiring attendance inherently "threat[ens] … reprisal." AR1459 (citation omitted); *see also* AR1460, 1464.

This is, once again, misdirection. Even assuming that the mandatory nature of a meeting somehow conveys a threat of reprisal (which is debatable), that is not the expression targeted by the new rule. Were that true, *all* mandatory meetings about any subject should be unlawful. But that is not what the Board has done. It has only prohibited mandatory meetings "at which the employer expresses its views on unionization"—"not all employer-mandated meetings in the workplace." AR1461, 1466. So the expressions that render the meeting unlawful are just the ones concerning unions.[3] And so long as "*such* expression contains no threat of force or promise of benefit," 29 U.S.C. § 158(c) (emphasis added), "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union." *Gissel*, 395 U.S. at 618; *see also id.* (focusing on whether *those* "communications" contain any threat or promise).

---

[3] Contrary to the Board's contention, this specificity is not "entirely a function of the Act's protection of Section 7 rights." AR1466. Section 7 rights cover many more topics than unionization—such as safety rules, working conditions, dress code—and none of those other topics are off-limits in a mandatory meeting. *See* AR1474 n.55 (Member Kaplan, dissenting).

To the extent the Board is suggesting that the overall context of the mandatory meeting somehow taints the expressions on unionization with a threat of reprisal, that is an unjustified logical leap. Even if employees are compelled by threat or promise to *attend* a mandatory meeting at which unionization is discussed, that does not mean the employees must also *listen to* or *agree with* everything said in the meeting under a threat or promise. The record here is illustrative. Associates in attendance did not feel pressure to even pay attention; many occupied themselves with their phones and videos, and some even slept. AR229:4-10, 301:5-8, 315:9-20, 369:19-370:5, 403:16-404:9.

## 2. Legislative History

Failing to escape the text, the Board turns to legislative history, particularly an excerpt from the Conference Report on the Taft-Hartley Act. AR1455, 1459-1460. According to that Report, the genesis for Section 8(c) was the Board's "practice" of "using speeches and publications of employers … as evidence, no matter how irrelevant or immaterial, that some later act of the employer had an illegal purpose." H.R. Rep. No. 510, 80th Cong., 1st Sess. 45 (1947) (Conf. Rep.). And in a decision from a "bygone era of statutory construction" in which courts "inappropriately resort[ed] to legislative history before consulting the statute's text and structure," *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (citation omitted), the Supreme Court in dictum inferred from this Report a limited

task for Section 8(c): namely, that "Congress adopted this section … to prevent the Board from attributing antiunion motive to an employer on the basis of his past statements." *Linn*, 383 U.S. at 62 n.5. Seizing on this dictum, the Board contends that Section 8(c) applies narrowly *and only* to bar such inferences of employer motive. AR1460.

The Board's reliance on legislative history fails for two reasons.

*First,* this Court has "frequently" said that "when the import of words Congress has used is clear[,] we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (citation, brackets, and ellipsis omitted). The meaning of Section 8(c) is plain, which should be the beginning and end of the analysis. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020).

*Second,* an accurate reading of the legislative history points against the mandatory-meeting rule in any event. As the Board admits, the legislative history of the Taft-Hartley Act (including the Conference Report) makes no explicit mention of mandatory meetings. AR1453. The closest reference is the Senate Committee's rejection of the NLRB's *Clark Brothers* decision as "too restrictive." Senate Report 23-24. That is a point against, not for, the Board's new rule.

Furthermore, reading Section 8(c)'s "text in context" shows that the Board's motive-only inference from the Conference Report must be rejected. *Pulsifer v. United States*, 601 U.S. 124, 133 (2024). As the Board acknowledges, anti-union "motive is required to prove only certain violations, like an employer's retaliation, in violation of Section 8(a)(3)," but not "interference and coercion under Section 8(a)(1)." AR1459. So if the Board's motive-only take on Section 8(c) were correct, the provision would apply only to proving "*certain* violations." *Id.* But the provision says just the opposite: the "expressi[on of] any views, argument, or opinion, or the dissemination thereof … shall not constitute or be evidence of an unfair labor practice under *any* of the provisions of this [Act]." 29 U.S.C. § 158(c) (emphasis added). The Board's reading of the legislative history cannot be reconciled with that sweeping text.

That returns to the point above—the Supreme Court's and this Court's caution against relying on legislative history. Even if the Conference Report reflects that the "principal evil" Section 8(c) sought to reach was inferences of anti-union motive, it is common for a statute to "reach[] 'beyond the principal evil' legislators may have intended or expected to address." *Bostock*, 590 U.S. at 674 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)).

### 3. Constitutional avoidance

If any doubt remained, the canon of constitutional avoidance would compel rejecting the Board's new rule as inconsistent with Section 8(c). For the reasons explained below, the mandatory-meeting rule "raise[s] serious constitutional problems." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). To the extent there is any ambiguity, this Court should construe Section 8(c) in a way that would forbid the rule and, therefore, avoid such problems. *Id.*

### C. The mandatory-meeting rule violates the First Amendment.

Beyond violating Section 8(c), the mandatory-meeting rule is a content-based restriction that runs afoul of the First Amendment. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). It is up to "each person," not the government, to "decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020) (citation omitted). So when the government overtly treats speech differently based on "its ideas, its subject matter, or its content," *id.* at 862 (quoting *Mosley*, 408 U.S. at 95), the strictest of constitutional scrutiny follows. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Only the "rare" content-based law survives,

*United States v. Playboy Entmt. Grp., Inc.*, 529 U.S. 803, 818 (2000), and the Board's mandatory-meeting rule is not one of them.

