IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————

AMAZON.COM SERVICES, LLC,

*Petitioner-Cross Respondent,*

versus

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross Petitioner.*

AMAZON LABOR UNION NO. 1, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,

*Intervenor.*

———————

On petition for review and cross-application for enforcement of an order
of the National Labor Relations Board

———————

BRIEF OF *AMICI CURIAE* THE CHAMBER OF
COMMERCE OF THE UNITED STATES OF AMERICA
*ET AL.* IN SUPPORT OF THE PETITIONER AND VACATUR

———————

Stephanie A. Maloney
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
T: (202) 463-5337

*Counsel for the Chamber of Commerce
of the United States of America*

Bryan Killian
Andrew R. Hellman
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
bryan.killian@morganlewis.com

*Counsel for All Amici*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1 through 26.1-3, and Federal Rule of Appellate Procedure 26.1, in addition to the persons and entities listed in the Certificates of Interested Persons (CIP) filed on November 22, 2024 (dkt. 3), March 12, 2025 (dkt. 34), and March 14, 2025 (dkt. 37), and the CIP within Petitioner-Cross-Respondent's Principal Brief, filed March 12, 2025 (dkt. 36) the following is a complete supplemental list of all persons and entities that have an interest in the outcome of this case:

- Associated Builders and Contractors, the Coalition for a Democratic Workplace, *Amicus Curiae*

- Chamber of Commerce of the United States of America, *Amicus Curiae*

- Morgan Lewis Bockius LLP, Counsel for All *Amici*
    - Hellman, Andrew R.
    - Killian, Bryan

- National Federation of Independent Business Small Business Legal Center, Inc., *Amicus Curiae*

- National Retail Federation, *Amicus Curiae*

- U.S. Chamber Litigation Center, Counsel for *Amicus Curiae* the Chamber of Commerce of the United States of America

  - o Maloney, Stephanie A.

  - o Von Bokern, Jordan L.

Further, *Amici Curiae* the Chamber of Commerce of the United States of America, Associated Builders and Contractors, the Coalition for a Democratic Workplace, the National Federation of Independent Business Small Business Legal Center, Inc., and the National Retail Federation state that they are not publicly held corporations, that they do not have parent corporations, and that no publicly held corporation owns 10% or more of their stock.

# CONTENTS

Interests of *Amici Curiae*     1

Statement of the Issue     5

Summary of Argument     6

Argument     11

I.  The Board misunderstands the Supreme Court's cases about unwilling listeners.     11

II.  The Board's decision regulates speech.     19

Conclusion     25

Certificates     26–27

# AUTHORITIES

## CASES

_303 Creative v. Elenis,_

    600 U.S. 570 (2023)............................................................................. 18

_Bldg. & Constr. Trades Council v. Associated Builders & Contractors_

    _of Mass./R.I., Inc.,_

    507 U.S. 218 (1993)............................................................................... 9

_Carey v. Brown,_

    447 U.S. 455 (1980)................................................................ 12, 13, 14

_Chamber of Commerce USA v. Bartolomeo,_

    Case No. 3:22-cv-01373-KAD (D. Conn.).............................................. 8