### 1. The mandatory-meeting rule is content-based and triggers strict scrutiny.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. In the extreme case, a law prohibits discussing a particular topic altogether. *See, e.g.*, *Wollschlaeger v. Governor*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc) (law prohibiting doctors from "writ[ing] and speak[ing] about a certain topic," namely, "the ownership of firearms"). Or worse yet, expressing certain viewpoints. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830-31 (1995) (calling this "an egregious form of content discrimination").

But the government need not outright prohibit a topic, let alone viewpoint, to engage in content-based discrimination. *See Playboy*, 529 U.S. at 812. A law that differentiates, for example, where a picket may take place depending on "the subject of the picketing" is just as content-based as a direct prohibition against that subject altogether. *Mosley*, 408 U.S. at 94-95. Other distinctions "are more subtle, defining regulated speech by its function or purpose" rather than by the specific words spoken. *Reed*, 576 U.S. at 163-64. All are subject to strict scrutiny. *Id.* at 164.

### i. The mandatory-meeting rule cannot be squared with this Court's ruling in *Honeyfund.com*.

This Court in *Honeyfund.com* deemed a similar mandatory-meeting provision content-based and subject to strict scrutiny. 94 F.4th at 1280. Florida's Individual Freedom Act ("IFA") "prohibit[ed] mandatory employee meetings, but only when those meetings include[d] speech endorsing certain ideas" regarding race, color, sex, or national origin. *Id.* at 1278. "To know whether the law ban[ned] a meeting, 'enforcement authorities must examine the content of the message that is conveyed.'" *Id.* (quoting *Otto*, 981 F.3d at 862).

This case is similar to *Honeyfund.com* in every way that matters. The Decision makes mandatory meetings unlawful if—and only if—"the employer expresses its views on unionization" during the meeting. AR1461. Thus, just like the IFA, the mandatory-meeting rule "prohibits mandatory employee meetings—but only when those meetings include speech" on certain topics. *Honeyfund.com*, 94 F.4th at 1278. And "[t]o know whether the law bans a meeting, 'enforcement authorities must examine the content of the message that is conveyed.'" *Id.* (quoting *Otto*, 981 F.3d at 862). Strict scrutiny applies.

The Board resists this conclusion. Attempting to distinguish *Honeyfund.com*, the Board claims that its rule "makes no distinctions based on *viewpoint*." AR1465 (emphasis added). That is a dubious assertion. A rule based on suspicion of employers' alleged "coercive" tactics that targets only employers—the party pre-

disposed to oppose unionization—"[i]n its practical operation … goes even beyond mere content discrimination, to actual viewpoint discrimination" by silencing only one side of the debate. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992); *see also* AR1457 n.31 (only discussing how *an employer* may upset "supporters of the union").

But the purported distinction is, in any event, irrelevant. "It is, of course, no answer to assert that" the Board's content-based rule does not commit the further sin of "discriminat[ing] on the basis of the speaker's viewpoint." *Carey v. Brown*, 447 U.S. 455, 462 n.6 (1980). Any law that prescribes what topics people "may and may not discuss" qualifies as "censorship in a most odious form." *Mosley*, 408 U.S. at 98 (quoting *Cox v. Louisiana*, 379 U.S. 536, 581 (1965) (Black, J., concurring)).

The second claimed distinction from *Honeyfund.com* is that the new rule regulates conduct rather than speech. AR1465-1466. This argument fails for the reasons already explained above, p.23 *supra*, and in *Honeyfund.com*. As this Court said in rejecting this same "clever framing" by Florida in *Honeyfund.com*, "the disfavored 'conduct' cannot be identified apart from the disfavored speech." 94 F.4th at 1278. There as here, "[t]o know whether" the mandatory-meeting rule "bans a meeting, 'enforcement authorities must examine the content of the message that is conveyed.'" *Id.* That is "a textbook regulation of core speech protected by the First Amendment." *Id.* at 1279.

Finally, the Board argues that it has not engaged in content distinction at all because singling out the topic of unionization is "entirely a function of the Act's protection of Section 7 rights." AR1466. As also already explained, *see* p.24 n.3, *supra*, that premise is false. It is the Board, not Section 7, that singles out just one specific species of disfavored employer speech.

### ii. Mandatory meetings do not fall within the First Amendment's limited captive-audience doctrine.

The Board cannot avoid strict scrutiny by casting its Decision as a "captive audience" rule. *Honeyfund.com*, 94 F.4th at 1282 n.5; *see* AR1456-1458. Under the First Amendment, the captive-audience doctrine allows the government to "selectively shield the public from some kinds of speech on the ground that they are more offensive than others." *Eroznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975). For example, the Supreme Court has upheld a law limiting people's ability to send unsolicited lewd mailings to a home once the homeowner has objected. *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 735-38 (1970). Yet, "where adults are concerned the Supreme Court has never used a vulnerable listener/captive audience rationale to uphold speaker-focused and content-based restrictions on speech." *Wollschlaeger*, 848 F.3d at 1315.

The doctrine is, in any event, inapplicable here. It has only been applied when "substantial privacy interests are being invaded in an essentially intolerable manner," generally in the home. *Eroznik*, 422 U.S. at 210; *Snyder v. Phelps*, 562

U.S. 443, 459 (2011); *see Rowan*, 397 U.S. at 737 ("[A] man's home is his castle

…."). Outside the home, "[e]nduring speech we dislike is a necessary price" of the

First Amendment. *Honeyfund.com*, 94 F.4th at 1282 n.5.

Mandatory meetings, the Board nevertheless argues, implicate privacy

concerns because of the power imbalance between employers and employees.