_Chamber of Commerce v. Brown,_

    554 U.S. 60 (2008)................................................................................. 9

_City of Austin v. Reagan Nat'l Advert. of Austin, LLC,_

    596 U.S. 61 (2022)............................................................................... 17

_Cohen v. California,_

    403 U.S. 15 (1971)........................................................................ 16, 17

*Dobbs v. Jackson Women's Health Org.,*

597 U.S. 215 (2022) .............................................................................. 17

*Elrod v. Burns,*

427 U.S. 347 (1976) .............................................................................. 24

*Erznoznik v. City of Jacksonville,*

422 U.S. 205 (1975) ....................................................................... 15, 17

*Frisby v. Schultz,*

487 U.S. 474 (1988) .......................................................... 12, 13, 14, 15

*Hill v. Colorado,*

530 U.S. 703 (2000) ..................................................................... *passim*

*Honeyfund.com Inc. v. Governor, State of Fla.,*

94 F.4th 1272 (11th Cir. 2024) .................................................... *passim*

*Kennedy v. Bremerton School District,*

597 U.S. 507 (2022) ....................................................................... 17, 18

*Kovacs v. Cooper,*

336 U.S. 77 (1949) ................................................................................ 15

*Lehman v. Shaker Heights,*

418 U.S. 298 (1974) ....................................................................... 15, 16

*Lorillard Tobacco Co. v. Reilly*,

    533 U.S. 525 (2001)..............................................................................24

*NLRB v. Gissel Packing Co.*,

    395 U.S. 575 (1969)................................................................................9

*R.A.V. v. St. Paul*,

    505 U.S. 377 (1992)......................................................................12, 14

*Rosenberger v. Rectors & Visitors of Univ. of Va.*,

    515 U.S. 819 (1995)......................................................................21, 22

*Rowan v. U.S. Post Office*,

    397 U.S. 728 (1970)..............................................................................15

*Snyder v. Phelps*,

    562 U.S. 443 (2011)..............................................................................17

*Sorrell v. IMS Health Inc.*,

    564 U.S. 552 (2011)..............................................................................23

*Ward v. Rock Against Racism*,

    491 U.S. 781 (1989)..............................................................................13

*Wollschlaeger v. Governor*,

    848 F.3d 1293 (11th Cir. 2017)...........................................................13

## STATUTES

29 U.S.C. § 158 ....................................................................................... 9

Me. Rev. Stat. tit. 26,

§ 600-B ................................................................................................ 6

Alaska Stat. § 23.10.490, *available at* https://www.elections.

alaska.gov/petitions/23AMLS/23AMLS-Bill.pdf .................................. 6

Cal. Labor Code § 1137 ............................................................................. 6

Conn. Gen. Stat. § 31-51q ........................................................................ 6

Haw. Rev. Stat. § 377-6............................................................................. 6

Ill. Pub. Act 103-0722 (July 31, 2024)...................................................... 6

Minn. Stat. § 181.531 ............................................................................... 6

N.J. Stat. §§ 34:19-9–19-11 ...................................................................... 6

N.Y. Lab. Law § 201-D .............................................................................. 6

Or. Rev. Stat. § 659.785 ........................................................................... 6

Vt. Stat. tit. 21, § 495o .............................................................................. 6

Wash. Rev. Code § 49.44.250 .................................................................... 6

OTHER AUTHORITIES

Colloquium, *Prof. Michael McConnell's Response*, 28 Pepp. L. Rev.

747 (2001) ............................................................................................. 17

Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev.

1267 (2007) ........................................................................................... 17

## INTERESTS OF *AMICI CURIAE* [1]

The **Chamber of Commerce of the United States of America** ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

**Associated Builders and Contractors** is a national construction industry trade association representing more than 23,000 members. Founded on the merit shop philosophy, ABC and its 67 chapters help members develop people, win work and deliver that work safely, ethically and

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

profitably for the betterment of the communities in which ABC and its members work. ABC's membership represents all specialties within the U.S. construction industry and is comprised primarily of firms that perform work in the industrial and commercial sectors. ABC's member companies seek to preserve their protected right to speak directly to their employees in response to union organizing.

The **Coalition for a Democratic Workplace** represents millions of businesses that employ tens of millions of workers across the country in nearly every industry. Its purpose is to combat regulatory overreach by the National Labor Relations Board, which through expansive interpretations of its own authority has threatened the wellbeing of employers, employees, and the national economy.

The **National Federation of Independent Business Small Business Legal Center, Inc.** is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. ("NFIB"), which is the nation's leading small business

association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB represents, in Washington, D.C., and all 50 state capitals, the interests of its members.

Established in 1911, the **National Retail Federation** ("NRF") is the world's largest retail trade association and the voice of retail worldwide. Retail is the largest private-sector employer in the United States. The NRF's membership includes retailers of all sizes, formats, and channels of distribution, spanning all industries that sell goods and services to consumers. The NRF provides courts with the perspective of the retail industry on important legal issues impacting its members. To ensure that the retail community's position is heard, the NRF often files *amicus curiae* briefs expressing the views of the retail industry on a variety of topics.

*Amici curiae* regularly advocate for the First Amendment rights of their members. An employer's free speech right to communicate his views on unionization is firmly established and constitutionally protected. It cannot be an unfair labor practice. *Amici* have a strong interest in the

Board's unlawful decision to overturn decades of precedent and hold that so-called "captive-audience meetings"—mandatory workplace meetings where an employer discusses unionization with its employees—are an unfair labor practice. The Board's contrary decision injures *amici* and their members.