"Employees summoned by their employer to such meetings cannot simply walk

away to avoid hearing views that they would rather not hear, unless they are prepared

to lose their jobs or suffer other discipline." AR1457; *see* AR1461 ("The violation

turns on the employer's use of its power to compel employees to attend such a

meeting.").

But that same dynamic applied in *Honeyfund.com*, where this Court held that

mandatory workplace meetings did *not* create a captive audience because that

doctrine "has historically been entertained 'only when the speaker intrudes on the

privacy of the home or the degree of captivity makes it impractical for the unwilling

viewer or auditor to avoid exposure.'" 94 F.4th at 1282 n.5 (quoting *Eroznik*, 422

U.S. at 209). The court concluded it was insufficient to argue that it may be difficult

or uncomfortable for employees to avoid exposure.

Rightly so, in light of *Wollschlaeger*. There, the court "reject[ed] the

argument" that "a significant power imbalance" between a doctor and patient can

justify a content-based restriction as "nothing in the record suggest[ed] that patients

who [we]re bothered or offended" by their doctors' questions were "psychologically unable to choose another medical provider." 848 F.3d at 1315. There can be no serious contention that the power imbalance between employer and employee is more so than that between doctor and patient. Indeed, the record in this case reflects as much, given that, despite any power imbalance, employees had no trouble ignoring or tuning out Amazon's speech. *See* p.5 (citing evidence of employees playing on their phones, talking, watching videos, and sleeping).

### iii. Neither *Hill* nor *Gissel* give the Board's rule a First-Amendment free pass.

Falling back on more vague notions of a "right to be let alone," AR1456, the Board further claims the mandatory-meeting rule is compelled by "the general rule that the First Amendment gives "no one … a right to press even 'good' ideas on an unwilling recipient." AR1461 (quoting *Hill v. Colorado*, 530 U.S. 703, 718 (2000)). But there is no such exception to strict scrutiny. Protecting the unwilling listener may sometimes qualify as a legitimate government interest, *Hill*, 530 U.S. at 717 & n.24, but the First Amendment's "general rule," AR1461, is always "more speech," *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

*Hill* suggests nothing different. The law there proscribed knowingly approaching an individual in front of a health-care facility, without consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." 530 U.S. at 707 (citation

omitted). "[T]he fulcrum of" *Hill* "was the majority's conclusion that the law was *not* content based" and, for that reason, not subject to strict scrutiny. *Honeyfund.com*, 94 F.4th at 1280 (emphasis added); *see Hill*, 530 U.S. at 719-25 (explaining why the law was content-neutral after endorsing the government's interest in protecting the listener). *Hill* did not carve out a new exception to strict scrutiny. In fact, that same Term, the Court assessed a content-based law aimed at "shield[ing] the sensibilities of" minors in their homes, applied strict scrutiny, and held the law invalid. *See Playboy*, 529 U.S. at 813-14.

The Board also cites *Gissel* as compelling its new bright-line rule, because "[a]ny assessment of the precise scope of employer expression … must be made in the context of the labor relations setting." AR1461 (quoting *Gissel*, 395 U.S. at 617) (alterations in original). But *Gissel* did not endorse any categorical prohibitions on employer speech based on the topic of unionization alone. Rather, the Court held that an employer generally may make statements to his employees about "unionism or … a particular union" and "even make a prediction as to the precise effects [the employer] believes unionization will have on his company." 395 U.S. at 618. And it set forth a fact-dependent, case-by-case test for assessing when specific predictions so lack a "basis of objective fact" that they cross-over from being lawful "reasonable prediction" to unlawful "threat[s] of reprisal or force or promise[s] of benefit." *Id.* The First Amendment continues to apply with full force in the labor-relations setting.

*See, e.g.*, *DeBartolo Corp.*, 485 U.S. at 574-75 (rejecting the "Board's construction of [the Act]" because, "as applied in this case, [it] poses serious questions … under the First Amendment"). For all these reasons, strict scrutiny applies.

### 2. The mandatory-meeting rule fails strict scrutiny.

"It is rare that a regulation restricting speech because of its content will ever be permissible." *Playboy*, 529 U.S. at 818. Strict scrutiny begins with a presumption that the restriction is invalid. *Otto*, 981 F.3d at 868. To overcome that presumption, the government must show that the law actually serves a "compelling state interest" and is "narrowly tailored" to the task. *Id.* (quoting *Reed*, 576 U.S. at 163). These are demanding obligations.

Here, the Board devotes only a passing footnote to how strict scrutiny would cash out "*even if*" it applied. AR1466 n.50 (emphasis added). After reciting the standard, the Board states, based on nothing more than the existence of the NLRA, that "[e]nsuring employees' full freedom to decide whether, when, and how to exercise their organizational rights is a compelling interest." *Id.* (citing 29 U.S.C. § 151). And no mention of narrow tailoring beyond its recitation of the standard for strict scrutiny.. *See id.*

This "throwaway footnote" "was itself barely reasoned," *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 42 (2025), which is alone reason enough to hold the mandatory-meeting rule unlawful. The footnote falls well short of the required

"rigorous scrutiny." *Playboy*, 529 U.S. at 812. And because the validity of the rule "must be measured by what the [Board] did, not by what it might have done," *SEC v. Chenery*, 318 U.S. 80, 93-94 (1943), neither the Board nor this Court is now permitted or obligated to back-fill the Board's failure to carry its burden.

Yet even if the Court were to scour the Board's decision to support a proper strict-scrutiny analysis in the first instance, the mandatory-meeting rule would fail both prongs.