# STATEMENT OF THE ISSUE

Whether the National Labor Relations Board violated the First Amendment's prohibition of content- and viewpoint-discriminatory regulation when the Board held that employers commit an unfair labor practice when they hold mandatory meetings to talk with employees about unionization but not when they hold mandatory meetings to talk about other topics.

# SUMMARY OF ARGUMENT

Governments across the country have been experimenting with a new strategy for silencing speech that labor unions oppose. At least a dozen States have enacted laws subjecting employers to private suits and/or civil penalties if they require employees to attend meetings where the employer presents its views on unionization or other topics the States disfavor. Law-abiding employers in those States face a no-win choice. Either stop talking about unionization at mandatory meetings, or talk about unionization only in optional meetings.[2]

In the decision on review, the National Labor Relations Board joined the crowd of regulators trying to placate labor unions by muzzling

---

[2] Most of the States ban mandatory workplace meetings on "religious matters" and "political matters," specially defined to include unionization: <u>California</u> (Cal. Labor Code § 1137); <u>Connecticut</u> (Conn. Gen. Stat. § 31-51q); <u>Illinois</u> (Ill. Pub. Act 103-0722 (July 31, 2024); <u>Maine</u> (Me. Rev. Stat. tit. 26, § 600-B); <u>Minnesota</u> (Minn. Stat. § 181.531); <u>New Jersey</u> (N.J. Stat. §§ 34:19-9–19-11); <u>New York</u> (N.Y. Lab. Law § 201-D); <u>Oregon</u> (Or. Rev. Stat. § 659.785); <u>Vermont</u> (Vt. Stat. tit. 21, § 495o); and <u>Washington</u> (Wash. Rev. Code § 49.44.250). <u>Alaska</u> approved a similar ban by initiative, which soon will be codified at Alaska Stat. § 23.10.490, *available at* https://www.elections.alaska.gov/petitions/23AMLS/23AMLS-Bill.pdf. <u>Hawaii</u>'s ban applies only to unionization and political matters. *See* Haw. Rev. Stat. § 377-6.

employers. The Board overturned decades of precedent and held that, henceforth, it will be an unfair labor practice for employers to convene "captive-audience meetings," defined as "mandatory meetings urging the employees to reject union representation." AR1443. The Board's decision in this case mimics the states laws mentioned above. An employer faces federal penalties if it mandates that employees attend a meeting where the employer addresses a disfavored topic (unions) or expresses a disfavored viewpoint (urging employees to reject union representation).

Like defenders of the state laws, the Board insists its rule does not violate the First Amendment because, by targeting an employer's act of mandating attendance at meetings, the decision regulates *conduct* rather than *speech*. *See, e.g.*, AR1456 ("[E]xercising the power to compel attendance is quintessentially conduct"). That defense is demonstrably false. The Board has not forbidden *all mandatory meetings*; it has forbidden only mandatory meetings *about unionization*. The Board's rule, in other words, is content-discriminatory. Indeed, it is obviously content-discriminatory, for the Board itself confessed that "we prohibit captive-audience

meetings (as defined) and not all employer-mandated meetings in the workplace." AR1466.

That content discrimination dooms the Board's decision, just as it dooms state laws imposing similar content-discriminatory restrictions on mandatory meetings.[3] Last year, this Court confronted a similar law and explained that "[w]hen the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech." *Honeyfund.com Inc. v. Governor, State of Fla.*, 94 F.4th 1272, 1278 (11th Cir. 2024). So too here. Under the Board's decision, only mandatory workplace meetings about unionization are unfair labor practices.

Incredibly, the Board perceived "no serious constitutional issue" with drawing content-discriminatory lines. In the Board's view, First Amendment concerns take a backseat because the National Labor Relations Act *requires* the Board to draw content-discriminatory lines. *See* AR1466.

---

3  Some of the *amici* are challenging similar laws in Connecticut and Minnesota. *See Chamber of Commerce USA v. Bartolomeo*, Case No. 3:22-cv-01373-KAD (D. Conn.); *Minn. Chapter of Associated Builders & Contractors*, Case No. 0:24-cv-536-KMM (D. Minn.).