### i.     The Board has not put forth a compelling interest.

As its name indicates, a "compelling interest" must be of the highest order—such as remedying past racial discrimination, *see Shaw v. Hunt*, 517 U.S. 899, 909 (1996); protecting the safety of minors, *see New York v. Ferber*, 458 U.S. 747, 756 (1982); and preserving public trust in the integrity of the judiciary, *see Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). Even protecting against private encroachment on a constitutional right is not necessarily sufficient. *See Wollschlaeger*, 848 F.3d at 1312-13 (law aimed at protecting the right to keep and bear arms); *id.* at 1327 (W. Pryor, J., concurring). Moreover, the interest must be "genuine, not hypothesized or invented *post hoc*." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (citation omitted).

The Board's claim that its statutory mandate to protect employees' "organizational rights is a compelling interest," AR1466 n.50; *see* 29 U.S.C. § 151, is wrong.

That Congress has manifested an interest in protecting organizational rights, *see* 29 U.S.C. § 151, does not make that interest compelling. Were it otherwise, courts would always hold that federal statutes serve a compelling interest. But of course, they don't. *See, e.g.*, *United States v. Eichman*, 496 U.S. 310, 318 (1990) (holding that federal government's interest in protecting symbolic value of the American flag "cannot justify [an] infringement on First Amendment rights"). And courts have similarly held that furthering a congressional interest embodied in a statute is also not, on its own, compelling. *See, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 357-58, 360-62 (6th Cir. 2021) (holding that agency's use of race-based classifications in furtherance of statutory objective to help the "socially and economically disadvantaged" did not serve a compelling interest); *cf. Miller v. Johnson*, 515 U.S. 900, 922 (1995) ("We do not accept the contention that the State has a compelling interest in complying with whatever [Voting Rights Act] preclearance mandates the Justice Department issues."). After all, the First Amendment trumps statutory law; not vice-versa.

Furthermore, even assuming the protection of employee organizational rights were compelling *in the abstract*, that would "not [be] enough." *Otto*, 981 F.3d at

868. The Board (or Congress) must have "specifically identif[ied] an 'actual problem' in need of solving," *Brown v. Entmt. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (quoting *Playboy*, 529 U.S. at 822-23), and the challenged rule must actually help solve that problem, *Otto*, 981 F.3d at 868. Under strict scrutiny, courts do not accept the government's mere say-so. They examine the record and confirm the problem is real. *See, e.g.*, *Sable Comm'cns of Cal., Inc. v. FCC*, 492 U.S. 115, 129-30 (1989) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." (citation omitted)); *Wollschlaeger*, 848 F.3d at 1313 (finding "no evidence whatsoever before the Florida Legislature" of the asserted problem).

For example, in *Playboy*, the Supreme Court considered a content-based law aimed at protecting children from seeing fleeting explicit images on their television sets. 529 U.S. at 807. Applying strict scrutiny, the Court held that a "central weakness in the Government's proof" of a compelling interest was absence of "hard evidence of how widespread or how serious the problem of signal bleed [was]." *Id.* at 819.

Likewise in *Brown*, the Supreme Court considered California's restrictions on "violent video games" to mitigate the games' "harmful effects on children." 564 U.S. at 789, 800. According to the Court, the studies on which California relied to show harm to minors did not establish causation, "suffer[ed] from significant, admitted

flaws in methodology," and showed that effects on children were "both small and indistinguishable from effects produced by other media." *Id.* at 800-01; *see also Otto*, 981 F.3d at 859, 868.

In both cases, the government put forth what is, in the abstract, a "compelling" interest: the "psychological well-being of a minor." *Ferber*, 458 U.S. at 756. But the Court "examine[d]" the government's proof "closely," *Otto*, 981 F.3d at 868, and held the evidence of "an 'actual problem' in need of solving" was wanting. *Brown*, 564 U.S. at 799 (quoting *Playboy*, 529 U.S. at 822-23); *see also Wollschlaeger*, 848 F.3d at 1313.

The Board's Decision makes the insufficient governmental proffers in *Playboy* and *Brown* look robust. The Board invokes a study showing that "[c]aptive-audience meetings are now a common feature of campaigns." AR1454. But it admits that "[t]he legislative history of the Taft-Hartley Act reflects little consideration of the issue of captive-audience meetings." AR1453; *cf.* pp.19-20, 26, *supra* (discussing the Senate Report's refutation of *Clark Bros.*). And the Decision is rife with speculative language when listing the purported sins of mandatory meetings: "[a]n employer *can* hold" captive-audience meetings "repeatedly, for whatever length of time it wants, and whenever it wants"; "[a]n employer *can* observe employees at these meetings"; and "[a]n employer *can* silence, or even banish" employees unsympathetic to the employer's message. AR1454 (emphasis added);

*cf.* AR1473 (Member Kaplan, dissenting) (noting the Board's failure to cite a single instance of "endless" mandatory meetings since *Babcock*).

This list of what an employer *could* do in a mandatory meeting is the Board's only case for why the new rule is necessary—and, to repeat, was not even offered in support of a strict-scrutiny analysis. *See* AR1454 ("We thus prohibit captive-audience meetings."); p.36, *supra*. The Board may not rest on "anecdote and supposition" about workplace power dynamics. *Playboy*, 529 U.S. at 822. Hypotheticals do not evince an "actual problem." *Id.* at 822-23.

### ii. The mandatory-meeting rule is not narrowly tailored.

There is, in addition, the lack of narrow tailoring. The government must show that *no* means less restrictive of free speech would adequately serve the compelling interest. *Playboy*, 529 U.S. at 813. But the Board did not.