But the First Amendment does not yield to a statute—not that the National Labor Relations Act condones or compels First Amendment violations, as the Board claims. Congress added Section 8(c) to the Act, 29 U.S.C. § 158(c), to "implement[] the First Amendment" as to employer speech. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969). Section 8(c) goes beyond the First Amendment and establishes a broad "zone" of free labor speech that is "protected and reserved for market freedom." *Chamber of Commerce v. Brown*, 554 U.S. 60, 67–68 (2008) (quoting *Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993)); *see also id.* ("It is indicative of how important Congress deemed such 'free debate' that Congress amended the NLRA rather than leaving to the courts the task of correcting the NLRB's decisions on a case-by-case basis.").

The First Amendment clearly forbids *all* regulators—from the National Labor Relations Board to State legislatures—from regulating activities in ways that discriminate against the content or viewpoint of someone's speech. So, even if mandating employee attendance at a workplace meeting were problematically coercive conduct, the First

Amendment still forbids the Board from making the content (much less the viewpoint) of an employer's speech the trigger for determining whether a particular mandatory meeting is or is not lawful. This Court should decisively reject the Board's decision and make clear to all that content-discriminatory regulations of mandatory meetings are constitutionally intolerable.

# ARGUMENT

The Board's decision subjects the Nation's employers to unfair-labor-practice liability for holding mandatory meetings to discuss unionization with their employees. As such, the Board's interpretation of the Act conditions an employer's ability to take an action (mandate employee attendance at a meeting) on what the employer says at the meeting. By linking employer conduct to employer speech in this flagrantly content-discriminatory way, the Board's decision violates the First Amendment rights of employers. The Petitioner and the dissenting Board Member raised these constitutional concerns, and the Board majority gave the First Amendment short shrift. Viewed correctly, the First Amendment requires vacating the Board's decision.

## I. The Board misunderstands the Supreme Court's cases about unwilling listeners.

Relying heavily on *Hill v. Colorado*, 530 U.S. 703 (2000), the Board claims that employers have no First Amendment right to talk to "unwilling listeners" when the listeners are "captive," that is, when it is "impractical for the unwilling viewer or auditor to avoid exposure." AR1456

(quoting *Hill*, 530 U.S. at 716–718); *see* AR1461 ("[T]he First Amendment gives no one … a right to press even 'good' ideas on an unwilling recipient") (quoting *Hill*). Thus, the Board defends its ban on mandatory meetings as "accommodat[ing] employees' right to be left alone." AR1457. The Board's reliance on *Hill* is entirely misplaced. *Hill* and its predecessors articulate a narrow holding that has no application here; indeed, *Hill* shows that the Board's decision violates the First Amendment.

*1.* Whatever authority the government has to silence speakers from talking to unwilling listeners, the government cannot exercise that authority in content- or viewpoint-discriminatory ways. The Supreme Court affirmed that principle of neutrality in *R.A.V. v. St. Paul*, 505 U.S. 377 (1992). The Court discussed a range of First Amendment precedents exemplifying the difference between content-neutral and content-discriminatory regulations of speech, including two cases where the government (like the Board here) had relied on the unwilling-listener rationale. *See id.* at 386 (discussing *Frisby v. Schultz*, 487 U.S. 474 (1988), and *Carey v. Brown*, 447 U.S. 455 (1980)). *Frisby* upheld a content-neutral total ban on residential picketing, whereas *Carey* struck down a content-

discriminatory partial ban on residential picketing (labor protests were exempt). Because the *Frisby* ban was content-neutral, the Court accepted the government's assertion that the ban was necessary to protect home occupants from the inescapable annoyance of picketing outside. *See Frisby*, 487 U.S. at 487. Because the *Carey* ban was content-discriminatory, however, the government had to specifically justify the law's discriminatory aspects; "the exclusion for labor picketing cannot be upheld as a means of protecting residential privacy for the simple reason that nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy." *Carey*, 447 U.S. at 465.