Here, the Board had an obvious less-restrictive alternative to address the problems it claims needed to be addressed: the *Babcock* regime. As noted, the Board claims its new rule is necessary to prevent employers from using mandatory meetings to "surveil[], interrogat[e], or poll[]" its employees "with regard to their exercise of Section 7 rights" or otherwise "coerc[e]" them to act a particular way. AR1455-1456. But for 75 years, the Board had assessed precisely such allegations of surveillance, interrogation, polling, and other coercive acts on a case-by-case basis, rather than with a categorical and vastly over-inclusive rule. *See, e.g.*, *Noah's*

*Bay Area Bagels*, 331 NLRB at 188 (finding certain comments made "during a captive audience speech" to "constitute[] an unlawful threat"); AR1455 n.26 (citing numerous Board decisions finding that such actions violate Section 8(a)(1)). So, too, allegations that employer statements about unionization cross the line from "reasonable prediction" to threats or promises with no "basis of objective fact." *Gissel*, 395 U.S. at 618.

The Board has not demonstrated that this case-by-case approach proved inadequate to protect employees' rights to organize. Only after making a considered finding that the prior regime was an "ineffective" solution to the perceived problem could the Board even consider a content-based approach. *Sable Comm'cns*, 492 U.S. at 130; *see id.* at 129 (lamenting the legislative history's lack of "legislative findings that would justify us in concluding that there is no constitutionally acceptable less restrictive means"); *Playboy*, 529 U.S. at 822 (similar). That is especially so when the Board's proposed solution is the type of "'broad prophylactic rule[]'" that is "generally disfavored and cannot survive" strict scrutiny. *Honeyfund.com*, 94 F.4th at 1281 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). But the Decision includes no such considered finding.

*** 

For all these reasons, the Board's Decision must be vacated without remand with regard to the mandatory-meeting rule. In an ordinary case, the Board's

"inadequate" analysis supporting its mandatory-meeting rule would likely call for vacatur and a remand for an agency do-over. *Calcutt v. FDIC*, 598 U.S. 623, 629 (2023) (per curiam). Here, though, the legal errors identified cannot be rectified with a more robust explanation. The mandatory-meeting rule simply cannot co-exist with Section 8(c) of the Act or the First Amendment.[4]

## II.   AMAZON DID NOT UNLAWFULLY SOLICIT AND PROMISE TO REMEDY GRIEVANCES.

As noted, the Board also ruled that comments by Williams and Rebel about the Open Door Policy improperly solicited employee grievances and impliedly promised to remedy them. That ruling is not supported by substantial evidence or consistent with law.

### A.   Employers may continue their preexisting practice of soliciting grievances during an organizing campaign.

Soliciting a grievance during an organizational campaign is not unlawful. Rather, it is the promise to remedy a grievance that violates the Act. *See Amptech, Inc.*, 342 NLRB 1131, 1137 (2004). Importantly, such a promise cannot be inferred

---

[4] The Board's method of creating the mandatory-meeting rule also violated both the APA and the NLRA. The mandatory-meeting rule satisfies the APA's definition of a "rule," and the APA requires that rules be promulgated by "rule making," not "adjudication." *See* 5 U.S.C. § 551(4)-(7). And the NLRA only empowers the Board to issue "rules and regulations" in accordance with the APA. 29 U.S.C § 156. To the extent *SEC v. Chenery*, 332 U.S. 194 (1947) permits the Board to create rules through adjudication rather than rule making, that decision is incorrect and Amazon reserves the right to challenge it in the appropriate court.

if an employer has a prior practice of soliciting grievances. *See id.*; *see also Johnson Tech., Inc.*, 345 NLRB 762, 764 (2005), *overruled on other grounds by Purple Comm'cns, Inc.*, 361 NLRB 1050 (2014). "[A]n employer with a past practice of soliciting employee grievances … may continue such a policy during a union's organizational campaign." *In Re Wal-Mart Stores, Inc.*, 340 NLRB 637, 640 (2003), *enfd. as modified*, 400 F.3d 1093 (8th Cir. 2005), *overruled on other grounds by Wynn Las Vegas, LLC*, 369 NLRB No. 91 (May 29, 2020); *see e.g., Longview Fibre Paper & Packaging, Inc*., 356 NLRB 796, 805 (2011) (employer holding "brainstorming meeting" to solicit, and eventually implement, employees' suggestions about shift schedules lawful where employer had past practice of soliciting grievances); *TNT Logistics N. Am., Inc*., 345 NLRB 290, 292 (2005) (manager asking employee "what would make things better" not unlawful solicitation where employer maintained open door policy that allowed employees to discuss work-related issues directly with management); *MacDonald Machinery Co., Inc.*, 335 NLRB 319, *3 (2001) (no violation found where, "both prior to the onset of the union campaign and after, the Employer was willing to listen to the complaints of its employees and to respond to them").

Likewise, employers may encourage employees to use existing avenues of communication to express concerns, provide suggestions, or air grievances. *See, e.g., In Re Wal-Mart Stores, Inc.*, 340 NLRB at 640 (encouraging employees to use pre-

existing avenues to report grievances is not unlawful); *Longview Fibre Paper & Packaging, Inc.*, 356 NLRB at 805 (implying same); *TNT Logistics N. Am., Inc.*, 345 NLRB at 292 (implying same); *cf. Johnson Tech., Inc.*, 345 NLRB at 764 (supervisor's comment that he would "get in touch with" employee's boss not an implied promise to remedy where solicitation accorded with pre-existing practice and supervisor had relayed the employee's concerns to higher management in the past).

Amazon followed these settled rules. It is undisputed that Amazon maintained numerous mechanisms for identifying employee concerns long before the ALU. AR587 at 2:14-5:53; AR589 at 1:50-9:20; AR1237; AR304:25-305:1, 312:4-16, 317:5-7, 318:14-20, 319:8-11, 319:14-20. And the thrust of the November 10-11 presentations was to remind Associates of these avenues and of Amazon's Open Door policy. As the ALJ correctly found, Amazon did not make any promises that Associates' "complaints would be presented in new forums, processed in a different way, be taken more seriously, or be remedied more favorably than they had been in the past." AR1498. Instead, the presentations at issue "largely concerned an explanation of existing policies and forums for employees to express and resolve complaints" and "did not solicit particular grievances or offer to resolve them." AR1498-1499.