Speech restrictions premised on protecting unwilling listeners are essentially "time, place, or manner" restrictions and are constitutional if and only if they are content-neutral. *Cf. Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (holding that "time, place, or manner" restrictions are constitutional only if "justified without reference to the content of the regulated speech"). Thus, the Supreme Court has never relied on the unwilling-listener rationale to uphold a content-discriminatory law. *See Wollschlaeger v. Governor*, 848 F.3d 1293, 1308 (11th Cir. 2017)

(*en banc*). Not even in *Hill*, the case on which the Board principally relies: according to the Supreme Court, the Colorado law barring leafletting and soliciting near abortion clinics and healthcare facilities survived because it was content-neutral. *See Hill*, 530 U.S. at 720–723 (distinguishing *Carey* as involving a discriminatory law); *see also Honeyfund.com*, 94 F.4th at 1280 (explaining that *Hill* involved a content-neutral restriction to protect unwilling listeners).

*Frisby*, *Carey*, and *R.A.V.* prove that the Board cannot avail itself of the unwilling-listener rationale here. As the Board admits, its decision generates a content-discriminatory rule: employers cannot hold mandatory meetings to discuss unionization but may hold mandatory meetings to discuss other topics. *See* AR1466. As in *Carey*, that distinction cannot be upheld as a means of protecting unwilling listeners "for the simple reason that nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy." *Carey*, 447 U.S. at 465. Because the First Amendment does not tolerate subjecting union-related mandatory meetings to special restrictions while allowing mandatory meetings on

other topics to proceed freely, the First Amendment (and Section 8(c)'s implementation of it) defeats the Board's decision.

*2.* The Board also erred by applying the unwilling-listener rationale without regard to the location where a mandatory meeting occurs. The unwilling-listener rationale allows for regulation of speech "only when the speaker intrudes on the privacy of the home or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975) (citation omitted). Thus, the unwilling-listener rationale saved a law banning *residential* picketing, *see Frisby*, 487 U.S. at 476–477, a law allowing *homeowners* to opt out of unwanted *residential* mailings, *see Rowan v. U.S. Post Office*, 397 U.S. 728, 738 (1970), and a law barring loud sound trucks *in residential neighborhoods*, *see Kovacs v. Cooper*, 336 U.S. 77, 88–89 (1949).

The list of places beyond the home where the unwilling-listener rationale justified restricting speech contains just a single entry—*Hill*.[4]

---

[4]  The Board cites *Lehman v. Shaker Heights*, 418 U.S. 298 (1974), as if it held that public transportation is a place where the
(footnote continued on next page)

That list is so short because there are few nonresidential places where listeners have "substantial privacy interests" tantamount to those which we have inside our homes. *Cohen v. California*, 403 U.S. 15, 21 (1971) ("The ability of government … to shut off discourse solely to protect others from hearing it is … dependent upon a showing that *substantial privacy interests* are being invaded in an essentially intolerable manner." (emphasis added)). The *Hill* Court held that abortion clinics meet that high standard, owing to the "recognizable privacy interest in avoiding unwanted communication" when accessing "a medical facility." *Hill*, 530 U.S. at 716–717.[5]

---

government can silence speech to protect unwilling listeners. *See* AR1456. All *Lehman* held is that a public transportation system is not a public forum, so the public operator of that system has broad discretion to reject advertisements to display on buses and trains, same as any private transportation provider could. *See Lehman*, 418 U.S. at 302–303.

5  *Hill* is a well-known outlier, and this Court, like the Supreme Court, should not extend *Hill*'s dubious application of the unwilling-listener rationale beyond its particular facts. *See Hill*, 530 U.S. at 742 (Scalia, J., dissenting) (recognizing that *Hill* stands "in stark contradiction of the constitutional principles we apply in all other contexts" outside abortion); *id.* at 765 (Kennedy, J., dissenting) (recognizing that *Hill* "contradicts more than a half century of well-established First Amendment principles"). *Hill* remains one

(footnote continued on next page)

The Supreme Court has rejected the unwilling-listener rationale in a wide range of other places. *See, e.g.*, *Cohen*, 403 U.S. at 21–22 (courthouse); *Erznoznik*, 422 U.S. at 212 (sidewalks and public streets); *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (cemetery); *Kennedy v. Bremerton School District*, 597 U.S. 507, 525 (2022) (high school football games). In some sense, listeners in those places may be captives, but the unwilling-listener rationale requires more than captivity. It requires that listeners also have strong privacy interests in the particular place. Without the privacy-interest element, the doctrine would easily slide into a heckler's veto. "The plain, if at times disquieting, truth is that in our pluralistic society, constantly proliferating new and ingenious forms of expression, 'we are inescapably captive audiences [f]or many purposes.'" *Erznoznik*,