**B.** **The Board's conclusion that Amazon unlawfully solicited grievances is not supported by substantial record evidence and ignores Amazon's Section 8(c) rights.**

While conceding that Amazon had preexisting practices for soliciting grievances, the Board faulted Amazon for "significantly alter[ing]" them by "emphatically urging employees to scale the entire chain of command as they saw fit until they got what they wanted" and by discussing them during the meetings. AR1449-1450. This conclusion distorts the record, and the plain language of Section 8(c).

**i.** **The Board's conclusion is not supported by substantial evidence.**

The Board supports its narrative with cherry-picked snippets of lengthy speeches. For instance, the Board criticizes Williams for saying Associates may "discuss any suggestion, concern, or other feedback with any member of the company's management" and that "Associates are encouraged to bring their ideas to the attention of management." AR1237. But Williams was simply describing the Open Door Policy (almost word for word in some places). AR587 at 2:14-4:30; pp.7-8, *supra*.

The Board also takes issue with a statement Rebel made, characterizing it as part of Amazon's repetitive plea for Associates to escalate their concerns. But, once again, the snippets relied on by the Board were merely part of a description of the Open Door Policy and how Associates could use it (in this particular description, as

a backstop to the VOA Board). AR589 at 8:35-9:19; p.8, *supra*. Nowhere does Rebel even hint that use of the Open Door Policy would lead to the remedy of a grievance.

Finally, the Board relies on Williams' statement that "[w]e can't make improvements if we don't know what you are thinking," as evidence that Amazon was soliciting grievances and "promising to remedy them." AR1449. But Williams made this statement in the portion of his presentation where he was explaining Amazon's preexisting Connections program, why it was implemented, how it works and why it was important for Associates to answer the prompts when they appeared. AR587 at 2:50-4:29; pp.8-9, *supra*. When read in context, it is clear Williams was merely reminding Associates about existing channels of communication. This does not violate the Act.

### ii.     The Board also ignored Section 8(c).

The Board also wrongly concluded that Amazon made a "significant" alteration to its existing practices by mentioning the Open Door Policy in a small group meeting. This fails for at least two reasons. First, to the extent the Board's objection is that the small group meetings occurred during an organizing campaign, that objection contravenes long-standing Board precedent. As noted, Amazon has a settled right to tout its grievance procedures during an organizing campaign. *See, e.g.*, *In Re Wal-Mart Stores, Inc.*, 340 NLRB at 640. Second, to the extent the Board's complaint is that Amazon had never previously mentioned the Open Door

Policy in such a meeting during an organizing campaign, that reasoning makes no sense. Amazon never had a prior occasion to do so. In any event, all that Board precedent requires is that the touted programs existed prior to the organizing campaign, and there is no dispute that is true.

## III.   AMAZON DID NOT DISPARATELY ENFORCE ITS SOLICITATION POLICY.

The Board also found that Amazon disparately enforced its Solicitation Policy when it hid the Signature Solicitation Post. That finding is not supported by substantial evidence either.

### A.   Discrimination under the Act requires unequal treatment of equal conduct.

Section 8(a)(1) prohibits discrimination against Section 7 activity. *See* 29 U.S.C. § 158(a)(1). That means "disparate treatment of activities or communications of a similar character because of their union or other Section 7-protected status." *T-Mobile USA, Inc.*, 369 NLRB No. 50, *4 (Apr. 2, 2020); *see also The Guard Pub'g Co. d/b/a The Register Guard*, 351 NLRB 1110, 1118 (2007) ("unlawful discrimination consists of disparate treatment of activities or communications of a similar character because of their union or other Section 7-protected status"), *enfd. in part and set aside in part*, 571 F.3d 53 (D.C. Cir. 2009). "Disparate enforcement inherently requires a finding that the employer treated similar conduct differently." *Rest. Corp. of Am. v. NLRB*, 827 F.2d 799, 806 (D.C. Cir. 1987). Thus, an employer

may enforce its own "no-posting rules" so long as "it does not engage in unlawful discrimination." *Faurecia Exhaust Sys., Inc.*, 353 NLRB 382, 382 (2008).

The Board itself has recognized that "[d]iscrimination means the unequal treatment of equals." *Register Guard*, 351 NLRB at 1117. In *Register Guard*, it rejected an alleged Section 8(a)(1) violation based on a prohibition on union-related emails because there was "no evidence that the [employer] permitted employees to use e-mail to solicit other employees to support any group or organization." *Id.* at 1119. The employer did not discriminate against pro-union communications by allowing non-work-related e-mails like jokes, baby announcements, and party invitations. *Id.*; *see also T-Mobile USA, Inc.*, 369 NLRB No. 50, at *1 (employer did not violate Section 8(a)(1) because it "never permitted emails in favor of a specific union or against union activity").

**B.    The Board's finding that Amazon disparately enforced its Solicitation Policy is not supported by substantial evidence.**

The Board erred because there was no unequal treatment of equals. Amazon hid the Signature Solicitation Post because it did what the Solicitation Policy prohibited: "soliciting for … signatures on petitions." AR1254; *see* AR636 ("So you're invited to come sign the petition for well-deserved holiday pay at the ALU tent…"). The Board conceded as much. *See* AR1446 n.11. The only plausible way to find a violation of Section 8(a)(1), then, would be to show Amazon *declining* to enforce the Solicitation Policy against other violative posts. But the General Counsel

failed to point to any such instance—and there is none. Instead, the record shows Amazon allowed 35 pro-ALU posts and hundreds of other posts critical of the company to remain visible on the VOA Board during the relevant time period. AR681-708. And there is no evidence that Amazon hid any post that promoted pro-ALU views.