---

of the Supreme Court's most widely criticized First Amendment decisions. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 92, 103 (2022) (Thomas, J., joined by Gorsuch & Barrett, JJ., dissenting); *Honeyfund.com*, 94 F.4th at 1280 (noting the Court "labeling *Hill* as one of several cases that 'distorted First Amendment doctrines'" (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 287 & n.65 (2022))); *see also* Colloquium, *Prof. Michael McConnell's Response*, 28 Pepp. L. Rev. 747, 747-48 (2001); Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1298 & n.174 (2007).

422 U.S. at 208, 210 (quotation omitted). The Constitution does not give *listeners* the trump card. The First Amendment protects *speakers*. For unwilling listeners, the simple answer is that "learning how to tolerate speech … of all kinds is part of learning how to live in a pluralistic society, a trait of character essential to a tolerant citizenry." *Kennedy*, 597 U.S. at 538 (quotation omitted); *see 303 Creative v. Elenis*, 600 U.S. 570, 602 (2023) ("If liberty means anything at all, it means the right to tell people what they do not want to hear." (quotation omitted)).

The Board erred as a matter of law in assuming that the unwilling-listener rationale should extend outside the home to cover employees inside an office, factory, or other workplace. *See* AR1456. The Supreme Court has never held that employees have a right not to hear unwanted speech while at work. This Court has rightly held that employees do not have that right; in *Honeyfund.com*, the Court rejected Florida's identical argument for shielding employees from disfavored speech at work. *See Honeyfund.com*, 94 F.4th at 1281 n.5. It may be impractical for employees to avoid listening to employers, but the unwilling-listener rationale applies only where listeners have intense, home-like privacy interests.

The Board did not suggest, nor could anyone credibly suggest, that employees have such privacy interests inside their employers' workplace.

The Board's decision has the unprecedented effect of regulating what a speaker may say on his or her own property. The Supreme Court has never relied on the unwilling-listener rationale to silence a private speaker who owns, operates, or controls the place where a constitutionally protected speech or meeting occurs. Yet that's what the Board's decision does; employers are limited in what they can say at meetings they hold inside their own premises. Contrary to the Board's assertion, AR1465-66, the Board's extension of *Hill* and the unwilling-listener lines of cases to silence employers in the workplace is unprecedented.

## II.   The Board's decision regulates speech.

Throughout its decision, the Board downplayed free-speech concerns by contending that its decision regulates only conduct—specifically, the conduct of compelling employees to attend a meeting. *See, e.g.*, AR1465 ("[A]n employer's use of coercion to compel attendance at a captive audience meeting is not immunized because the meeting involves the employer's expression of views."); *id.* n.46 ("[O]ur holding does not reflect

disapproval of the employer's message, but of the employer's coercion of employees as a means of ensuring that they will listen to the employer's message"). Yet even if, in theory, one could differentiate between the *conduct* of requiring attendance at a meeting and the *speech* spoken during a meeting, the Board did not interpret the Act as regulating only conduct. The Board did not interpret the Act as banning *all* mandatory meetings or *all* ways in which employers compel attendance at meetings. The Board interpreted the Act as banning only mandatory meetings *where the employer expresses its views on unionization*.

This Court has a simple test for evaluating whether a law regulates conduct-not-speech or whether it regulates conduct-and-speech:

> When the conduct-not-speech defense is raised, courts need tools to distinguish between the two. One "reliable way" to sort them out is to "ask whether enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated." In other words, we ask whether the message matters, or just the action. When the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech.