The Board points to a single message posted to the VOA Board—the T-shirt Post—as the basis for its finding. AR1446. Its reliance on that post is misplaced for three reasons.

*First*, the T-shirt post was not "equal" to the Signature Solicitation Post. *See Register Guard*, 351 NLRB at 1117. It did not solicit Associate "signatures on petitions." Rather, it informed Associates they could pick up a t-shirt in a non-working area on non-working time. The Board's contrary conclusion rests on a generalized assertion that both posts "clearly violated the policy." AR1446. But it never explains *how* the T-shirt post actually violated the Policy.[5]

*Second*, the T-shirt Post has little probative value to Amazon's decision to hide the Signature Solicitation Post. For one thing, it appeared on the VOA Board some eight-and-a-half months after the Signature Solicitation Post was taken down.

---

[5] Moreover, when it came to posts regarding the distribution of Section 7 paraphernalia, the record shows Amazon treated such posts exactly the same regardless of viewpoint. AR1446 n.11.

The Board routinely discounts evidence of employer policy enforcement after a challenged action has been taken. *See Prof'l Med. Transp., Inc.*, 362 NLRB 144, 159 n.22 (2015) (alleged comparator evidence not particularly probative when it concerned actions occurring "well after" the underlying charges were filed); *Rockwell Automation/Dodge*, 330 NLRB 547, 550 n.12 (2000) (employer's failure to discharge four employees after the alleged discriminatee's discharge for a similar offense did not establish disparate treatment).

*Third*, even if the T-shirt Post was "equal" to Miller's, Board law is clear that an "isolated" incident of missed enforcement does not establish disparate treatment under Section 8(a)(1). In *Wal-Mart Stores, Inc.*, the Board held that one isolated incident did not reflect the type of "widespread worktime solicitation indicative of disparate application of the rule." 350 NLRB 879, 881 (2007). For a store that employed "more than 400" employees, "[t]he General Counsel showed no more than that one employee engaged in one act of tolerated solicitation." *Id.* The Board found that the "quantum of proven nonunion solicitation is insufficient to show that the [employer] enforced its no-solicitation rule disparately against union activity." *Id*. Here, the General Counsel points to one instance of alleged "tolerated solicitation" at a workplace of nearly 8,000 Associates. AR1480 n.101 (Member Kaplan, dissenting). The T-shirt Post simply does not evidence "widespread" disparate treatment.

The Board attempts to distinguish *Wal-Mart* by arguing that the timing of the *Wal-Mart* comparator evidence makes it inapposite. According to the Board, the "single incident" in *Wal-Mart* "occurred 7 years prior to [the Board's] decision." AR1446 n.11 (emphasis added). "By contrast," the Board reasons, Amazon allowed the T-shirt Post "mere months after it removed Miller's posting regarding the Juneteenth post." *Id.*

This distinction badly misstates *Wal-Mart*. The "7 years" in *Wal-Mart* represented the time it took the Board to issue its decision, not the gap between the "isolated" incident and the alleged discrimination. Instead, the comparator events in *Wal-Mart* took place just *months* apart. *Wal-Mart*, 350 NLRB at 881 ("Hammond had violated the Respondent's solicitation and distribution policy before July 12 [2000] and again in August [2000] … Here, the only evidence of tolerated nonunion solicitation is Sorensen's testimony that a single employee—Robinson—sold Avon products and candy in early 2000."). The same is true here.

## IV. AMAZON DID NOT UNLAWFULLY THREATEN MILLER.

Finally, the Board found that Tanelli had threatened Miller, based on its belief that an employee in Miller's position would have felt threatened by the statement that there would be "follow up" in the midst of Amazon's "aggressive anti-union response." AR1446. That finding conflicts with precedent and is not supported by substantial evidence.

**A.  An employer does not threaten an employee unless the statement would tend to interfere with the employee's Section 7 rights.**

The ALJ correctly found that "Tanelli did not threaten Miller with discipline during their July 12 meeting" when he told Miller there "would be additional follow up" if she reposted the message. AR1496. When determining whether a remark amounts to a threat, the Board applies an objective standard, assessing whether, in the totality of the circumstances, a statement would reasonably tend to interfere with an employee's free exercise of Section 7 rights. *See Consol. Bus Transit, Inc.*, 350 NLRB 1064, 1066 (2007), *enfd.*, 577 F.3d 467 (2d Cir. 2009) (per curiam). As the ALJ reasoned, "Tanelli's comment did not dissuade Miller from reposting the message and Miller was not disciplined for doing so." This "lack of an [sic] disciplinary 'follow up' would tend to confirm that there had been no threat of discipline in the first place." AR1496. Moreover, as the ALJ also noted, Tanelli had told Miller she was not in trouble and that the meeting was just to educate her on the policy. *Id*.