*Honeyfund.com*, 94 F.4th at 1278 (citations omitted). That test dooms the Board's decision. As the Board interpreted Section 8(a)(1) of the National Labor Relations Act, only mandatory meetings *about unionization* count

as unfair labor practices now. Mandatory meetings about any other top-
ics—from new software to the employer's views on hot-button issues like
politics—do not count as unfair labor practices. On the Board's interpre-
tation of the Act, "the message matters," and Section 8(a)(1) is therefore
"functionally a regulation of speech." *Id.*

The Board's attempt to distinguish *Honeyfund.com* fails. Primarily,
the Board insists that *Honeyfund.com* does not apply here because the
Florida law was viewpoint-discriminatory whereas the Board's interpre-
tation is only content-discriminatory. *See* AR1465. But whether a law is
content-neutral, content-discriminatory, or viewpoint-discriminatory is
beside the point. The test articulated in *Honeyfund.com* applies anytime
a government officer claims that a law regulates conduct, not speech.

That said, the Board's distinction of *Honeyfund.com* is both legally
and factually illusory. Content discrimination and viewpoint discrimina-
tion are not qualitatively different things. Both content-discriminatory
laws and viewpoint-discriminatory laws do the same evil: they subject
speech to special regulation "because of its message." *Rosenberger v. Rec-
tors & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). The difference
between them is a matter of degree. Viewpoint discrimination is a form

of content discrimination—a particularly "egregious form," *id.* at 829, and thus is subjected to the most exacting, stricter-than-strict judicial scrutiny. So, even if the Florida law in *Honeyfund.com* was only viewpoint-discriminatory, and even if the Board's decision was only content-discriminatory, *Honeyfund.com* would fully apply here.

But the Florida law and the Board's decision are not all that different. Both discriminate against the content of employer speech, and both discriminate against the viewpoint of employer speech. In *Honeyfund.com*, the Court repeatedly characterized the Florida law as, not just viewpoint-discriminatory, but also content-discriminatory. *See Honeyfund.com*, 94 F.4th at 1280 ("Florida's law is meaningfully different, specifically targeting certain content and viewpoints."); *id.* ("[T]he Act is a content- and viewpoint-based speech regulation."). For its part, the Board's decision is viewpoint discriminatory. The "captive-audience" meetings the Board prohibits are, in the Board's own words, meetings where an employer "urg[es] the employees to reject union representation." AR1443. That is plainly targeting a particular, anti-union viewpoint.

Perhaps recognizing that its decision targets anti-union viewpoints, the Board claims that *all* mandatory meetings about unionization are unfair labor practices, regardless of the views the employer expresses. *See* AR1465-66. That claim is not credible, yet even if credited, it would not eliminate the viewpoint-discriminatory aspects of the Board's decision. The fact remains that that the Board's decision silences only *employer* speech. Laws that target and apply only to particular speakers are viewpoint-discriminatory because they exclude an entire category of speakers and their viewpoints from debate on a topic. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564–565 (2011) (equating speaker-based restrictions with viewpoint-discrimination). Silencing employers from commenting on unionization is obviously an effort to promote pro-union viewpoints.

The Board's final attempt to distinguish *Honeyfund.com* is a distraction. The Board claims that the Florida imposed more severe penalties on employers than the Board's decision imposes. *See* AR1465 n.47. Even accepting that assertion as true—the Board cites no evidence that being found to have committed an unfair labor practice is actually a less severe sanction—it does not save the Board's unconstitutional content-based

restriction of employers' speech. The First Amendment protects speakers from penalties, big and small. Even "fin[ing] a person a penny" can chill speech and violate First Amendment rights. *Elrod v. Burns*, 427 U.S. 347, 359 n.13 (1976). "There is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001).

# CONCLUSION

The Board's order should be vacated.


Dated: March 19, 2025          Respectfully submitted,

                               /s/ Bryan Killian

                               Bryan Killian
                               Andrew R. Hellman
                               MORGAN, LEWIS & BOCKIUS LLP
                               1111 Pennsylvania Ave., NW
                               Washington, D.C. 20004
                               T: 202-739-3000
                               bryan.killian@morganlewis.com
                               *Counsel for All Amici*

                               Stephanie A. Maloney
                               Jordan L. Von Bokern
                               U.S. CHAMBER LITIGATION CENTER
                               1615 H Street, NW
                               Washington, DC 20062
                               (202) 463-5337
                               *Counsel for the Chamber of Commerce
                               of the United States of America*

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4,033 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Century, 14-point font.

Dated: March 19, 2025                    /s/ Bryan Killian

# CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2025, I electronically filed the foregoing brief with the Clerk of the United States Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 19, 2025          /s/ Bryan Killian