The totality of the evidence shows that Tanelli's statement did not reasonably tend to interfere with Miller's Section 7 rights. Tanelli was clear that he "just want[ed] to *follow up* with [Miller], let [Miller] know that the comment will be removed," and twice affirmed that Miller had "every right to [solicit signatures for petition] on nonworking time, in break areas." AR1488. His statement that if Miller posted the message again there may be "additional follow up"—i.e., more of the

same "follow up" in which he had just engaged—therefore cannot reasonably be construed as a threat. *See, e.g., Wynn Las Vegas, LLC*, 369 NLRB No. 91, *11 (May 29, 2020) (meeting to inform employee that conversation violated solicitation policy was not coercive, and was merely intended to put employee "on notice" of violation of policy); *see also Suburban Elec. Eng'rs/Contractors, Inc.*, 351 NLRB 1, 3 (2007) (ambiguous statement containing neither explicit nor implicit threat of discipline was insufficient to establish violation). The benign use of the phrase "follow up" throughout the meeting evidences that a reasonable person would not have construed this phrase as a threat. Miller herself used it when she asked Tanelli when he would "follow up" with her "in writing" regarding the decision to hide her post.

Finally, Miller continued to repost the same message after her meeting with Tanelli. This shows Tanelli's statement did not reasonably tend to interfere with her ability to exercise her Section 7 rights.

### B. The Board's conclusion that Tanelli threatened Miller ignores controlling precedent and is not supported by substantial evidence.

The Board's decision to overrule the ALJ and find that Tanelli unlawfully threatened Miller disregards the Act's Section 8(c) protections, misapplies legal precedent, and ignores the substantial record evidence.[6]

---

[6] The Board's finding depends entirely on its parallel finding that Amazon disparately enforced its Solicitation Policy. *See Woodlawn Hosp. v. NLRB*, 596 F.2d 1330, 1335 (7th Cir. 1979) (explaining that it was Congress's "intent to preserve an employer's right to discipline conduct not protected by the Act"). If the Court

The Board errs in relying on *Lush Cosmetics, LLC*, 372 NLRB No. 54 (2023), for its conclusion that a reasonable person could have viewed Tanelli's statement of "additional follow-up" as an unlawful threat. In *Lush*, the employer sent an employee a letter addressing a policy violation. *Id*. at *2. The Board found the letter "strongly suggested" that future violations could result in discipline because of the specific language contained in that letter. *Id.* at *4. It stated the employee's actions were "not acceptable" and "inappropriate," and noted that similar behavior in the future would be treated as "misconduct." *Id.* at *2.

There is no similar language used here. Tanelli reassured Miller twice that she had "every right to [solicit signatures for a petition] on nonworking time, in break areas." AR1488. The letter in *Lush* starkly contrasts with the casual, polite and generally friendly conversation between Tanelli and Miller.[7]

The Board deems Amazon's removal of the Signature Solicitation Post as "highly unusual," which would lead a reasonable employee to view Tanelli's statement as a threat. AR1447. But it was Miller's posting of the Signature Solicitation Post that was "highly unusual." There is no evidence that any other

_____

disagrees with that finding, *see supra* Section III, the claim against Tanelli necessarily fails.

[7] Even a cursory review of the audio recording of this exchange belies any notion that a reasonable person would have believed Tanelli was threatening Miller. AR1199 at 2:43-6:50.

employee sought to solicit signatures on the VOA Board. Amazon's subsequent enforcement of its Solicitation Policy was simply an ordinary and expected consequence of Miller's policy violation.

Moreover, the substantial record evidence undermines the Board's finding that "a reasonable employee certainly could have perceived [Amazon's removal of the post] as signaling a change in the Respondent's willingness to tolerate such posts." AR1447. Associates regularly addressed their support for the ALU on the VOA Board without ever being threatened or disciplined. Most of the nearly 400 posts on the VOA Board between May 1 and July 15, 2021, sharply criticized Amazon, and many directly supported the ALU. There is no evidence that any Associate was coerced or threatened for making these posts. Miller never testified that she felt threatened and she continued to post to the VOA Board, including three dozen criticisms of Amazon and several pro-ALU posts. Aside from her violation of the Solicitation Policy, Miller was never reprimanded for any of these posts. In fact, her repetitive posting of similar Juneteenth solicitations *after* the conversation with Tanelli suggests that no reasonable employee, including Miller, feared reprisal for his or her posts.

Finally, the Board's observation that Tanelli's remarks should be viewed through the lens of "the Respondent's aggressive anti-union response," AR1446-1447, is profoundly inappropriate. As already noted, an employer has a Section 8(c)

right to oppose unionization and to express its opinions to its employees, even "aggressively," as long as its expressions do not contain threats or promises of benefits. *See supra* Section I.A. Viewing Tanelli's comments as more likely to be unlawful simply because they were made during an alleged "anti-union" response is in tension with, if not a blatant violation of, Amazon's rights under Section 8(c). Indeed, it turns the protections of Section 8(c) on their head by using the employer's protected expression in opposition to unionization to *infer* the existence of a threat.

## CONCLUSION

The Board's mandatory-meeting rule offends the Act and the First Amendment. For these and all the foregoing reasons, Amazon respectfully requests that the Court grant its Petition and deny enforcement of the Board's Decision.

DATED: March 12, 2025                    Respectfully submitted,

                                         /s/ Elbert Lin
                                         Elbert Lin
Amber Rogers                             Kurt G. Larkin
HUNTON ANDREWS KURTH LLP                 Kevin S. Elliker
1445 Ross Avenue, Suite 3700             David N. Goldman
Dallas, Texas 75202                      HUNTON ANDREWS KURTH LLP
Telephone: (214) 979-3000                Riverfront Plaza, East Tower
Facsimile: (214) 880-0011                951 East Byrd Street
                                         Richmond, Virginia 23219
                                         Telephone: (804) 788-8200
                                         Facsimile: (804) 788-8218

*Counsel for Amazon.com Services LLC*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,983 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4. I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

Dated: March 12, 2025

/s/ Elbert Lin
Elbert Lin
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of March, 2025, a true copy of the foregoing was served on opposing counsel via electronic filing using the appellate CM/ECF system.

/s/ Elbert Lin
Elbert Lin
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200